No. 04-488

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006  MT 11

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

GREGORY MICHAEL MIZENKO,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the Twelfth Judicial District,
In and For the County of Chouteau, Cause No. DC 2003-13,
Honorable David G. Rice, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Martin W. Judnich (argued), Missoula, Montana

        For Respondent:

            Honorable Mike McGrath, Attorney General; John Paulson (argued),
            Special Assistant Attorney General, Helena, Montana

            Stephen A. Gannon, County Attorney, Fort Benton, Montana

        For Amici Curiae:

            Michael Donahoe, Bozeman, Montana (Criminal Defense Trial Lawyers)

            Marty Lambert, Bozeman, Montana (County Attorneys Association)

            Christine A. Mandiloff, Helena, Montana (Montana Coalition Against
            Sexual and Domestic Violence)

Heard:  April 15, 2005
Submitted:  April 26, 2005
Decided:  January 11, 2006

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     The jury convicted Gregory Mizenko (Mizenko) of his third offense of Partner or Family Member Assault in violation of § 45-5-206, MCA.  During trial, the District Court admitted a number of hearsay statements from the victim, Mizenko's wife, Debra. Mizenko appeals.  We affirm.

¶2     The issue is:  Were Debra's statements testimonial?[1]

## BACKGROUND

¶3     The Chouteau County Attorney filed an information charging Mizenko with Partner or Family Member Assault in violation of § 45-5-206, MCA.  Dawn Grove, the Mizenkos' neighbor, testified at trial that Debra was out of breath when she appeared at the Groves' house late one afternoon.  Debra had a wound on her cheek or jaw area.  Grove testified that Debra asked her to call 911 as well as a friend, Carol Richard.  Grove called 911 and handed the phone to Debra.  Tami King answered the 911 call.

¶4     Although the State subpoenaed Debra, she failed to appear at trial.   Grove testified that Debra "said that her husband had been drinking and was trying to hurt her."  Seeking clarification of Debra's statement to her, the prosecutor asked Grove:  "And you stated that he had been drinking and had hurt her?"  "Yes," Grove replied.

---

[1]If testimonial, we would consider whether the State made a showing that Debra was unavailable at trial and that Mizenko had an opportunity to cross-examine Debra at the time she made the statements, as required to overcome a Sixth Amendment Confrontation Clause objection.

2

¶5      Presumably relying on the excited utterance exception of Rule 803(2), M.R.Evid., the District Court overruled an objection to the following testimony from King about her conversation with Debra.

> [Prosecution]:  Do you recall what Mrs. Mizenko told you?
>
> [King]:  She said that Greg hit her, pushed her down and she had hair—he had pullen [sic] out her hair.
>
> [Prosecution]:  Okay.  Did she request law enforcement?
>
> [King]:  Yes.  She wanted him arrested, is what she said.

Without objection from Mizenko, the court also allowed the prosecution to play the audiotape of the 911 call for the jury.  On the tape, Debra, breathing heavily and in a cracking and wavering voice, states, "he hit me, pulled out my hair, knocked me down.  I tried so hard not to call [gasp], but umm, this is ridiculous.  I can't do this anymore."

¶6      Officer Scott Buennemeyer testified that when he arrived at the Mizenko home, he saw a bruise on Debra's face.  As he walked through the house, he saw pens and pencils and dog food on the floor of the kitchen.  He saw a lock of hair near the pet bowl in the kitchen and another lock of hair on the floor in the living room.  The District Court twice sustained foundational objections to Buennemeyer's testimony that the hair was Debra's.  Finally, the prosecution asked Buennemeyer, "Did Debra Mizenko tell you where this hair came from?"  Overruling Mizenko's hearsay objection, the District Court allowed Buennemeyer to answer.  He testified, "Yes, she did.  She told me it was her hair, pulled from her head, during an altercation at her residence, at that time and date."

3

¶7 After the State rested, Mizenko objected to the hearsay statements from Grove, King and Buennemeyer, arguing that they denied him his right to confrontation. The District Court ruled that Mizenko's cross-examination of the witnesses who had contact with Debra satisfied his Sixth Amendment right to confrontation. The jury found Mizenko guilty by a unanimous verdict.

**STANDARD OF REVIEW**

¶8 We will review a district court's evidentiary decision to determine whether it abused its discretion. *State v. Cameron*, 2005 MT 32, ¶ 14, 326 Mont. 51, ¶ 14, 106 P.3d 1189, ¶ 14. There is no discretion, however, in properly interpreting the Sixth Amendment. *See Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001), 532 U.S. 424, 456-36, 121 S.Ct. 1678, 1685-86, 149 L.Ed.2d 674, 686-87 (indicating that *de novo* review is appropriate when applying a constitutional standard or concept, not capable of precise articulation, to the facts of a particular case); *Crawford v. Washington* (2004), 541 U.S. 36, 42, 124 S.Ct. 1354, 1359, 158 L.Ed.2d 177, 187 (applying *de novo* review to the Washington Supreme Court's application of the Sixth Amendment, albeit without expressly articulating any standard of review). We review a district court's conclusions of law and interpretations of the Constitution or the rules of evidence, *de novo*. *State v Villanueva*, 2005 MT 192, ¶ 9, 328 Mont. 135, ¶ 9, 118 P.3d 179, ¶ 9; *State v. Mathis*, 2003 MT 112, ¶ 8, 315 Mont. 178, ¶ 8, 68 P.3d 756, ¶ 8; *see United States v. Blue Bird* (8th Cir. 2004), 372 F.3d 989, 991.

**DISCUSSION**

**I. *Crawford* Changes the Landscape**

¶9      "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.  Until recently, the Supreme Court had allowed courts to admit hearsay when that evidence bore "adequate 'indicia of reliability.'" *Ohio v. Roberts* (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (citation omitted).  Further, "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception" or if the evidence has "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608.  Thus, under *Roberts*, the rules of evidence subsumed any substantive restrictions the Sixth Amendment had placed on admitting hearsay.

¶10     In 2004 the United States Supreme Court decided *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, in which the Court dramatically bifurcated hearsay law from the Confrontation Clause.  The Confrontation Clause of the Sixth Amendment allows courts to admit hearsay against criminal defendants in only two instances: (1) if the hearsay is testimonial, the defendant must have had an opportunity to cross-examine the declarant and the prosecution must show that the declarant is unavailable to appear at trial, *Crawford*, 541 U.S. at 59, 124 S.Ct. at 1369, 158 L.Ed.2d at 197; or (2) if the hearsay is nontestimonial, the hearsay must bear adequate indicia of reliability or particularized guarantees of trustworthiness.  *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.  In *Crawford*, although the Supreme Court gave numerous examples, it

5

specifically declined to define what constitutes "testimonial" evidence. *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203. Mizenko's case forces this Court to deal with the definitional void left by *Crawford*.

## II. Testimonial vs. Nontestimonial

¶11 Testimony is "'[a] solemn declaration or affirmation *made for the purpose* of establishing or proving some fact.'" *Crawford*, 541 U.S. at 51, 71, 124 S.Ct. at 1364, 1375, 158 L.Ed.2d at 192, 205 (quoting 1 N. Webster, An American Dictionary of the English Language (1828)) (emphasis added). However, "[h]earsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), M.R.Evid. Debra's statements to Grove, King, and Buennemeyer are all clearly hearsay. As *Crawford* recognizes, though, whether the statements are testimonial is a separate issue. Unfortunately, the facts of this case do not fit neatly within *Crawford*'s examples of testimonial or nontestimonial.

¶12 Mizenko proffers that all hearsay is testimonial if it is (1) substantive and (2) accusatorial. While appealing in its clarity and ease of application, this definition is overly broad; it would require courts to exclude more evidence than the Sixth Amendment requires. Specifically, the Supreme Court has decided that, although a statement may be substantively accusatory, the Sixth Amendment would not exclude "[a]n off-hand, overheard remark," albeit accusatory, because such an off-hand remark "bears little resemblance to the civil-law abuses the Confrontation Clause targeted," *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192.

6

¶13 In the cross-examination essential to the adversarial system, the defendant tests the witness's testimony in the most rigorous, demanding, and exacting test. *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370, 158 L.Ed.2d at 199. Through cross-examination, the defendant can delve into the witness's story and potentially reveal inherent flaws, inconsistencies, and insidious motives. Indeed, John Henry Wigmore called cross-examination the "'greatest legal engine ever invented for the discovery of truth.'" *California v. Green* (1970), 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497 (quoting 5 John Henry Wigmore, A Treatise on the Anglo-American System of Evidence in Trials at Common Law § 1367 (3d ed. 1940)).

¶14 Contrary to the holding in *Roberts* that allowed courts to decide whether testimony has "adequate indicia of reliability" or "particularized guarantees of trustworthiness," 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608, the Sixth Amendment itself defines the indicia of reliability and guarantees of trustworthiness necessary to admit testimonial evidence. The Sixth Amendment establishes confrontation through cross-examination as the minimally adequate index of reliability and guarantee of trustworthiness. *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370, 158 L.Ed.2d at 199. ("It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.")

¶15 Testimonial evidence requires a more demanding test of reliability than non-testimonial evidence because the framers intended to protect the defendant from the evils inherent in testimonial evidence. Through example, *Crawford* highlights one particular evil:

7

"First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Crawford*, 541 U.S. at 50, 124 S.Ct. at 1363, 158 L.Ed.2d at 192. *Crawford* elaborates on the two concerns engendered by this evidence. The first is the concern with possible prosecutorial misconduct and overzealousness:

> The Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by "neutral" government officers. But even if the court's assessment of the officer's motives was accurate, it says nothing about Sylvia's perception of her situation. Only cross-examination could reveal that.

*Crawford*, 541 U.S. at 66, 124 S.Ct. at 1373, 158 L.Ed.2d at 202. In identifying the possible purposes behind the protections afforded by the Confrontation Clause, Professor Mosteller notes that this concern may manifest in either of two ways: "government[al] manipulation of the witness in creating the evidence-manipulating the words uttered"; or "governmental manipulation of the recording of the statement rather than manipulation of what was said." Robert P. Mosteller, *Crawford v. Washington*: Encouraging and Ensuring the Confrontation of Witnesses, 39 U. Rich. L. Rev. 511, 569-70 (2005).

¶16    The second concern is with the declarant's opportunity to abuse the criminal justice system in order to punish, to exact revenge on, or to shift the blame to the defendant.[2] The trial of Sir Walter Raleigh, as quoted in *Crawford*, illustrates this danger:

---

[2]Professor Mosteller similarly identifies the other possible purpose of the Confrontation Clause as "protect[ing] the defendant from malicious falsehoods or even errors by the witness independent of governmental manipulation." Mosteller, 39 U. Rich. L. Rev. at 571.

Lord Cobham, Raleigh's alleged accomplice, had implicated him in an examination before the Privy Council and in a letter. At Raleigh's trial, these were read to the jury. Raleigh argued that Cobham had lied to save himself: "Cobham is absolutely in the King's mercy; to excuse me cannot avail him; by accusing me he may hope for favour."

*Crawford*, 541 U.S. at 44, 124 S.Ct. at 1360, 158 L.Ed.2d at 188 (quoting 1 D. Jardine, Criminal Trials 435 (1832)). As the Sixth Circuit has noted, cross-examination is essential to expose possible bias or motive of the declarant:

Indeed, the danger to a defendant might well be greater if the statement introduced at trial, without a right of confrontation, is a statement volunteered to police rather than a statement elicited through formalized police interrogation. One can imagine the temptation that someone who bears a grudge might have to volunteer to police, truthfully or not, information of the commission of a crime, especially when that person is assured he will not be subject to confrontation.

*United States v. Cromer* (6th Cir. 2004), 389 F.3d 662, 675.

¶17 *Crawford* characterizes "a casual remark to an acquaintance" as nontestimonial. *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192. The word "casual," rather than modifying the setting in which the declarant made the statement, modifies the declarant's assumption as to what use, if any, the listener might make of the statement. When an objective declarant would reasonably expect the state to use her statements at trial, the Sixth Amendment demands that courts exclude such statements absent an opportunity for confrontation. *United States v. Saget* (2nd Cir. 2004), 377 F.3d 223, 228-29; *Horton v. Allen* (1st Cir. 2004), 370 F.3d 75, 84.

¶18 When speaking to government agents or officials, the circumstances are such that a declarant should reasonably expect that the government will seek to use those statements at

trial. Whereas when a declarant speaks with her neighbor across the backyard fence, she has much less of an expectation that the government will make prosecutorial use of those statements. Any situation in which the declarant is knowingly speaking to the police or government agents implicates concerns both with the declarant's motivation and with the possibility of prosecutorial misconduct. The declarant expects and understands that the government may use her statements at trial, and the police may deliberately or inadvertently color the substance of their statements to reflect their own prejudices and understandings of the situation, or may selectively record the declarant's statements.

¶19 Likewise, when the declarant signs an affidavit or gives a recorded statement, the declarant expects that the state will seek to make use of those statements. *See White v. Illinois* (1992), 502 U.S. 346, 365, 112 S.Ct. 736, 747, 116 L.Ed.2d 848, 865 (Thomas, J., joined by Scalia, J., concurring in part and concurring in the judgment). Although the government may not be directly involved in obtaining recorded or sworn testimony, a declarant who provides such testimony clearly anticipates that the state may use the statements against an accused. *See White*, 502 U.S. at 365, 112 S.Ct. at 747, 116 L.Ed.2d at 865 ("extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," implicate the Confrontation Clause) (Thomas, J., joined by Scalia, J., concurring in part and concurring in the judgment) (quoted in *Crawford*, 541 U.S. at 51-52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193 (ellipses in quotation)); *see also* Richard D. Friedman, The Confrontation Clause Re-Rooted and Transformed, 2004 Cato Sup. Ct. Rev. 439, 458 ("Thus, if just before trial a person shoved

10

a written statement under the courthouse door, asserting that the accused did in fact commit the crime, that would plainly be testimonial even though no government official played a role in preparing the statement.").

¶20     A declarant who is alerting law enforcement of imminent and immediate danger has much less of an expectation that the state will seek to make prosecutorial use of her statements at trial. *United States v. Brun* (8th Cir. 2005), 416 F.3d 703 (911 call from adolescent boy regarding an argument escalating into an assault); *see People v. Moscat* (N.Y. Crim. Ct. 2004), 3 Misc.3d 739, 746 (deciding that a 911 call "is the electronically augmented equivalent of a loud cry for help"); *Leavitt v. Arave* (9th Cir. 2004), 383 F.3d 809, 830 n.22 (determining that statements to police by a victim of an attempted break-in identifying the perpetrator are nontestimonial because they were volunteered in order to end "a frightening intrusion into her home"); *People v. Coleman* (N.Y. App. Div. 2005), 16 A.D.3d 254, 255 ("[t]he information conveyed by the 911 caller was for the purpose of urgently seeking police intervention"; "we note that the caller repeatedly emphasized that one or both of the victims was 'bleeding real bad.' This indicates that his primary motivation was to call for urgent assistance, and not to phone in an anonymous accusation"). Whether a reasonable declarant would expect statements made during a call to 911 to be used prosecutorially will depend on the content of the conversation and the particular circumstances that led to the call being placed.

¶21     We do not assume that a declarant speaking to her neighbor across the backyard fence reasonably expects that the government will seek to use her statements as testimony. For

11

most people, none of their "casual" remarks ever surface in court. Seldom do people make such "casual remark[s]," *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192, with "any anticipation by the speaker that the statement will be conveyed beyond the immediate audience, let alone that it will be used at trial," Mosteller, 39 U. Rich. L. Rev. at 573. In *United States v. Franklin* (6th Cir. 2005), 415 F.3d 537, the court held that where a declarant Clarke's statements were to a friend, Wright, they were nontestimonial. "Clarke made the statements to his friend by happenstance; Wright was not a police officer or a government informant seeking to elicit the statements to further a prosecution against Clarke or Frankin. To the contrary, Wright was privy to Clarke's statements only as his friend and confidant." *Franklin*, 415 F.3d at 545; *United States v. Gibson* (6th Cir. 2005), 409 F.3d 325, 338 (describing statements as nontestimonial where the "statements were not made to the police or in the course of an official investigation . . . [nor in an attempt] to curry favor or shift the blame"); *United States v. Manfre* (8th Cir. 2004), 368 F.3d 832, 838 n.1 ("Mr. Rush's comments were made to loved ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks"); *United States v. Lee* (8th Cir. 2004), 374 F.3d 637, 645 ("Kehoe's statements to his mother do not implicate the core concerns of the confrontation clause"). Likewise, many state courts have been less apt to conclude that statements made to personal acquaintances are testimonial. *See, e.g., People v. Cervantes* (Cal. Ct. App. 2004), 12 Cal.Rptr.3d 774, 777, 782-83 (deciding that statements made to a neighbor from whom the declarant sought medical assistance, which described a murder and implicated the declarant and others, were not

testimonial under any of the formulations provided in *Crawford*); *State v. Rivera* (Conn. 2004), 844 A.2d 191, 201-02 (determining that a statement made to the declarant's nephew describing a botched robbery-turned-murder undertaken by the declarant and an accomplice was nontestimonial); *Demons v. State* (Ga. 2004), 595 S.E.2d 76, 78-80 (holding that a statement made to the declarant's co-worker indicating that the declarant's bruises came from beatings inflicted by his domestic partner whom he feared would kill him was nontestimonial).

¶22    In *State v. Carter*, 2005 MT 87, 326 Mont. 427, 114 P.3d 1001, we held that the weekly field certification reports that the state introduced to show that the Intoxilizer 5000 was functioning properly when it was administered by the police, were nontestimonial.  We reasoned that the reports were "not substantive evidence of a particular offense, but rather are foundational evidence necessary for the admission of substantive evidence. In other words, the certification reports are nontestimonial in nature in that they are foundational, rather than substantive or accusatory." *Carter*, ¶ 32 (internal citation omitted).  The Sixth Amendment, itself, extends only to "witnesses against" the defendant, and hearsay provided for foundational purposes is not evidence "against" the defendant. Thus, while the author of the certification reports could reasonably anticipate that the reports would be used in or by a court, those reports, because "not substantive evidence of a particular offense," were held to be nontestimonial. *See Crawford*, 541 U.S. at 56, 124 S.Ct. at 1367, 158 L.Ed.2d at 195-96  (business records are nontestimonial); *United States v. Cervantes-Flores* (9th Cir. 2005),

421 F.3d 825, 831-34 (immigration records nontestimonial); *United States v. Garner* (6th

Cir. 2005), 2005 WL 2175907 (unpublished) (medical records nontestimonial).

¶23    Bringing together these rationales, generally, when a declarant knowingly speaks to

a police officer or governmental agent, her statements are presumed testimonial. If, however,

the declarant had objective reason to believe that her statement would serve only to avert or

mitigate an imminent or immediate danger and the agent who received the statement had no

intent to create evidence, the statement is presumed to be nontestimonial. Alternatively,

unless the declarant had clear reason to believe that the statement would be used in court as

substantive evidence against the defendant, her statements to a non-governmental agent are

nontestimonial.[3]

## III. Debra Mizenko's Statements at Issue

¶24    Mizenko's appeal presents three instances of statements by Debra Mizenko, who did

not appear at trial and whom Mizenko was unable to cross-examine: (1) Debra's statements

to her neighbor Dawn Grove, (2) Debra's statements to 911 dispatcher Tami King, and (3)

Debra's statements to Deputy Buennemeyer.

---

[3]We note that this approach, in addition to being relatively easy to apply, approximates that proposed by Professor Mosteller, whereby different burdens apply depending on whom the declarant speaks to: the defendant must show that a statement made to a private individual was clearly or exclusively intended to be testimonial; or the prosecution must show that a statement made to a government agent was intended by the declarant only for a non-testimonial purpose and that the government agent who received the statement was not producing a statement to be used prosecutorially. *See* Mosteller, 39 U. Rich. L. Rev. at 572, 624. We favor an "objective reason to believe" standard over Professor Mosteller's proposed "declarant's intent" standard because of the practical difficulty of divining the intentions of an absent declarant except by reference to what they have reason to believe (*i.e.*, what they should reasonably expect).

¶25 Mizenko argues that the court erred in allowing Dawn Grove to testify that Debra told her that Mizenko had been drinking and was trying to hurt her; in allowing the police dispatcher Tami King to testify as to the contents of the 911 tape, in particular that Mizenko had pushed Debra down, hit her and pulled her hair out; and in allowing Deputy Buennemeyer to testify that Debra told him that the hair on the floor was hers and had been pulled out during the altercation with Mizenko.

¶26 In discussing these issues, it must be noted that the State, through witness King, offered the 911 taped conversation as evidence. Since King stated that she had not listened to the tape and could not verify its accuracy, Mizenko objected for lack of foundation. The court sustained the objection. During a break, King listened to the tape and was subsequently able to testify that it was an accurate representation of the conversation. The tape was then admitted without objection and was played for the jury. During the taped conversation, Debra told King that Mizenko had hit her, pushed her down, and pulled out her hair. Since Debra's taped statements that Mizenko had pulled out her hair were admitted without objection, King's and Buennemeyer's testimony concerning the hair pulling, even if objectionable, was cumulative and, thus, harmless error. *State v. Van Kirk*, 2001 MT 184, ¶ 43, 306 Mont. 215, ¶ 43, 32 P.3d 735, ¶ 43. Likewise, King's statements that Mizenko had pushed Debra down and hit her constitute harmless error, at most.

¶27 As to witness Dawn Grove, she was Debra's neighbor. Debra appeared at Dawn's house late one afternoon, out of breath and bruised on the cheek. She was seeking assistance after having been beaten by her husband. Given that she was in distress and addressing a

15

non-governmental agent, her neighbor, she had no objective reason to believe or anticipate that her statement would be used in court. *See* Mosteller, 39 U. Rich. L. Rev. at 573 (indicating that "most private statements, even if accusatory, are not candidates for being considered testimonial"). The most reasonable construction of Debra's statement to Grove is that Debra merely endeavored to provide Grove with a context that would explain Debra's sudden appearance, with dog in tow and a freshly bruised face, on her neighbor's doorstep. Her utterance also enabled Debra to share the burden of a traumatic beating, a need evidenced by the fact that she sought the immediate solace that her neighbor could provide as well as her desire to phone her friend Carol Richard. To the extent that the statement can be construed in any other manner, it is fairly characterized as primarily a cry for help. Debra, having fled her own home where her husband had just beaten her, sought sanctuary from which to take her next step. Significantly, Debra apparently did not feel sufficiently secure in her own home to remain there and phone either her friend Carol Richard or 911. In light of the abuse she suffered and the very real possibility that Mizenko would return and continue the assault, her fear of remaining in her home was well founded. Debra's cursory explanation of the circumstances that prompted her to request Grove's assistance, though evidence, were not created by the judicial process. Debra lacked reason to believe that her statement would be used prosecutorially as substantive evidence against Mizenko. If she had anticipated such use, in all likelihood, she would have divulged greater detail, as she later did when speaking with 911 operator King, and indicated that her husband *had in fact hurt her*, not merely that he was trying to hurt her. Accordingly, her statement to Grove was

16

nontestimonial and the admission of Dawn Grove's hearsay testimony did not offend the confrontation clause.

¶28    Ruling on the admissibility of statements made in a remarkably similar situation, the Colorado Supreme Court recently rendered a decision that mirrors our conclusion that Debra's statement to Grove was not testimonial.  In *Compan v. People* (Colo. 2005), 121 P.3d 876, the Colorado Court unanimously[4] affirmed the admission of hearsay statements made by a woman shortly after suffering abuse at the hands of her husband and describing that abuse in detail.  During a heated argument with her husband, the victim, while crying, had called her friend Vargas and asked her to come pick her up.  *Compan*, 121 P.3d at 877.  About twenty minutes later, the victim, now "subdued, very quiet and sad" again called Vargas, reported that her husband had already hit her, and again requested a ride.  *Compan*, 121 P.3d at 877.  Another fifteen minutes elapsed before Vargas arrived to whisk the victim away to the secure environs of Vargas's home.  During the ride, the victim, who was biting her nails, shaking and crying, explained that her husband had kicked and punched her stomach, "slapped her, pulled her hair, and thr[own] her against a wall."  *Compan*, 121 P.3d at 878.  When they arrived at Vargas's house, the victim continued recounting the assault and eventually asked Vargas to call the police.  The victim did not testify at trial.[5]  *Compan*, 121

---

[4]Justices Coats and Kourlis specially concurred, but they agreed, without further elaboration, that the victim's statements were not testimonial.  *Compan*, 121 P.3d at 886.

[5]Incidentally, the victim had made an appointment with the district attorney to formally recant her accusation, but did not show up for the appointment.  *Compan*, 121 P.3d at 878.

17

P.3d at 878. The Colorado Court considered each of the three formulations of "testimonial" postulated by the *Crawford* Court and unanimously concluded that the victim's excited utterances to Vargas did not fall within any of them. *See Compan*, 121 P.3d at 880-81 ("the victim's statements were not made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. Rather, the victim was speaking informally to her friend"); *see also* Mosteller, 39 U. Rich. L. Rev. at 544 (indicating that under his proposed method for ascertaining whether a statement is testimonial, "the statements in *Compan* and similar fact patterns would not be considered testimonial"). Furthermore, the Colorado Court concluded that "the constitutionality of nontestimonial statements is controlled by the federal confrontation clause as set forth in *Roberts*." *Compan*, 121 P.3d at 881 (citing a litany of cases from federal circuit courts and state supreme courts that have reached the same conclusion).

¶29 As to the dissent, Justice Nelson is jousting with windmills of his own making. He relies on Article II, Section 24 of the Montana Constitution, a theory which he admits was not argued by the defendant, and he focuses on the testimony of 911 operator King and Officer Buennemeyer without acknowledging that their testimony, if objectionable, was cumulative since the 911 tape itself was admitted without objection.[6] The dissent proffers

---

[6]Arguably, Grove's testimony was also cumulative insofar as it asserts any wrongdoing by Mizenko. Debra told Grove only that he husband had been drinking and was trying to hurt her. The 911 recording, however, includes statements that Mizenko had hit Debra, pulled *out* her hair and pushed her to the ground. Certainly, such acts constitute attempts to hurt Debra. Accordingly, the only additional statement to Grove is that Mizenko had been drinking—no crime for a person such as Mizenko who has obtained the age of majority.

18

a tortured interpretation of this opinion by insinuating that the Court's definition of "testimonial" encompasses only statements made to government agents. Contrary to the dissent's mischaracterization, the Court has afforded the defendant *greater* protection from statements made to a government agent, by presuming that such statements are testimonial.[7] Although the Supreme Court identified three of the "[v]arious formulations of . . . 'testimonial' statements [that] exist," it explicitly "[left] for another day *any effort* to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 51, 68, 124 S.Ct. at 1364, 1374, 157 L.Ed.2d at 193, 203 (emphasis added). Justice Nelson's painstaking efforts in "formulating" a comprehensive definition of "testimonial" has led him to simply adopt the formulation proffered to the Court by the National Association of Criminal Defense Lawyers—the broadest of the extant formulations acknowledged by *Crawford*—despite the Court's tacit warning against doing so. Finally, Justice Nelson quotes from the Victim Impact Statement submitted by Debra after Mizenko had been tried and convicted. This statement, however, was not submitted until after trial, and has *no* evidentiary value as to the propriety of admitting Debra's various statements, nor as to Mizenko's guilt. Moreover, the Victim Impact Statement, though rhetorically resonant, suffers from the flaws that Justice Nelson decries in the hearsay testimony that was admitted—lack of oath, inability to cross-

---

[7]The dissent likewise mischaracterizes our method for determining whether a statement is testimonial as "a belief/knowledge/purpose" test. While we do identify the declarant's potentially suspect motivation as being of concern to the drafters of the Sixth Amendment, we have announced a test that depends on the declarant's *reasonable* expectation at the time a statement is made.

19

examine and inability to assess credibility—provides Debra ample opportunity for reflection and fabrication, and represents a premeditated, conscientious attempt to provide testimony.

¶30 Many state courts have considered whether a statement made by the victim of a crime to a friend, family member or acquaintance and describing the crime, identifying the perpetrator or both, is testimonial. Despite Justice Nelson's disagreement, extant authority supports the Court's position that such statements, even if made to a loose acquaintance, are nontestimonial unless the declarant had clear reason to believe that they will be used prosecutorially. *See, e.g.*, *Salt Lake City v. Williams* (Utah Ct. App. 2005), __ P.3d ___, 2005 UT App 493, ¶ 24 (statements by the deceased victim to a friend identifying the perpetrator by name and indicating that he had threatened to kill her held nontestimonial because they were issued "with no reasonable expectation that it would be used in a later legal proceeding"); *State v. Kemp* (Mo. Ct. App. 2005), __ S.W.3d ___, 2005 WL 2977790 at *4 (statements by the victim to her neighbor, whose home she had gone to in seeking assistance, that her boyfriend had been holding her hostage at gunpoint held nontestimonial "[e]ven under the broadest reading of *Crawford*"); *Wallace v. State* (Ind. Ct. App. 2005), 836 N.E.2d 985, 996 (statements by murder victim identifying his killer in response to questions posed by an unknown civilian, EMT, and a nurse held nontestimonial because not taken "'in significant part . . . with an eye towards trial'" (citation omitted)); *Bray v. Commonwealth* (Ky. 2005) __ S.W.3d ___, 2005 WL 2317014 at *3 (statements by murder victim to her sister indicating that she was afraid for her life and that defendant was outside of her home held nontestimonial even under *Crawford*'s third and broadest formulation); *Foley v. State*

20

(Miss. 2005), 914 So.2d 677, ¶ 11 (statements by sexual assault victim to examining physician indicating that defendant forced her to perform oral sex and other sexual acts held nontestimonial); *Commonwealth v. Gonsalves* (Mass. 2005), 833 N.E.2d 549, 559-62 (assault victim's response to questioning by her mother stating that her boyfriend had constricted her breathing and hit her held nontestimonial; a reasonable person in the victim's position would not "anticipate the statement's being used [prosecutorially]"; the mother's purpose for procuring the statements "was to understand what had happened, not to establish a basis for prosecution"); *Flores v. State* (Tex. Ct. App. 2005), 170 S.W.3d 722 (statements by infant victim's mother to defendant's sister indicating that defendant had hit their infant held nontestimonial; statements were made within hours after the child had died); *State v. Krasky* (Minn. Ct. App. 2005), 696 N.W.2d 816, 819-20 (statements made by victim of sexual assault to a nurse practitioner describing the assault held nontestimonial under the "third and broadest formulation" provided in *Crawford* because "the examination was conducted, at least in part, for the purpose of medical diagnosis"); *People v. Rincon* (Cal. Ct. App. 2005), 28 Cal.Rptr.3d 844, 858 (statements by victim to former gang-member indicating that he had been shot in the ankle during a gun battle at a particular location held nontestimonial because the victim "could not reasonably have anticipated" prosecutorial use of his statements); *State v. Wilkinson* (Vt. 2005), 879 A.2d 445, ¶ 10 (statements by victim to defendant's cousin indicating that defendant had pulled a gun on him and that he thought the defendant was going to kill him held nontestimonial; statements were "made to an individual who had no relationship to the prosecution" and not in the presence of police); *Herrera-Vega v. State*

21

(Fla. Dist. Ct. App. 2004), 888 So.2d 66 (statement by victim to her parents describing how defendant sexually abused her held nontestimonial); *State v. Staten* (S.C. Ct. App. 2005), 610 S.E.2d 823, 836 (statements by murder victim, made a day prior to his murder, to his cousin indicating that the defendant had pulled a gun on him held nontestimonial under any of *Crawford*'s formulations); *State v. Blackstock* (N.C. Ct. App. 2004), 598 S.E.2d 412, 420 (statements by hospitalized murder victim made to his daughter and wife before he died, describing in detail the armed robbery that culminated with the victim's being shot, held nontestimonial because "it is unlikely that [the victim] made the statements under a reasonable belief that they would later be used prosecutorially"); *State v. Walker* (Wash. Ct. App. 2005), 118 P.3d 935, ¶¶ 34-35 (statements by victim of sexual assault describing the incident, identifying the perpetrator and given in response to questioning by her mother held nontestimonial; "the exchange between [mother] and [daughter] was that of a conversation between a concerned parent and an upset child, nothing more"); *State v. Moses* (Wash. Ct. App. 2005), 119 P.3d 906, ¶ 22 (statements by victim of domestic abuse made to a treating physician and describing the beating and identifying the perpetrator held nontestimonial because victim did not have "reason to believe that her statements to Dr. Appleton would be used at a subsequent trial"). After an exhaustive review of cases applying *Crawford*, we could find only two instances when a court held that a victim's statement to a private individual is testimonial. *See In re E.H.* (Ill. Ct. App. 2005), 823 N.E.2d 1029, 1037 (statements, made by child victim of sexual assault to her grandmother, describing the sexual abuse perpetrated by defendant held testimonial because the statements concern "the fault

22

and identity" of the perpetrator); *In re T.T.* (Ill. Ct. App. 2004), 815 N.E.2d 789, 804 (statements made by victim of sexual assault to a treating physician that explain how she was physically injured and the pain she experienced held nontestimonial; however, her statements identifying the defendant as the perpetrator held testimonial).

¶31     The dissent, in arguing that *Crawford* has eradicated the excited utterance exception to hearsay in criminal cases, paints with too broad a brush.  Although *Crawford* does disallow the use of hearsay exceptions based on indicia of reliability as the basis to admit hearsay statements, it does so only in the context of testimonial statements which violate the Sixth Amendment right to confront witnesses. *Crawford* does not expressly or impliedly supersede the rules of evidence as they relate to nontestimonial evidence. *See Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203 ("[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether").  In the wake of *Crawford*, nontestimonial hearsay is analyzed pursuant to the *Roberts* reliability standard, or simply to ensure compliance with the rules of evidence.  *See* Mosteller, 39 U. Rich. L. Rev. at 617, 619 ("[p]resently, lower courts should still apply the 'old system' to non-testimonial hearsay because *Crawford* did not overrule *Roberts* in this area"); *see also Agostini v. Felton* (1997), 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.E.2d 391, 423 (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.* (1989), 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.E.2d 526) ("'[i]f a precedent of this Court has direct application in a case, yet appears to rest on

reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions'"). Rather than divine the dramatic and unexpressed implications of *Crawford*, we will afford the Supreme Court the first opportunity to expressly overrule *Roberts* and to invalidate the Federal Rules of Evidence pertaining to hearsay in criminal cases, as is their express preference.

¶32 As the Sixth Circuit has recognized, *Crawford* dealt only with testimonial statements and did not disturb the rule that nontestimonial statements are constitutionally admissible if they fit within a firmly rooted hearsay exception or they bear independent guarantees of trustworthiness. *Gibson*, 409 F.3d at 338.

¶33 We thus turn to the question of whether Debra's statement fits within a firmly rooted exception to the hearsay rule. Rule 803, M.R.Evid. (Availability of declarant immaterial), enumerates the exceptions to the hearsay rule in Montana. Subsection 2 of the Rule sets forth the "excited utterance" exception. In *Matter of S.M.*, 2001 MT 11, 304 Mont. 102, 19 P.3d 213, a child had seen her mother's abusive boyfriend outside of a building and subsequently told a social worker that she was frightened. *Matter of S.M.*, ¶ 19. We found that the social worker's testimony relaying the child's statement was properly admitted as an excited utterance relating to the startling event of seeing her abuser. *Matter of S.M.*, ¶ 24. We noted that the social worker observed the child tightly grasping her foster mother's arm "with a very frightened look in her eyes." *Matter of S.M.*, ¶ 20. Presumably, we relied on this observation of the child's appearance to support our unstated conclusion that the child

remained "under the stress of excitement" when she expressed her fear. In *State v. Hamby*, 1999 MT 319, 297 Mont. 274, 992 P.2d 1266, we concluded that hearsay statements were properly admitted under the excited utterance exception because "[t]he record does not suggest that [the victim's] distress subsided once Betty asked her questions, even when they were in the bathroom." *Hamby*, ¶ 29; *see also State v. Graves* (1995), 272 Mont. 451, 454, 458-59, 901 P.2d 549, 551, 554-55 (indicating that a rape victim's statements to an anonymous 911 caller made "shortly after defendant left" her home and while she was still crying qualified as an excited utterance); *State v. Cameron*, 2005 MT 32, 326 Mont. 51, 106 P.3d 1189 (holding that a victim's sobbing statement to her sister related to a sexual assault that had occurred one or two hours earlier was an excited utterance under Rule 803(2), M.R.Evid.). It is clear from the cases cited above that a declarant's appearance and demeanor can indicate that the declarant remains under the stress of excitement caused by a startling event and a lapse of time is not determinative of whether that stress has subsided.

¶34    In the present case, Debra's statements to Grove were made a short time after the assault while she was out of breath, visibly upset and had a fresh wound on her face. Since Debra's statements, made while she was still under stress caused by the event, clearly fall within the firmly rooted excited utterance exception to hearsay under Rule 803(2), M.R.Evid., the court did not err in admitting them.

¶35    Affirmed.

/S/ W. WILLIAM LEAPHART

25

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice John Warner concurs.

¶36    Although I concur in the Court's opinion, I wish to further address several issues.

I present the following scenario:

Mary Smith:        Mr. Jones, I'm calling because I was just served with a subpoena. Am I supposed to testify against my husband in the spousal abuse trial?

Prosecutor Jones:      Yes, that's right Mary. The trial starts Monday morning at 8:00 a.m. at the courthouse. I'll be asking you to tell the jury how Harry beat you last October when he came home drunk from the football game.

Mary Smith:        Look. I've been thinking it over, and I've decided I don't want to testify. Harry told me that he's not going to prison because of me. Then, last night Harry and a couple of his friends got me alone and told me that if I testify one of them will break my legs. They also said that if I even show up at the courthouse they will take my daughter and she won't be worth much when she comes back. I know these guys, and I believe them - they'll do it. I'm scared. I'm not coming to testify and I just thought I'd let you know so you can call off the trial.

Prosecutor Jones:      I can't do that Mary. This is Harry's third spousal abuse offense. We're going to prosecute. You've got a subpoena and you're required to be there. It's a court order and you can be held in contempt if you don't show up.

Mary Smith:        I'm telling you I'm not going to testify. I don't particularly care about some stupid court order. I won't be there, so forget the whole thing.

Prosecutor Jones:      But Mary, without your testimony we can't convict Harry. Our State Supreme Court has told us that we need your testimony. We cannot use your statements to your neighbor Ginny after the fight, and we can't use your statements when you called 911. For sure we can't have Officer Brown testify about what you told him when he got there, and the ER doctor can't testify about what you told him either. I can't even prove to the Court that Harry and his friends really

threatened you unless you show up.  You've got to come, we can protect you; and if you don't come I'll have to have you arrested.

Mary Smith:       Harry told me that's what you would say.  But, he's right that you can't protect me 24 hours a day for years, and I'm not going to let Harry's friends at my daughter.  I'm out of town now, you'll never find me, and I don't care what you threaten me with - I'm not coming.  Bye.  [Click.]

¶37     This colloquy is, of course, the counter-point to the thoughtful dissent with which I must disagree.[1]  The dissent's historical analysis of the right of a defendant in a criminal case is instructive, and points to problems that must be faced in modern criminal prosecutions.  In my view, however, it ignores the interests of the victim; takes too cynical, and dangerous, of an approach to our system of criminal justice; and misinterprets *Crawford*.

¶38     The dissent fails to give sufficient consideration to the interests of witnesses and victims.  The Court recognizes the critical importance of the Confrontation Clause.  However, as the dialogue I have presented above illustrates, an accused must not be allowed to hide behind the Constitution by intimidating witnesses.  It would be naive to assume that defendants would not do so, if given the opportunity.  It takes little imagination to picture the jungle of fear that would be created if the rationale that is

---

[1]The foregoing dialogue is not fanciful. Some research has shown that approximately 80% of victims decline to assist the government in prosecutions of domestic violence cases. Tom Lininger, *Prosecuting Batterers After* Crawford, 91 Va. L. Rev. 747, 768-769 (2005) ("The reasons why victims refuse to cooperate with the prosecution are manifold, but chief among them is the risk of reprisals by the batterers. One study found that batterers threaten retaliatory violence in as many as half of all cases, and 30 percent of batterers actually assault their victims again during the predisposition phase of prosecution.").

proposed by the dissent is adopted. In my view it would become intolerably more dangerous to be the victim of an offense, or to be a witness in any criminal case, if the Confrontation Clause is interpreted to mean that prosecutions cannot be maintained if witnesses, for whatever reason, do not appear at trial, which is what the dissent seems to advocate.[2] *See* Tom Lininger, *Prosecuting Batterers After* Crawford, 91 Va. L. Rev. 747, 750 (2005) (65% of prosecutors surveyed in California, Oregon, and Washington "reported that victims of domestic violence are less safe in their jurisdictions than during the era preceding the *Crawford* decision.").

¶39 I also disagree with the dissent's premise that government officers will run amok in their zeal to unfairly obtain convictions. In our justice system, prosecuting attorneys, and impliedly all law enforcement personnel, occupy a position of public trust. Courts, citizens and even criminal defendants must rely on these public servants to be honorable advocates both for the community on whose behalf they litigate and for the justice system of which they are an integral part.

---

[2]As a potential safeguard the *Crawford* majority noted the rule of forfeiture by wrongdoing. *Crawford*, 541 U.S. at 62, 124 S.Ct. at 1370, 158 L.Ed. at 199. This was codified in FRE 804(b)(6), which admits hearsay "offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the witness." Application of Rule 804(b)(6) is complicated. *See U.S. v. Dhinsa* (2nd Cir. 2001), 243 F.3d 635, 653-654. It has been adopted by only a few states, and has not been adopted in Montana. However, because *Crawford* has heightened the importance of live testimony, and therefore increased the probability that the accused will threaten potential witnesses, FRE 804(b)(6) may now see increased application in the federal courts, with respect to testimonial hearsay. Lininger, 91 Va. L. Rev. at 808-810.

29

¶40 It cannot be gainsaid that it is possible for unscrupulous prosecutors or other government officials to cheat, connive, and abuse the system to unfairly obtain a conviction. Indeed, it was the intent of the Framers to limit the discretion of these individuals. *See Crawford*, 541 U.S. at 67, 124 S.Ct. at 1373, 158 L.Ed. at 202-203. However, I do not presume, as the dissent seems to, that prosecutors inevitably abuse their offices, violate their oaths to uphold the Constitution, and connive to manufacture evidence so that a complaining witness need not appear at trial. Such general accusations undermine public confidence and bring into question our entire system of justice. There are implicit checks on prosecutors and government officials imposed by the elective system, the legislature, the bar, and the courts. Such is evident in this Court's decision today, providing protection for defendants against testimonial hearsay.

¶41 It is clear that only those out of court statements that are testimonial in nature are the "primary objective" of the Confrontation Clause. *Crawford*, 541 U.S. at 53, 124 S.Ct. at 1365, 158 L.Ed. at 194. Until the Supreme Court expressly rules otherwise, we should continue to apply the precedent left in place. Robert P. Mosteller, Crawford v. Washington: *Encouraging and Ensuring the Confrontation of Witnesses*, 39 U. Rich. L. Rev. 511, 619 (2005) ("lower courts should still apply the 'old system' to non-testimonial hearsay because *Crawford* did not overrule *Roberts* in this area."). As Professor Friedman, whose scholarly work influenced the *Crawford* majority, notes, "[I]f the statement is not testimonial, so that the declarant should not be deemed to have been acting as a witness in making it, the [Confrontation] Clause should not bar its

admissibility, even if the statement does not seem reliable."[3]  No matter how the dissent

spins the language of *Crawford*, the decision does not broaden Confrontation Clause

scrutiny to encompass nontestimonial statements.  Thus the dissent is incorrect to go as

far as to assume "that the right of confrontation applies to both testimonial and

nontestimonial statements[,]" and that the *Roberts* analysis has been rendered

inapplicable.  Nontestimonial statements should be admitted under the *Roberts* standard,

which is most often met by a "firmly rooted" hearsay exception.[4]  The rules of evidence,

properly interpreted, provide sufficient guarantees of fairness.  Contrary to the dissent's

assertion, firmly rooted exceptions, like that for excited utterances, are still valid law.

¶42    Prosecutors are still required to prove their case beyond a reasonable doubt.  The

difficulty of gaining a conviction increases significantly where the prosecution's case

relies primarily upon out of court statements.  Experience shows that jurors simply give

less weight to hearsay. John G. Douglass, *Confronting the Reluctant Accomplice*, 101

Colum. L. Rev. 1797, 1839, n.180 (2001) ("[J]urors exposed to hearsay will know that

they are receiving secondhand goods."); Richard F. Rakos & Stephan Landsman,

*Researching the Hearsay Rule: Emerging Findings, General Issues, and Future*

---

[3]Richard D. Friedman, *Confrontation: The Search For Basic Principals*, 86 Geo. L. J. 1011, 1029 (1998).

[4]*See* Mosteller, 39 U. Rich. L. Rev. at 618 ("Resolving *Roberts's* future will not have an impact on the outcome of many cases since the Confrontation Clause was generally easily satisfied under the *Roberts* test as to most admissible hearsay, and indeed, admissibility under *Roberts's* reliability and trustworthiness analysis was most often decided automatically when the statement met a broadly accepted and long established -'firmly rooted'- hearsay exception.").

*Directions*, 76 Minn. L. Rev. 655, 656-658 (1992); *Crawford*, 541 U.S. at 70, 124 S.Ct. at 1375, 158 L.Ed. at 204, n.1.

¶43    The Court's opinion today provides for fair trials of the accused while giving consideration to victims and witnesses. Conversely, the dissent's objective of protecting the accused to the utmost extent, while perhaps well intentioned, fails to adequately consider how such an interpretation of the Confrontation Clause would impede our pursuit of truth and justice in an imperfect world.

/S/ JOHN WARNER

Justice James C. Nelson dissents.

¶44      Mary Smith:      Mr. Jones, I'm calling because I was just served with a subpoena. Am I supposed to testify against my husband in the spouse abuse trial?

         Prosecutor Jones:      Yes, that's right Mary. The trial starts Monday morning at 8:00 A.M. at the courthouse. I'll be asking you to tell the jury how Harry beat you last October when he came home drunk from the football game.

         Mary Smith:      Look. I've been thinking it over, and I've decided I don't want to press charges. I just overreacted because Harry went to the game with his buddies and left me with the kids. Harry's been pretty good since he spent the weekend in jail, and if I testify it will just make him mad. He'll lose his temper and then . . . . Well, it's just not worth it. I've got to think about the kids. I'm not going to testify against Harry. He's still my husband. I love him. I have to live with him; you don't. I won't testify. Just call the trial off.

         Prosecutor Jones:      I can't do that Mary. This is Harry's third domestic abuse offense. We're going to prosecute with or without your help. You've got a subpoena and you're required to be there. It's a court order and you can be held in contempt if you don't show up.

         Mary Smith:      I'm telling you I don't want to press charges and I'm not going to testify. I don't particularly care about some stupid court order. I won't be there, so forget the whole thing. Call it off.

         Prosecutor Jones:      I'm sorry, but that isn't going to happen. Besides, our State Supreme Court has told us that we don't need your testimony anyway. We've got your statements to your neighbor, Ginny, after the fight, and we've got your statements when you called 911. Officer Brown will testify as to what you told him about the fight. We may be able to get the ER doctor to testify about what you told him when he patched you up. That's all we need. We're going ahead with the trial whether you show up or not.

34

Mary Smith:        Oh. So you really don't need my testimony? Thanks a bunch. Bye.

¶45    I have no doubt that, henceforth, this conversation, or something closely akin, will be had in prosecutors' offices across the State.[1] Police and prosecutors have already begun modifying their evidence-gathering techniques so as to avoid the impact of *Crawford*.[2] And I fully expect that victims' advocacy groups will be advising their clients

---

[1] For those who think the foregoing dialogue is fanciful, it is not. *See*, *e.g.*, Andrew King-Ries, Crawford v. Washington: *The End of Victimless Prosecution?*, 28 Seattle U. L. Rev. 301, 321-28 (arguing that the Supreme Court's decision in *Crawford v. Washington* should be interpreted so as to preserve "victimless" domestic violence prosecutions). Professor King-Ries explains that when victims of domestic abuse refuse to testify against their abusers, prosecutors often proceed with "victimless" prosecutions, which he characterizes as "a creative, resourceful, and effective response" to the dynamics of domestic violence. *See* King-Ries, at 301, 305-06, 327. In a victimless prosecution, the victim does not testify; rather, the prosecution is based largely on the admission of the victim's out-of-court statements as excited utterances (as in the case at hand), present sense impressions, or statements to medical personnel. *See* King-Ries, at 301, 308-11.

Professor King-Ries advocates "carefully constru[ing]" the definition of *Crawford*'s "testimonial" concept in the domestic violence context so as to permit the continued use of excited utterances, present sense impressions, and statements to medical personnel in victimless prosecutions and, thereby, to preserve "the strength of victimless prosecutions." *See* King-Ries, at 326-28. He submits that if it were no longer possible to prosecute a domestic abuse case in the victim's absence, prosecutors would be "powerless to address a significant portion of domestic violence crimes," King-Ries, at 328, and defendants would "profit from [their] own misdeeds because the domestic violence victim is generally absent from trial due to the defendant's action or threatened action," King-Ries, at 325. (Of course, as will be explained below, it is not necessary for the victim to testify *at trial*, as long as she is unavailable in the legal sense and the defendant has had a prior opportunity to cross-examine her--for instance, at a pre-trial proceeding such as a deposition or a preliminary hearing. Furthermore, if the victim's absence from trial were due to threats by the defendant of repercussions should the victim appear and testify against him, then his right to confront the victim would be extinguished on equitable grounds. *See Crawford*, 541 U.S. at 62, 124 S.Ct. at 1370 ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds.").)

[2] *See* Robert P. Mosteller, Crawford v. Washington: *Encouraging and Ensuring the Confrontation of Witnesses*, 39 U. Rich. L. Rev. 511, 513 (2005) (hereinafter, "Mosteller, *Encouraging and Ensuring*") ("[T]he practices in some jurisdictions of having victims make statements to investigating officers on videotape shortly after the crime *were* once very useful to the prosecution, but now produce inadmissible testimonial statements. Police and prosecutors are

of this Court's decision and counseling that whether victims show up at trial to testify is of little consequence and may, in fact, put their clients at greater risk of harm.[3]

---

certain to develop alternative investigative methods in an attempt to avoid *Crawford*'s impact.") (footnote omitted); Richard D. Friedman, *Grappling with the Meaning of "Testimonial,"* 70 Brook. L. Rev. (forthcoming 2005), *at* http://www-personal.umich.edu/~rdfrdman/Grappling1.pdf (draft) (hereinafter, "Friedman, *Grappling*"), at 3 ("Some police have been led to believe that even if a statement[] made knowingly to them accuses a person of a crime it is not testimonial unless [the] product of a formal interrogation begun after the police have determined that a crime has been committed. And so we have seen that police and prosecutors have done their best to secure accusatory statements without beginning what would necessarily be deemed a formal interrogation."); Friedman, *Grappling*, at 14 (The idea "that a statement is not testimonial unless it is made in response to governmental interrogation," which some courts define restrictively as " 'structured police questioning,' " "has begun to distort police practices, as police [try] to act in such a way that prosecutors can later argue that statements made to the police were not in response to interrogation."). *See also* Friedman, *Grappling*, at 20 ("Since *Crawford*, many courts have continued operating essentially as they did before. . . . [T]he National Council of Juvenile and Family Court Judges published in its journal *Juvenile Justice Today* an article by two Florida judges saying that courts could essentially ignore *Crawford* by invoking the excited utterance exception to the rule against hearsay.").

[3] *See* Brief of Amicus Curiae Montana Coalition Against Domestic and Sexual Violence at 3 ("Victims of domestic and/or sexual violence [defined by amicus "to include all emotional and/or physical abuse perpetrated by an individual exerting power and control over another individual"] often recant or refuse to participate in prosecution efforts. While there are myriad reasons victims choose not to participate in the prosecution of those who have battered them, many choose not to participate because of the risk of further harm from their abusers. 'Many victims who become witnesses in criminal cases against their abusers are subject to threats, retaliation, and intimidation to coerce their noncooperation with prosecutors.' Often, the victim is in more danger when s/he participates in the criminal prosecution.") (citations and footnote omitted).

*See also* Friedman, *Grappling*, at 11 ("A rule providing that a statement is not testimonial unless it is made directly to government agents would have some consequences that I believe are intolerable. . . . I think it is not only plausible but virtually inevitable that, if a government agent standard is established by the courts, private victims' rights organizations will provide a comfortable way for [many] complainants to create evidence for use in prosecution without having to confront the accused: 'Make a videotape, and then go on vacation. We'll bring the tape to court and present the testimony necessary to get the tape shown to the jury. Don't worry, you never have to look the accused in the eye, you never have to answer questions by his attorney, and you don't even have to take an oath.' How can the making of that videotape not be considered testimonial?").

¶46 Indeed, according to the majority opinion, the State may freely use a victim's hearsay statements if it can come up with a third party witness who was not a known government agent, or if it can persuade the trial court that the hearsay statements served only to avert or mitigate an imminent or immediate danger, that the recipient of the statements had no intent to create evidence, and that the statements are sufficiently reliable or trustworthy to be admitted notwithstanding the accused's inability to cross-examine the victim[4]--not a difficult feat, as this case demonstrates. As such, there will be no compelling reason for victims of Partner or Family Member Assault to testify at the trials of their alleged abusers. In fact, if the theory of this case is followed to its logical conclusion, there likewise will be no reason for victims of rape, sexual assault, robbery, assault, attempted homicide or, for that matter, any crime involving "emotional and/or physical abuse perpetrated by an individual exerting power and control over another individual," Brief of Amicus Curiae Montana Coalition Against Domestic and Sexual Violence at 3 n.1, to testify either. Subpoenas of victims will not be worth the paper they are written on.

¶47 Even worse, and under the same circumstances, there will no longer be a compelling reason for the State to even subpoena the victim. Why put up with the risk of

---

[4] *See* Rule 803(1)-(4), M.R.Evid. (setting forth the present sense impression (803(1)), excited utterance (803(2)), then-existing mental, emotional or physical condition (803(3)), and statements for purposes of medical diagnosis or treatment (803(4)) exceptions to the hearsay rule).

recanted and equivocal testimony?[5] Why subject the victim to the additional trauma of having to confront the alleged perpetrator face to face and deal with his or her attorney's cross-examination? Why put the victim at risk of contempt if he or she "refuse[s] to participate in prosecution efforts" or "choose[s] not to participate in the prosecution," Brief of Amicus Curiae Montana Coalition Against Domestic and Sexual Violence at 3? Better to simply shift the burden of proof to the accused--allow the State to introduce the victim's out-of-court statements and force the defendant to subpoena the victim in order

---

[5] In the case at hand, for instance, Debra (the victim/declarant) told the investigating officer that she "was pressing no charges and was not going to court," and she sent a notarized statement to the prosecutor before trial informing him that Mizenko had not injured her in any way. She later completed a Victim's Impact Statement (in connection with the Pre-Sentence Investigation) in which she expressed frustration that her notarized statement "seems to have been completely ignored" and reiterated that Mizenko "did not cause bodily injury to me. . . . I was not injured. The rugburn on my chin was a result of playing w/the dog." In an attached letter, she referred to an "inebriated recording" (presumably her tape-recorded statements to the 911 operator) and conveyed surprise that Mizenko had been convicted in spite of her "true" notarized statement: "I still cannot believe the jury could find him guilty after seeing my true statement. I did not think that court would even be held after the statement had been read." (According to the record, the jury asked during deliberations to see the letter Debra had written to the prosecutor, but the District Court denied the jury's request.) Also in her letter, Debra lamented that the Victim's Impact Statement "could have exonerated my husband" had she been asked to fill it out "before this whole court fiasco." And finally, when asked whether this incident has affected her lifestyle, she stated, "Yes because of my inebriated and false statement, my husband has lost his job."

These assertions are entirely contrary to the hearsay statements admitted against Mizenko at his trial. Thus, if Debra had been subjected to direct and cross examination, the prosecutor would have had to contend with Debra's recantation. Indeed, he acknowledged this fact during his closing argument: "Did I want Mrs. Mizenko here to testify, you bet I did. Did I suspect what she might have told you, yeah, I suspect what she might have told us. But you know at the time she went over to Dawn Grove's house, and we are going to send a tape back in with you to listen to, it had just happened and what she told Dawn Grove, is what [Mizenko] did." Hence, rather than having to persuade the jury to believe one of two conflicting versions of the events of October 3, 2003, the prosecution was able to supply the jury--unhampered by contrary testimony--with the one version that supported its case. The jury never had to assess which version was more reliable; the District Court, in overruling Mizenko's hearsay objections, did that for them.

to prove his innocence. If the victim refuses or chooses not to show up for the trial, so what? The State's case is secure.

¶48 And the threat of contempt?[6] Even if the prosecutor pushes the issue and even if the District Judge is willing to make the non-testifying-victim a martyr by holding her or him in contempt, most victims still will be more than happy to take a tongue-lashing from the court and pay a small fine than testify, especially since doing so is now an option as a practical matter. Indeed, I expect that most *abusers* will be more than happy to pay the fine if doing so keeps their accusers off the witness stand.

¶49 The majority opinion misinterprets and, thus, misapplies the right of confrontation. The hearsay evidence admitted in Mizenko's trial, over his objection, consisted of statements by his wife Debra to three persons: Dawn Grove ("Grove"), Mizenko and Debra's neighbor; Tami King ("King"), the 911 operator; and Deputy Buennemeyer ("Buennemeyer"), the investigating officer. Mizenko never had an opportunity to cross-examine these statements. Thus, by affirming the District Court's admission of this hearsay testimony, the majority perpetuates the District Court's denial of Mizenko's fundamental right "to be confronted with the witnesses against him," as guaranteed by the Sixth Amendment of the United States Constitution, and his even greater fundamental right "to meet the witnesses against him *face to face*" under Article II, Section 24, of Montana's Constitution (emphasis added).

---

[6] *See* §§ 3-1-501(1)(j) and 45-7-309(1)(c), MCA.

39

## I. Approach

¶50    The majority opinion is grounded in the United States Supreme Court's decision in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, which effected a sea change in Sixth Amendment jurisprudence.[7]  However, the majority has misapplied the core holdings of the *Crawford* decision and, in so doing, has severely diminished the confrontation and cross-examination rights of persons accused of crimes in this state.  That this should happen in Montana is especially tragic.

¶51    *Crawford* may be analyzed from two perspectives, both of which I cover in this opinion.  First, I begin with an analysis of what constitutes a "testimonial" statement, focusing on the meaning of that term as set forth in *Crawford* and the authorities to which it cites.  During this discussion, I also address the majority's (mis)interpretation of the Confrontation Clause and, in particular, its erroneous definition of "testimonial."

¶52    I next apply to the facts of the case *sub judice* a definition of "testimonial" that is faithful to both *Crawford* and the Confrontation Clause as conceived by the Framers.  If the hearsay evidence at issue here is "testimonial" under this definition--and I conclude

---

[7]  This is especially true of domestic violence cases.  "As jurisdictions implemented policy judgments that abusers should be arrested and prosecuted in domestic violence cases regardless of the wishes of the immediate victim, prosecutors developed methods for 'victimless' prosecutions. These prosecutions were based on the introduction of hearsay through excited utterances, statements for medical treatment, past recollection recorded, special exceptions, and the catch-all provision. *Ohio v. Roberts* [(1980), 448 U.S. 56, 100 S.Ct. 2531,] allowed the Confrontation Clause to be satisfied automatically for hearsay exceptions, such as excited utterances, that were 'firmly rooted' and required no showing of unavailability.  *Crawford* has disrupted domestic violence prosecutions to a degree not seen in any other area.  It erected a 'stop sign' in front of most of this evidence, which combined with its reluctance to treat excited utterances as a historic exception to confrontation, has caused massive disruption and great uncertainty."  Mosteller, *Encouraging and Ensuring*, *supra* note 2, at 607-08 (footnotes omitted).

that it is--then its use at Mizenko's trial was categorically barred unless Debra was "unavailable" to testify *and* Mizenko had a prior opportunity to cross-examine her.

¶53 Thus, because I disagree with the majority's determination that the hearsay statements admitted at trial were nontestimonial, I then address whether Debra was "unavailable" to testify and whether Mizenko had a prior opportunity to cross-examine her. With respect to the former requirement, the District Court (1) failed in its obligation to hold the State to its burden to prove Debra was unavailable (in the legal sense) and (2) failed to specifically rule on the question of unavailability. Thus, Debra was not "unavailable." With respect to the latter requirement, there is no dispute that Mizenko did not at any time have an opportunity to cross-examine Debra. Accordingly, I conclude that neither requirement was met and that the District Court, therefore, erred in admitting Debra's statements.

¶54 Finally, I take up the second perspective from which *Crawford* may be analyzed, focusing on the Supreme Court's rejection of the reliability and trustworthiness framework of *Ohio v. Roberts* (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, and, in particular, the Court's rejection of the very rationales upon which it had relied in *White v. Illinois* (1992), 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848, in upholding the admission of hearsay testimony as an excited utterance. I conclude that the admission of hearsay statements based on the excited utterance exception is no longer permitted unless the declarant is "unavailable" and there was a prior opportunity for the accused to cross-examine the declarant.

## II. The Right to Confront

¶55    *There are few subjects . . . upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.*

*Pointer v. Texas* (1965), 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923.

¶56    *Crawford* breathes new life into the admonition of *Pointer*. Before turning to *Crawford*, however, it is critical to first acknowledge that Article II, Section 24, of Montana's Constitution guarantees persons accused of crimes even greater rights of confrontation and cross-examination than does the Federal Constitution. It is very unfortunate that the defense did not recognize this fact and pursue a claim under Article II, Section 24.[8] Nonetheless, given that the right of confrontation is a fundamental right, I will address this right under the Montana Constitution, after which I will proceed with my discussion of *Crawford*.

## A. The Right of Confrontation in Montana

¶57    In pertinent part, Article II, Section 24, provides that "[i]n all criminal prosecutions the accused shall have the right . . . to meet the witnesses against him *face to face*." (Emphasis added.) In *State v. Clark*, 1998 MT 221, 290 Mont. 479, 964 P.2d 766, we interpreted this guarantee and held that the admission of a state crime lab report under the public records and reports hearsay exception, *see* Rule 803(8), M.R.Evid., without

---

[8] The only citation in Mizenko's brief to Article II, Section 24, is in the following sentence, which itself is an incorrect statement of the extent of the protection afforded under the Montana Constitution: "It is a basic premise that [under] the sixth amendment to the United States Constitution (*similar to* Art. II, Sec. 24, Montana Constitution) the right of confrontation is effectively denied a criminal defendant when . . . ." Brief for Appellant at 6 (emphasis added).

requiring the presence of the technician who wrote the report, violated the defendant's state constitutional right to confront and cross-examine his accuser. *See Clark*, ¶¶ 25, 30. Importantly, based on the plain language of our Constitution, we held that Montana's Confrontation Clause provides the accused greater protection than does its federal counterpart, the Sixth Amendment. *Clark*, ¶¶ 20-25. We stated that

> [u]nlike its federal counterpart, the text of Montana's Confrontation Clause specifically guarantees the accused's right "to meet the witnesses against him face to face." As we noted in *State v. Young* (1991), 249 Mont. 257, 260, 815 P.2d 590, 592, "[t]he 1972 Montana Constitution and subsequent cases analyzing the Confrontation Clause have made it abundantly clear that full cross-examination is a critical aspect of the right of confrontation." Moreover, we have recognized that the rights contained in the Declaration of Rights, which include the rights guaranteed to an accused person in a criminal prosecution, are fundamental rights. *Wadsworth v. State* (1996), 275 Mont. 287, 299, 911 P.2d 1165, 1171-72.

*Clark*, ¶ 22 (second alteration in original).

¶58 We then went on to discuss the importance of cross-examination, which is protected by the Confrontation Clause:

> Cross-examination is the hallmark of our system of justice because it produces truth. Such things as the demeanor of a witness, his or her body language, and a witness's hesitancy in giving testimony, often communicate as much to the fact-finder as the spoken words.

*Clark*, ¶ 23. Finally, we observed that

> [t]he framers of the Montana Constitution appreciated these safeguards and saw fit to distinguish our Confrontation Clause from the United States Constitution by insuring a criminal defendant the right "to meet the witnesses against him face to face." Mont. Const. art. II, § 24.

*Clark*, ¶ 24.

¶59 The point of *Clark* is that whatever confrontation right the Sixth Amendment guarantees to persons accused of crimes, Montana's Constitution protects this right to an even greater extent because the plain language of our Constitution "specifically guarantees a criminal defendant the right to a *face-to-face* confrontation with his or her accusers." *Clark*, ¶ 25 (emphasis added).

## B. *Crawford* and the Federal Right of Confrontation

### 1. Background

¶60 Crawford stabbed a man who allegedly tried to rape his wife, Sylvia. Over objection, the prosecution introduced--as evidence that the stabbing was not in self-defense, as Crawford claimed--a tape-recorded statement that Sylvia had made during a police interrogation. Sylvia did not testify at trial because of Washington's marital privilege; however, this privilege did not extend to out-of-court statements admissible under an exception to the hearsay rule. *See Crawford*, 541 U.S. at 38-40, 124 S.Ct. at 1356-58.

¶61 The State invoked the exception for statements against penal interest, Wash. Rule Evid. 804(b)(3) (2003). In response, Crawford argued that, state law notwithstanding, admitting Sylvia's statement would violate his federal constitutional right to be "confronted with the witnesses against him." *Crawford*, 541 U.S. at 40, 124 S.Ct. at 1358 (internal quotation marks omitted). In denying Crawford's objection, the trial court relied on *Roberts*, *supra*. Under that case, the out-of-court statement of an unavailable[9] witness

---

9 In *United States v. Inadi* (1986), 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390, the Supreme Court "rejected the proposition that *Roberts* established a rule that 'no out-of-court

44

against a criminal defendant is not barred if the statement bears "adequate indicia of reliability." *Crawford*, 541 U.S. at 40, 124 S.Ct. at 1358 (internal quotation marks omitted). To meet this test, the statement must fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." *Crawford,* 541 U.S. at 40, 124 S.Ct. at 1358 (internal quotation marks omitted).

¶62 Concluding that Sylvia's statement was sufficiently reliable under the latter ground--i.e., it bore "particularized guarantees of trustworthiness"--the trial court admitted it. *See Crawford*, 541 U.S. at 40, 124 S.Ct. at 1358. The prosecution played the tape for the jury and referred to it in closing argument as "damning evidence" that "completely refutes" Crawford's claim of self-defense. *Crawford*, 541 U.S. at 40-41, 124 S.Ct. at 1358 (internal quotation marks omitted). The jury convicted Crawford of assault, *see Crawford*, 541 U.S. at 41, 124 S.Ct. at 1358, and the Washington Supreme Court upheld the conviction after determining that Sylvia's statement was "reliable," *see Crawford*, 541 U.S. at 38, 124 S.Ct. at 1357.

¶63 On appeal, the United States Supreme Court addressed the issue of whether the procedure used by the Washington courts complied with the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford*, 541 U.S. at 38, 124 S.Ct. at 1357

statement would be admissible without a showing of unavailability.' To the contrary, rather than establishing 'a wholesale revision of the law of evidence' under the guise of the Confrontation Clause, we concluded that '*Roberts* must be read consistently with the question it answered, the authority it cited, and its own facts.' So understood, *Roberts* stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry *only when the challenged out-of-court statements were made in the course of a prior judicial proceeding.*" *White,* 502 U.S. at 353-54, 112 S.Ct. at 741 (emphasis added) (citations omitted).

(alteration and ellipsis in original) (internal quotation marks omitted). In resolving this question against the State, the Court overruled *Roberts*, at least as that case applies to a particular class of out-of-court statements. *Crawford*, 541 U.S. at 68-69, 124 S.Ct. at 1374.

¶64 The Court commenced its analysis by discussing the common law tradition and development of the Confrontation Clause. *See Crawford*, 541 U.S. at 43-50, 124 S.Ct. at 1359-63. From this history, the Court drew two inferences about the meaning of the Sixth Amendment. First, the Court determined that "the principle evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused."[10] *Crawford*, 541 U.S. at 50, 124 S.Ct. at 1363. Accordingly, the Court soundly "reject[ed] the view that the Confrontation Clause applies of its own force only to in-court testimony,

---

[10] One of the "most notorious" instances of civil-law examination occurred in the great political trial of Sir Walter Raleigh for treason in 1603. *See Crawford*, 541 U.S. at 44, 124 S.Ct. at 1360. The Court discussed this trial--which has long been thought a "paradigmatic confrontation violation," *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364--during its analysis of the historical background of the Confrontation Clause:

> Lord Cobham, Raleigh's alleged accomplice, had implicated him in an examination before the Privy Council and in a letter. At Raleigh's trial, these were read to the jury. Raleigh argued that Cobham had lied to save himself: "Cobham is absolutely in the King's mercy; to excuse me cannot avail him; by accusing me he may hope for favour." Suspecting that Cobham would recant, Raleigh demanded that the judges call him to appear, arguing that "[t]he Proof of the Common Law is by witness and jury: let Cobham be here, let him speak it. Call my accuser before my face . . . ." The judges refused, and, despite Raleigh's protestations that he was being tried "by the Spanish Inquisition," the jury convicted, and Raleigh was sentenced to death.

*Crawford*, 541 U.S. at 44, 124 S.Ct. at 1360 (alteration and ellipsis in original) (internal citations omitted).

and that its application to out-of-court statements introduced at trial depends upon the law of Evidence." *Crawford*, 541 U.S. at 50-51, 124 S.Ct. at 1364 (internal quotation marks omitted). Moreover, the Court explained, "[t]he constitutional text . . . reflects an especially acute concern with a specific type of out-of-court statement," which the Court referred to as "testimonial" hearsay.[11] *See Crawford*, 541 U.S. at 51, 53, 124 S.Ct. at 1364, 1365.

¶65 The second proposition supported by the history of the Confrontation Clause is "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54, 124 S.Ct. at 1365. Furthermore, the text of the Sixth Amendment does not suggest that courts may develop "open-ended exceptions from the confrontation requirement." *Crawford*, 541 U.S. at 54, 124 S.Ct. at 1365. Rather, the Confrontation Clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." *Crawford*, 541 U.S. at 54, 124 S.Ct. at 1365. Those exceptions "conditioned admissibility of an absent witness's examination on *unavailability* and *a prior opportunity to cross-examine*," *Crawford*, 541 U.S. at 54, 124 S.Ct. at 1366 (emphases added), not on amorphous notions of reliability and

---

[11] It was not necessary in *Crawford* to "definitely resolve" whether the Confrontation Clause applies *only* to testimonial hearsay, since Sylvia Crawford's statement was "testimonial under any definition." *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370. However, the Court did note that "even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object." *Crawford*, 541 U.S. at 53, 124 S.Ct. at 1365.

trustworthiness. Therefore, the Sixth Amendment incorporates those limitations. *See Crawford*, 541 U.S. at 54, 124 S.Ct. at 1366.

¶66 Moreover, the Court determined from the historical record that a prior opportunity to cross-examine was a "necessary," and not "merely a sufficient, . . . condition for admissibility of testimonial statements." *Crawford*, 541 U.S. at 55, 124 S.Ct. at 1366-67. In other words, the requirement was "dispositive" as to whether a testimonial statement could be admitted; it was not merely one of several ways to establish reliability. *See Crawford*, 541 U.S. at 55-56, 124 S.Ct. at 1367. The Court also observed that while there were exceptions to the general rule of exclusion of hearsay evidence in 1791 (the year the Sixth Amendment was ratified), most of those exceptions "covered statements that by their nature were not testimonial--for example, business records or statements in furtherance of a conspiracy." *Crawford*, 541 U.S. at 56, 124 S.Ct. at 1367. "[T]here is scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a *criminal* case."[12] *Crawford*, 541 U.S. at 56, 124 S.Ct. at 1367 (emphases in original).

¶67 The Court then addressed its prior case law, *see Crawford*, 541 U.S. at 57-59, 124 S.Ct. at 1367-69, concluding that, for the most part, its jurisprudence (or, at least, the outcomes of its cases) had been consistent with the two propositions discussed above and with the Framers' understanding of the right of confrontation: "Testimonial statements of

---

[12] The Court acknowledged that testimonial statements were admitted in some cases under the "dying declaration" exception. *See Crawford*, 541 U.S. at 56 n.6, 124 S.Ct. at 1367 n.6. However, even if the Sixth Amendment incorporates an exception for testimonial dying declarations, "it is *sui generis*." *Crawford*, 541 U.S. at 56 n.6, 124 S.Ct. at 1367 n.6.

witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."[13] *Crawford*, 541 U.S. at 59, 124 S.Ct. at 1369.

¶68    In sum, *Crawford* sets forth a categorical bar:  certain hearsay evidence is inadmissible at a criminal trial unless (1) the declarant is unavailable and (2) the defendant has had a prior opportunity to cross-examine the declarant.  *See Crawford*, 541 U.S. at 53-54, 55-56, 59, 68, 124 S.Ct. at 1365, 1366-67, 1369, 1374.  The "specific type of out-of-court statement" implicated by this prohibition is, at a minimum, the "testimonial" statement of a witness who is absent from trial.  *See Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364.

### 2. "Testimonial" Statements

¶69    The Court "[left] for another day any effort to spell out a comprehensive definition of 'testimonial,' " *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374; however, it did, nonetheless, provide a number of insights into what the term means.  The Court stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374.  We are also told that "[a]n accuser who makes a formal statement to government officers bears testimony," *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364, and that a plea allocution showing the existence of a conspiracy is "plainly testimonial," *Crawford*, 541 U.S. at 64, 124 S.Ct. at 1372.  At the other extreme,

_____

[13]    *Crawford* left undisturbed the rule of forfeiture by wrongdoing, which extinguishes confrontation claims on equitable grounds.  *See Crawford*, 541 U.S. at 62, 124 S.Ct. at 1370.

"[a]n off-hand, overheard remark" and "a casual remark to an acquaintance" are nontestimonial. *See Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364. Also, statements falling within the hearsay exceptions for business records and statements in furtherance of a conspiracy at the time of the framing "by their nature were not testimonial." *Crawford*, 541 U.S. at 56, 124 S.Ct. at 1367.

¶70    As for statements which do not fit within one of the foregoing examples, the Court provided guidance in the form of three definitions or "formulations" of testimonial statements:

> "*ex parte* in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23;  "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois*, 502 U.S. 346, 365 (1992) (THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); [and] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 3.

*Crawford*, 541 U.S. at 51-52, 124 S.Ct. at 1364 (ellipsis in original).  While these formulations suggest the dividing line between "testimonial" and "nontestimonial," the Court did not identify any of them as defining the outer boundary of testimonial statements (since Sylvia Crawford's statement was "testimonial under any definition," *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370).  Rather, the Court observed that "[t]hese formulations all share a common nucleus and then define the Clause's coverage *at various levels of abstraction around it*." *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364

(emphasis added). *See also Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374 ("[Testimonial] applies *at a minimum* to prior testimony at a preliminary hearing, before a grand jury, or at a former trial.") (emphasis added); *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364 ("Statements taken by police officers in the course of interrogations are also testimonial *under even a narrow standard*.") (emphasis added). (The third formulation--asking whether the circumstances under which a statement was made would lead an objective witness reasonably to believe that the statement would be available for use at a later trial-- is the broadest of the three, while the second--tying the definition of testimonial to "formalized" materials--is the narrowest.) Thus, because the statements by Debra to Grove and King do not fit within any of the aforementioned examples,[14] it is necessary in the case at hand to determine what "level[] of abstraction," *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364, best reflects the meaning of "testimonial" as contemplated by *Crawford* and the Confrontation Clause, and whether Debra's statements fall within that formulation.[15]

---

[14] Debra's statements to Deputy Buennemeyer fit within the category of "interrogations by law enforcement officers." *Crawford*, 541 U.S. at 53, 124 S.Ct. at 1365. The Court used the term " 'interrogation' in its colloquial, rather than any technical legal, sense," *Crawford*, 541 U.S. at 53 n.4, 124 S.Ct. at 1365 n.4; and, at the time Debra's statements were made, Buennemeyer was at the Mizenkos' house, pursuant to "a report of a domestic problem," investigating Debra's charge that Mizenko had "hit her, pushed her down and . . . pulle[d] out her hair."

[15] In this regard, our previous decision addressing the meaning of "testimonial"--*State v. Carter*, 2005 MT 87, 326 Mont. 427, 114 P.3d 1001--is inapposite. While we acknowledged the applicability of *Crawford* to the hearsay statements at issue in *Carter* (the certification reports for the Intoxilizer 5000), we explicitly declined to even "attempt to articulate a precise definition of testimonial evidence," *Carter*, ¶ 31, concluding simply that "the certification reports used at Carter's trial are nontestimonial evidence because they do not fall within the *core group* of statements which the Confrontation Clause was meant to address," *Carter*, ¶ 32 (emphasis added). Furthermore, we relied on pre-*Crawford* Montana law--specifically, *State v. Delaney*, 1999 MT 317, 297 Mont. 263,

¶71 In ascertaining the breadth of "testimonial," the starting point is the text of the Confrontation Clause itself, which by its terms applies to "witnesses against [the accused]." U.S. Const. amend. VI. As noted above, the Court rejected the view that this provision applies only to *in-court* testimony (i.e., persons who testify against the accused at trial). *See Crawford*, 541 U.S. at 50-51, 124 S.Ct. at 1364. At the same time, however, the Court made it clear that not *all* declarants whose out-of-court statements are offered at trial to prove the truth of what they assert are "witnesses" within the meaning of the Sixth Amendment. *See Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364 ("not all hearsay implicates the Sixth Amendment's core concerns"). Rather, the term applies to "those who 'bear testimony.' " *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364 (quoting 1 N. Webster, An American Dictionary of the English Language (1828)). Thus, the question becomes under what circumstances besides those listed in *Crawford* as plainly testimonial--prior testimony at a preliminary hearing, before a grand jury, or at a former trial; police interrogations; a formal statement made by an accuser to a government officer; and a plea allocution showing the existence of a conspiracy--is an out-of-court declarant "bear[ing] testimony." In other words, when is a declarant functioning as a "witness[]" against the accused extrajudicially? *Cf.* Mosteller, *Encouraging and Ensuring*, *supra* note 2, at 515 ("In essence, the issue is whether the core of the

---

991 P.2d 461--in defining "testimonial" for purposes of the certification reports. *See Carter*, ¶ 32 ("As we stated in *Delaney*, such certification reports are not substantive evidence of a particular offense, but rather are foundational evidence necessary for the admission of substantive evidence. In other words, the certification reports are nontestimonial in nature in that they are foundational, rather than substantive or accusatory.") (citation omitted); *Carter*, ¶ 34 ("Thus, we adhere to the rationale of *Delaney* and hold that the nontestimonial pieces of evidence at issue here . . . do not implicate Carter's constitutional right of confrontation.").

Confrontation Clause, covering a relatively small group of statements, is instead the complete confrontation right."). The answer to this question determines which statements that do not fit within the aforementioned "common nucleus" are nevertheless testimonial.

¶72 At the outset, it is necessary to clarify, for the reasons which follow, that neither government involvement nor a particular procedure in procuring a declarant's statement is required in order for the declarant to function as a witness against the accused. First, all of the formulations set forth in *Crawford* contemplate statements made in the absence of government officials or agents, and two of the three formulations clearly extend to situations outside the ambit of formalized materials. Specifically, the first formulation refers to the "functional equivalent" of *ex parte* in-court testimony, giving affidavits[16] and "similar pretrial statements that declarants would reasonably expect to be used prosecutorially" as examples. *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364 (internal quotation marks omitted). The second formulation, which is the narrowest of the three, also includes affidavits as an example of a testimonial statement.[17] *See Crawford*, 541 U.S. at 51-52, 124 S.Ct. at 1364. And the third formulation refers to statements that were made "under circumstances which would lead an objective witness reasonably to believe

---

[16] An "affidavit" is "a written declaration under oath, made without notice to the adverse party." Section 26-1-1001, MCA. A notary public, who is not necessarily a government official, *see* §§ 1-5-401 to -402, MCA, has the power to administer oaths or affirmations, *see* § 1-6-101, MCA, and to take depositions and affidavits, *see* § 1-5-416(1)(b), MCA.

[17] The second formulation, proposed by Justice Thomas in *White*, 502 U.S. at 365, 112 S.Ct. at 747 (Thomas, J., concurring in part and concurring in the judgment), also includes "confessions," *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364, which is noteworthy because confessions are not always taken in a "formalized" manner.

53

that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364 (internal quotation marks omitted).

¶73 Second, in its discussion of the historical development of the right of confrontation and the "principal evil" at which the Confrontation Clause was directed, the Court repeatedly emphasized the *ex parte* aspect of the evidence admitted against the accused and the absence of face to face confrontation. *See Crawford*, 541 U.S. at 43-50, 124 S.Ct. at 1359-63. Although it was frequently the case that a government official had gathered this evidence pursuant to a prescribed or formalized procedure, it was the accused's lack of an opportunity to confront his accuser which most concerned the Framers. Indeed, one source of the out-of-court statements read to the jury at Sir Walter Raleigh's trial was Lord Cobham's letter.[18] *See Crawford*, 541 U.S. at 44, 124 S.Ct. at 1360. Furthermore, to say that the right of confrontation is concerned only with statements given pursuant to a formalized procedure would render statements most in need of testing "in the crucible of cross-examination," *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370, beyond the Clause's reach.[19] It would be a strained interpretation of the historical record, therefore, to

---

[18] Cobham actually wrote *two* letters "to the Lords, one on July 29, 1603, after his examination before the Council on July 20. The other, which is much more damning, was written just before trial, which occurred in November 1603. It explained away Cobham's recantation of his accusation as occasioned by two letters Raleigh was able to get to Cobham while he was in prison, begging him to renounce his former statements. While the voluntariness of the statements may be doubted, nothing in the proceedings indicated that the first letter was solicited by the Council and the second was stated to be unsolicited." Mosteller, *Encouraging and Ensuring*, at 545 (footnotes omitted).

[19] *See* Mosteller, *Encouraging and Ensuring*, at 571 & n.309 ("When statements are accurately recorded in their entirety, then manipulation [by government officials] of what was said is not possible. Interestingly, this particular concern is not eliminated--but exacerbated--by the failure to record the statement when it is made, which a focus on formality in recording gets

conclude that the Framers would be content with the reading of out-of-court statements as long as they had been given informally to a civilian acquaintance instead of formally to a government official or agent.

¶74 Third, there is evidence that at the time of the framing, the legal community understood that a person who made an accusation against the defendant was the equivalent of a witness against him, though the statement was not made to a government official or pursuant to a prescribed procedure. *See* Robert P. Mosteller, *Remaking Confrontation Clause and Hearsay Doctrine Under the Challenge of Child Sexual Abuse Prosecutions*, 1993 U. Ill. L. Rev. 691, 749 (1993) (hereinafter, "Mosteller, *Remaking*").

> For example, in *King v. Brasier* [(1779), 168 Eng. Rep. 202], an ordinary criminal case decided in England a decade before the drafting of the Confrontation Clause, the defendant was charged with rape of a seven-year-old child and convicted on the testimony of the child's mother and another individual who related the accusations made to them by the child immediately after she returned home following the assault. The child was not sworn or produced as a witness at trial. The conviction was found invalid because of the determination that "no testimony whatever can be legally received except on oath," a determination that unmistakably rested on the conclusion that the child was effectively a witness against the defendant despite her oral statement being offered through other witnesses. This procedural infirmity was not forgiven even though the statement would likely have been admitted under modern analysis as an excited utterance.

---

backward. For example, the court in *People v. Cage* said that because the statement to the officer was not written down but recited from memory, the statement was non-testimonial. 15 Cal. Rptr. 3d 846, 857 (Ct. App. 2004)[, *review granted*, 19 Cal.Rptr.3d 824 (Cal. Oct. 13, 2004)]. In fact, the possibility of governmental manipulation is even greater with informal statements because witnesses are not constrained by contemporaneous written records that may check additions and modifications.") (n.308 omitted).

Mosteller, *Remaking*, at 749-50 (footnotes omitted).  Professor Mosteller also points out that "historical practice did not depend on whether the statement was made with a view toward legal proceedings."  Mosteller, *Remaking*, at 750.

¶75    Fourth, pursuant to the procedural rules of our legal system, declarants are able to "bear testimony" in informal extrajudicial settings.  This is due to the fact that our legal system generally places no greater restrictions upon a fact-finder in assessing testimony given by a declarant in the form of out-of-court statements versus as a live witness in court.  In other words, a fact-finder may give the same weight to the statement "Joe assaulted me" whether it is repeated by the declarant herself in court, repeated by a police officer on the declarant's behalf, or repeated by a private citizen on the declarant's behalf.  And the same is true whether the statement is read from the declarant's diary or from an affidavit signed by the declarant.  For this reason, it would be specious to define "testimonial" as requiring governmental involvement or prescribed formalities in obtaining the statement.  *See* Richard D. Friedman, *Confrontation: The Search for Basic Principles*, 86 Geo. L.J. 1011, 1039 (1998) (hereinafter, "Friedman, *Basic Principles*") ("The question of whether a statement made by a person out-of-court should be considered testimonial--or put another way, whether the person should be considered a witness in making the statement--is not exogenous to the legal system's procedural rules.  Rather, the question depends crucially on those rules because to a large extent it depends on the use that the system makes of the statement.").

¶76    Lastly, the right of confrontation is expressed in general terms:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with *the witnesses*

56

*against him.*" U.S. Const. amend. VI (emphasis added). This language reflects a target broader than just *ex parte* examinations by government officials or pursuant to formalized procedures: the ability of a witness to bear testimony extrajudicially, not under oath, and not subject to cross-examination, as did Lord Cobham.[20] If examinations of witnesses by government officials or pursuant to particular formalities were the only concern of the Framers, then they surely would have drafted the Clause to reflect this, using narrower language that more directly addressed such concerns (e.g., "the accused shall enjoy the right to be confronted with the witnesses against him who have provided *ex parte* testimony pursuant to formal examinations by government officials").

¶77     Thus, the definition of "witnesses against" the accused does not turn on whether the declarant made her statement to a government official or agent (whether of her own initiative or pursuant to an interrogation) or in some prescribed manner, though these factors are undoubtedly relevant to the inquiry. A declarant who, with anticipation that her oral statement will be presented to the fact-finder at a criminal trial, entrusts a civilian

---

[20] It is unclear, due to the vacillating nature of its opinion, whether the majority narrowly construes the target of the Confrontation Clause as *examinations* of witnesses by *government officials*. *Compare* ¶¶ 18, 19, 21, 27 (emphasizing the presence or absence of government agents, and referring to recorded statements, elicited statements, official investigations, judicial-process-created evidence, etc.) *with* ¶ 19 ("Thus, if just before trial a person shoved a written statement under the courthouse door, asserting that the accused did in fact commit the crime, that would plainly be testimonial even though no government official played a role in preparing the statement.") (internal quotation marks omitted) (quoting Richard D. Friedman, *The Confrontation Clause Re-Rooted and Transformed*, 2004 Cato Sup. Ct. Rev. 439, 458). But, to the extent it is advocating a government agent and/or formalized procedure standard, the majority is reading *Crawford* too narrowly. The Court referred to the "use of *ex parte* examinations as evidence against the accused" as a particularly heinous aspect of the civil-law mode of criminal procedure, which itself was characterized only as the "principal" evil at which the Confrontation Clause was directed. *See Crawford*, 541 U.S. at 50, 124 S.Ct. at 1363.

acquaintance to relay that statement is surely "bear[ing] testimony," notwithstanding the absence of governmental involvement in obtaining the statement or prescribed procedures in recording it.

¶78    Furthermore, the meaning of "witnesses against" is not derived by reference to the particular vices of the civil-law mode of criminal procedure that existed at the time of the framing (*ex parte* examinations being the primary vice).  *See generally* Mosteller, *Remaking*, at 751-55.[21]  To hold otherwise would freeze application of the Clause to a particular historical affront to the common law right of confrontation:  the use of *ex parte* examinations--and modern procedures which "bear a striking resemblance" thereto, such as police interrogations, *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364--as evidence against the accused.  In other words, to say that the Confrontation Clause applies only to the particular modes of collecting prosecutorial evidence which were known in 1791 (the year the Sixth Amendment was ratified) and which the Framers rejected would leave modern, functionally equivalent means of evading the common law right of confrontation intact, and thereby leave the government free to employ such methods, a possibility the Framers surely recognized but did not intend with the words "witnesses against."

¶79    It is for this reason that "witnesses against" must be interpreted by reference to the *substance*--as opposed to the *form* or manifestations--of the evil at which the

---

[21]  "[E]ven though opposition to the worst elements of the inquisitorial system motivated acceptance of the Confrontation Clause, no affirmative evidence exists that the Framers intended the clause to limit its reach only to the specific inquisitorial procedures.  The best guide--the actual words of the Sixth Amendment's Confrontation Clause--do not carry such a message.  Nevertheless, there is strong reason to believe that the Framers intended the confrontation right to prevent such procedures in particular."  Mosteller, *Remaking*, at 754.

Confrontation Clause was directed and which the failings of the civil-law mode of criminal procedure represented. The many shortcomings of the inquisitorial system are obvious. For instance, as the majority observes, denying the right of confrontation creates risks of "possible prosecutorial misconduct and overzealousness," ¶ 15, and "abuse [of] the criminal justice system [by a declarant] in order to punish, to exact revenge on, or to shift the blame to the defendant," ¶ 16. *See also* Mosteller, *Encouraging and Ensuring*, at 569-71 (suggesting, with respect to police questioning of a declarant, "[t]hree broad purposes" served by the Confrontation Clause: preventing "government[al] manipulation of the witness in creating the evidence--manipulating the words uttered," preventing "governmental manipulation of the recording of the statement rather than manipulation of what was said," and "protect[ing] the defendant from malicious falsehoods or even errors by the witness independent of governmental manipulation."). In addition, the accused is unable to explore the declarant's motives in making the statement, the declarant's direct knowledge of the facts which the statement asserts as true, the declarant's ability to have observed and understood the events her statement represents, the declarant's memory and perception of her situation, and the declarant's credibility. *Cf. Crawford*, 541 U.S. at 65-67, 124 S.Ct. at 1372-73 (discussing the purposes cross-examination would have served at Crawford's trial).[22]

---

[22] *See also* Mosteller, *Remaking*, at 753-54 ("Proof of the state's case through ex parte accusations is antithetical to the adversary system in three regards. First, the manner in which the accusation is created is suspect--often secret and always one-sided. Second, the presentation of the state's case through such documents rather than by oral presentation of the witness is inconsistent with face-to-face accusation. The historical record indicates that the drafters were not inclined to permit trial by dossier. Third, the procedure denies the accused the right to cross-examine the witnesses--to test their conscience about the accusation.") (footnote omitted).

¶80    Furthermore, a third party witness who repeats a declarant's hearsay statement at trial inevitably does so through the filter of his or her own perceptions, prejudices, and motivations. Nevertheless, because the witness is under oath, the declarant's statement is presumed by the fact-finder to be true. In other words, the hearsay statement itself takes on the mantle of a sworn statement because the third party witness swears to the truth of his or her recollection and rendition of the statement. Absent outright confabulation or perjury, however, a witness testifies only to what he or she *believes* is the truth--i.e., his or her perceived, subjective understanding of what he or she saw or heard. *See State v. Clifford*, 2005 MT 219, ¶ 71, 328 Mont. 300, ¶ 71, 121 P.3d 489, ¶ 71 (Nelson, J., concurring). Granted, there may be cases in which the defendant will effectively cross-examine a third party witness on issues of bias, powers of observation, ability to retain and recall, etc.; however, doing so is not a sufficient substitute for cross-examining *the declarant*. "Raleigh was, after all, perfectly free to confront those who read Cobham's confession in court." *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364. Yet, "Raleigh's trial has long been thought a paradigmatic confrontation violation." *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364.

¶81    Again, it is the right of the accused to test the truth and reliability of an out-of-court statement "in the crucible of cross-examination" of *the declarant*, *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370, that the Framers enshrined in the Sixth Amendment. The importance of adversarial testing--which underlies our entire legal system--cannot be understated. In *California v. Green* (1970), 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489, the Court observed that

[c]onfrontation: (1) insures that the witness will give his statements under oath--thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*Green*, 399 U.S. at 158, 90 S.Ct. at 1935 (footnote omitted). It is not surprising, therefore, that the common law right of confrontation and, thus, the Confrontation Clause

reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about *how reliability can best be determined*. Cf. 3 Blackstone, Commentaries, at 373 ("This open examination of witnesses . . . is much more conducive to the clearing up of truth"); M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better").

*Crawford*, 541 U.S. at 61-62, 124 S.Ct. at 1370 (ellipsis in original) (emphasis added).

¶82    Hence, guaranteeing the right to confront one's accusers is the Framers' response to a system that permitted the use at trial of statements not subjected to adversarial testing. Again, some of the shortcomings inherent in such a system are the inability of the accused to probe inconsistencies or untruths in the declarant's statement and to elicit additional information from the declarant; the potential for misrepresentations (inadvertent though they may be) on the part of the third party witness; the risk of "prosecutorial misconduct and overzealousness," ¶ 15; and the potential for "abuse [of] the criminal justice system [by the declarant]," ¶ 16. This is not to say, however, that the confrontation right arises only when these specific shortcomings are implicated (e.g., only when there is a possibility for prosecutorial misconduct and/or declarant maliciousness). As noted above, if the Clause's reach were limited by strict reference to particular

61

manifestations or symptoms of the mode of criminal procedure rejected by the Framers, then analogous inquisitorial practices would be free to flourish.

¶83    Rather, the confrontation right arises whenever the civil-law system itself is implicated. *See Crawford*, 541 U.S. at 48, 124 S.Ct. at 1362 ("At the Massachusetts ratifying convention, Abraham Holmes objected to [the omission in the proposed Federal Constitution of a right of confrontation] precisely on the ground that it would lead to civil-law practices . . . ."). This occurs when a declarant creates testimony without doing so before the fact-finder under oath and subject to cross-examination by the accused. *See Crawford*, 541 U.S. at 43-50, 124 S.Ct. at 1359-63. *Cf.* Mosteller, *Encouraging and Ensuring*, at 514 (characterizing "the positive procedural goal of the confrontation right" as "encouraging and ensuring that evidence is presented in the courtroom in the presence of the accused and subject to adversarial testing"). Stated more generally, the substance of the evil at which the Confrontation Clause was directed is the inequity and inaccuracy inherent in a system of criminal procedure which precludes an accused from challenging the reliability of the State's evidence through meaningful confrontation and permits the State to convict a person on the basis of testimony given extrajudicially. *Cf.* Mosteller, *Remaking*, at 748 n.277 (characterizing "the historical evil" as "proof of charges by statements from absent accusers").

¶84    Thus, the Confrontation Clause ensures an adversarial system pursuant to which testimony is given at trial. Given this purpose, an out-of-court declarant "bear[s] testimony" or functions extrajudicially as a "witness[]" against the accused when she understands, or should understand, that she is doing so or, independent of her

understanding, when the government is gathering evidence for possible prosecutorial use. The evidence-gathering feature of functioning as a witness against the accused is reflected in the first two formulations set forth in *Crawford*, which refer to "custodial examinations," "prior testimony," and "depositions," *see Crawford*, 541 U.S. at 51-52, 124 S.Ct. at 1364, as well as the Court's extended discussion of pretrial *examinations* of suspects and witnesses by justices of the peace or other officials, *see Crawford*, 541 U.S. at 43-48, 124 S.Ct. at 1359-62, while the witness-understanding feature is reflected in *Crawford*'s first and third formulations, which ask what a declarant would reasonably expect concerning the prosecutorial use of her statements (first formulation) and whether the statements were made under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at a later trial (third formulation). *See Crawford*, 541 U.S. at 51, 52, 124 S.Ct. at 1364.

¶85 All three formulations indicate that the proper focus is on the statement's function or evidentiary purpose, as opposed to its characteristics. *See generally* Friedman, *Grappling*, *supra* note 2, at 3-6.[23] In other words, did the statement, at the time it was made, serve the function of in-court testimony? Professor Friedman proposes a general definition of this function: "[The function of prosecution testimony], in rough terms, is

---

[23] Professor Friedman points out that "[i]t . . . makes no sense to determine whether a statement is testimonial by asking whether the statement shares key characteristics with trial testimony. The very point of the Clause is to ensure that testimony will be given at trial, or at some other proceeding that maintains the essential attributes of trial testimony. To say that a statement is beyond the reach of the Confrontation Clause because the circumstances in which it was given do not resemble a trial therefore turns logic on its head. It means that the more that a statement fails to satisfy the conditions for testimony prescribed by the Confrontation Clause, the less likely the Clause will address the problem." Friedman, *Grappling*, at 3.

the transmittal of information for use in prosecution." Friedman, *Grappling*, at 2. In light of the foregoing discussion, whether an out-of-court statement is being transmitted for use in prosecution depends on the nature of the statement, the circumstances under which it was made, and to whom it was made.[24] If, given these considerations, the declarant should have anticipated that her statement would be used in a criminal proceeding, she was functioning as a witness against the accused, and her statement is testimonial. (As implicated by the standard itself, this is an objective inquiry, which will be discussed in greater detail below. *See* ¶ 89, *infra*.) Furthermore, if the declarant was speaking to a government agent who was generating testimony, her statement is testimonial regardless of whether she recognized that purpose. *See* Mosteller, *Encouraging and Ensuring*, at 614, 624. Professor Mosteller points out that "the Framers feared the role of the government in manipulating the statements received and would not have excused them if the government deluded the witnesses or took advantage of their inadequate knowledge or limited mental capacity." Mosteller, *Encouraging and Ensuring*, at 624-25.

¶86    To state a definition of "testimonial" any narrower than the foregoing formulation would afford the government ample opportunities to avoid *Crawford*'s mandate and the right of confrontation through a variety of countermeasures.

---

[24] As explained above, whether the statement at issue was made to a government official or in a formalized manner or was obtained through a procedure that bears a "striking resemblance" to examinations by justices of the peace in England," *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364, is not talismanic. Rather, such characteristics relate to the circumstances or formalities under which the statement was made and, as such, are merely informative of whether the declarant should have anticipated that the statement would be used in a criminal proceeding.

> [M]any of the indicators of testimonial statements[--e.g., they were made pursuant to police interrogation, they are contained in formal, signed, written documents, etc.--]can disappear. If such "cookbook" changes in form can render the statements non-testimonial, avoidance of the restriction of *Crawford* will prove relatively easy for many statements that are not made to police officers, and if there is no Confrontation Clause protection whatsoever for those statements, serious issues of justice as to problematic accusatory statements will go unaddressed.

Mosteller, *Encouraging and Ensuring*, at 539-40. Stating a narrower definition also would permit a declarant to act as a witness while escaping confrontation by the simple expedient of making her statement in a manner less formal than the formalities implicated by the first and second formulations set forth in *Crawford* or to anyone other than a government agent. Professor Friedman, posits the following example:

> A woman tells a counselor at a private shelter that she has been raped. The counselor says:

> > Please make a statement for us. We will videotape it and send the tape to the prosecutor. I anticipate that the prosecutor's office will use it at trial as the cornerstone of its case against your assailant. The prosecutor won't have to call you as a witness, because that's just not necessary any more . . . . The accused might call you--but only if he dares, and only if you're then available. Which, so far as the law is concerned, you needn't be. [¶] Oh, and by the way, since you're not speaking under oath, don't worry about the prosecutor going after you for perjury.

Friedman, *Basic Principles*, at 1041.

¶87    If the woman in this example makes the statement and if it is then presented at trial, she undoubtedly was acting as a "witness[] against" her assailant. She was providing testimony in a manner to which the legal system is receptive; she anticipated that her statement could (and would) be used testimonially; and the counselor essentially

acted as a conduit or an agent for the declarant. *See* Friedman, *Basic Principles*, at 1041. The fact that the statement was not made to the authorities, or even at their instigation, does not alter this conclusion.[25]

¶88     But even if the declarant is not seeking to escape cross-examination, the result can be no different. It is no less a Confrontation Clause violation to disallow confrontation simply because the declarant's motives (to the extent those motives are ascertainable) are benign. While protecting the accused from "malicious falsehoods" perpetrated by the declarant is one goal effectuated by the Clause, the Framers were equally concerned with "unchecked witness error." *See* Mosteller, *Encouraging and Ensuring*, at 571.

¶89     For this reason, the foregoing inquiry--whether the declarant should have anticipated that her statement would be used in a criminal proceeding--is an objective standard,[26] which may be expressed in a number of ways. For instance, given the nature

---

[25] Nor does the fact that the woman's statement was not made under oath. The Supreme Court specifically stated that "the absence of oath [is] not dispositive. Cobham's examination was unsworn, yet Raleigh's trial has long been thought a paradigmatic confrontation violation." *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364 (citation omitted). *See also Crawford*, 541 U.S. at 52 n.3, 124 S.Ct. at 1365 n.3 ("We find it implausible that a provision which concededly condemned trial by sworn *ex parte* affidavit thought trial by *unsworn ex parte* affidavit perfectly OK."); Friedman, *Basic Principles*, at 1042. ("The oath is one of the protections accorded the defendant, providing some assurance that witnesses will not offer testimony without putting themselves at risk for false statement. Assuming the statement was made with testimonial intent, the absence of an oath is part of the problem; it should not be an excuse for admitting an accusatory statement that suffers from yet another critical problem--the lack of opportunity for adversarial examination.").

[26] This standard is suggested by *Crawford* itself. The first formulation of "testimonial" implicates an objective inquiry ("pretrial statements that declarants would *reasonably expect* to be used prosecutorially"), while the third states the standard explicitly ("statements that were made under circumstances which would lead an *objective* witness reasonably to believe that the statement would be available for use at a later trial"). *See Crawford*, 541 U.S. at 51, 52, 124 S.Ct. at 1364 (emphases added).

of the statement, the circumstances under which it was made, and to whom it was made, would an objective declarant have believed that the statement would be available for use at a later trial? This inquiry resembles *Crawford*'s third formulation.[27] *See Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364. Alternatively, should the declarant have understood at the time she made her statement that there was a significant probability the statement would be used prosecutorially? Or, because the declarant is deemed to have intended the natural consequences of her actions, *see* Friedman, *Grappling*, at 6-7, was evidentiary use of the statement in a criminal proceeding a natural consequence of the declarant's actions? *See also U.S. v. Summers* (10th Cir. 2005), 414 F.3d 1287, 1302 ("[W]e believe

---

[27] The Supreme Court "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374. The majority infers from this language a "tacit warning" against a court's adopting the third (and, presumably, the first and second) formulation set forth in *Crawford*. *See* ¶ 29. Yet, there is no such "warning" implicit in this language (or anywhere else in the *Crawford* opinion, for that matter); it is merely an observation by the Court that spelling out a *comprehensive* definition was unnecessary to resolve the Confrontation Clause issue in *Crawford*, since Sylvia Crawford's statement was "testimonial under any definition," *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370. Moreover, to conclude that the Court's purpose in setting forth the three formulations was not to give lower courts guidance in defining "testimonial" beyond the specific examples set forth in its opinion, but rather to lead us astray in our attempts to ascertain whether a statement is "testimonial," is a preposterous reading of *Crawford*.

Notably, the majority itself cites with approval numerous courts which adopted and/or applied one or more of the three formulations. *See Horton v. Allen* (1st Cir. 2004), 370 F.3d 75, 84 (cited at ¶ 17); *U.S. v. Brun* (8th Cir. 2005), 416 F.3d 703, 706-07 (cited at ¶ 20); *People v. Cervantes* (Cal.App. 2 Dist. 2004), 12 Cal.Rptr.3d 774, 782-83 (cited at ¶ 21); *State v. Rivera* (Conn. 2004), 844 A.2d 191, 201-02 (cited at ¶ 21); *Compan v. People* (Colo. 2005), 121 P.3d 876, 880-81 (cited at ¶ 28); *Bray v. Com.* (Ky. 2005), ___ S.W.3d ___, 2005 WL 2317014, 2005 Ky. LEXIS 288 (cited at ¶ 30); *State v. Krasky* (Minn.App. 2005), 696 N.W.2d 816, 819-20 (cited at ¶ 30); *People v. Rincon* (Cal.App. 2 Dist. 2005), 28 Cal.Rptr.3d 844, 857, 858 (cited at ¶ 30); *State v. Staten* (S.C.App. 2005), 610 S.E.2d 823, 836 (cited at ¶ 30); *State v. Blackstock* (N.C.App. 2004), 598 S.E.2d 412, 420 (cited at ¶ 30); *State v. Walker* (Wash.App. Div. 1 2005), 118 P.3d 935, ¶¶ 21, 35 (cited at ¶ 30); *State v. Moses* (Wash.App. Div. 1 2005), 119 P.3d 906, ¶¶ 10, 22 (cited at ¶ 30); *U.S. v. Cromer* (6th Cir. 2004), 389 F.3d 662, 675 (adopting and applying a test resembling the third formulation set forth in *Crawford*) (cited at ¶ 16); *Com. v. Gonsalves* (Mass. 2005), 833 N.E.2d 549, 557-58, 561-62 (same) (cited at ¶ 30).

an objective test focusing on the reasonable expectations of the declarant under the circumstances of the case more adequately safeguards the accused's confrontation right and more closely reflects the concerns underpinning the Sixth Amendment. Thus we hold that a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime.") (citation omitted).

¶90    Of particular relevance to this inquiry is whether the statement was accusatorial in nature. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the *accused* shall enjoy the right . . . to be confronted with the witnesses against him.") (emphasis added); *Crawford*, 541 U.S. at 43, 124 S.Ct. at 1359 ("The right to confront one's *accusers* is a concept that dates back to Roman times.") (emphasis added); *Crawford*, 541 U.S. at 43, 124 S.Ct. at 1359 (Pre-trial examinations of suspects and witnesses by justices of the peace or other officials "were sometimes read in court in lieu of live testimony, a practice that 'occasioned frequent demands by the prisoner to have his "*accusers*," *i.e. the witnesses against him*, brought before him face to face.' ") (emphases added); *Crawford*, 541 U.S. at 44, 124 S.Ct. at 1360 ("Suspecting that Cobham would recant, Raleigh demanded that the judges call him to appear . . . . 'Call my *accuser* before my face . . . .' ") (second ellipsis in original) (emphasis added); *Crawford*, 541 U.S. at 47, 124 S.Ct. at 1362 ("Early in the 18th century, . . . the Virginia Council protested against the Governor for having 'privately issued several commissions to examine *witnesses against particular men ex parte*,' complaining that 'the person accused is not admitted to be confronted with, or defend himself against his *defamers*.' ") (emphases added); *Crawford*,

68

541 U.S. at 51, 124 S.Ct. at 1364 ("An *accuser* who makes a formal statement to government officers bears testimony . . . .") (emphasis added); *California v. Green* (1970), 399 U.S. 149, 179, 90 S.Ct. 1930, 1946, 26 L.Ed.2d 489 (Harlan, J., concurring) ("[T]he Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous *accusers*, and absentee witnesses.") (emphasis added); Mosteller, *Encouraging and Ensuring*, at 514 n.18 ("[I]f testimonial is defined using the [third formulation] in *Crawford* and, appropriately interpreted, it will include most accusatory hearsay."); Mosteller, *Remaking*, at 747-49 (setting forth the historical basis for interpreting the Confrontation Clause as applying to accusatorial statements in particular).[28]  Indeed, our conclusion in *State v. Carter*, 2005 MT 87, 326 Mont. 427, 114 P.3d 1001, that the Intoxilizer 5000 certification reports were nontestimonial, is most plausibly reconciled with the foregoing discussion of what constitutes a "testimonial" statement on the ground that the statements represented by the certification reports (e.g., "This machine has been tested and/or calibrated and produces accurate results.") are not accusatory in nature.[29]

---

[28] Professor Mosteller notes that "[t]he proposed amendments to the Constitution that James Madison introduced in the First Congress would have guaranteed the right 'to be confronted with his accusers, and the witnesses against him.'  The reference to accusers was perhaps dropped from the final version because, with the addition of the term *against him*, it was seen as redundant.  By contrast . . . , the Georgia Constitution of 1877 granted a differently phrased and clearly more limited right:  'shall be confronted with the witnesses testifying against him.' [¶] There is certainly no indication that the historical evil of proof of charges by statements from absent accusers had been abandoned by the Framers.  The most reasonable interpretation is that protection against that danger was believed to be accomplished through the phrase *witnesses against*."  Mosteller, *Remaking*, at 748 n.277 (citations omitted).

[29] For this reason, the majority's treatment of *Carter*, *see* ¶ 22, is somewhat baffling, as is its apparent hostility to the idea that the accusatory nature of a statement is relevant to the

"testimonial" inquiry, *see* ¶ 30. As noted above (*see* note 15), we explained in *Carter* that the Intoxilizer 5000 certification reports "are not substantive evidence of a particular offense, but rather are foundational evidence necessary for the admission of substantive evidence. In other words, the certification reports are nontestimonial in nature in that they are foundational, rather than substantive or accusatory." *Carter*, ¶ 32. Not surprisingly, therefore, Mizenko proffers that all out-of-court statements are "testimonial" if they are (1) substantive and (2) accusatorial. *See* ¶ 12. The majority rejects this formulation as "overly broad" because "it would require courts to exclude more evidence than the Sixth Amendment requires." ¶ 12. We are not immediately told what makes Mizenko's formulation "overly broad"--perhaps it is the substantive prong, perhaps it is the accusatorial prong, perhaps it is both prongs, or perhaps it is their simultaneous application--however, the majority enlightens us later in the opinion where it states that "the author of the certification report" was not a " 'witness[] against' " Carter and then reiterates that the certification reports at issue in *Carter* were nontestimonial "because 'not substantive evidence of a particular offense.' " ¶ 22.

Hence, three explanations have been proffered for why the certification reports were found to be nontestimonial in *Carter*: (1) they are foundational, not substantive, evidence of a particular offense, (2) they are not accusatorial in nature, and (3) the person making the statements reflected by the certification reports is not a witness "against" the defendant. As to the first theory, Black's defines "substantive evidence" as "[e]vidence offered to help establish a fact in issue, as opposed to evidence directed to impeach or to support a witness's credibility." Black's Law Dictionary 599-600 (8th ed. 2004). While the majority's theory (that an out-of-court statement is nontestimonial when offered for a purpose other than to establish a fact in issue) is "appealing in its clarity and ease of application," ¶ 12, a more exhaustive analysis of *Crawford* and the right of confrontation than we found necessary to conduct in *Carter* reveals that the "testimonial" inquiry does not depend on whether the statement at issue is offered to establish a fact in issue. There is no indication in *Crawford* that a statement is exempted from Confrontation Clause scrutiny if it is used foundationally to establish the admissibility of other evidence. Rather, the question of whether a "testimonial" inquiry is necessary turns on whether the out-of-court statement is offered to prove the truth of the matter asserted. *See Crawford*, 541 U.S. at 60 n.9, 124 S.Ct. at 1369 n.9 ("The Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").

Furthermore, the majority cites no post-*Crawford* authority for its theory other than *Carter* which, as explained above (*see* note 15), relied on pre-*Crawford* Montana law in defining "testimonial" for purposes of the statements at issue. *See Carter*, ¶¶ 32, 34. Granted, the majority analogizes the Intoxilizer 5000 certification reports to business records, immigration records, and medical records. *See* ¶ 22. However, the reason such records are nontestimonial in a run-of-the-mill case is not because they are "not substantive evidence of a particular offense," which in many cases they are. Rather, it is because the "nature" of such statements places them in the nontestimonial category. *See Crawford*, 541 U.S. at 56, 124 S.Ct. at 1367. Professor Mosteller ably explains this distinction as follows:

> [T]here is no theoretical basis to assume that, simply because a statement falls within
> a modern-day hearsay exception, it was intended to be excluded from protection
> under the Confrontation Clause if that particular statement has testimonial

characteristics. Rather, the Court's treatment [of several hearsay exceptions in *Crawford* as non-testimonial] probably was meant to say that, because of *the specific requirements of the particular hearsay exceptions*, most statements within them would not meet the testimonial definition. . . .

An examination of business records and statements in furtherance of a conspiracy is helpful in suggesting an important indicator of when statements are non-testimonial and which particular statements, even though falling within a modern hearsay exception, should be treated as testimonial. That indicator is whether the statement is made for the purpose of accusing, or whether it is made for another purpose associated with other ordinary human activities.

Some business records may concern matters that are understood at the time they were made to be destined for litigation or may be clearly accusatory. However, at their core, they involve employees, who are recording matters that are ordinary, routine, and related to performing their job functions.

Mosteller, *Encouraging and Ensuring*, at 546, 547-48 (emphasis added) (footnotes omitted).

The cases cited by the majority (*see* ¶ 22) support Mosteller's interpretation. *See U.S. v. Cervantes-Flores* (9th Cir. 2005), 421 F.3d 825, 830, 832, 833 (The "certificate of nonexistence of record," which was offered "to prove that Cervantes had not received the Attorney General's consent to reenter the United States," is "nontestimonial *in nature* because it closely resembles a business record." The certificate "certifies the nonexistence of a record within a class of records that themselves existed prior to the litigation, much like business records.") (emphasis added); *U.S. v. Garner* (6th Cir. 2005), 148 Fed.Appx. 269, 270, 274 (unpublished) ("[T]he [medical] records at issue were prepared at Garner's request and were submitted by her in order to obtain benefits. The physicians involved were not preparing their reports in the context of a criminal prosecution [for mail fraud, making false statements to obtain federal employees' compensation, and making false statements to obtain Social Security disability benefits], and had no reason to 'anticipate [their] statement[s] being used against [Garner] in investigating and prosecuting the crime.' ") (some alterations in original).

As noted above, the majority offers an additional explanation for why the Intoxilizer 5000 certification reports were nontestimonial: "the author of the certification reports" was not a " 'witness[] against' " Carter because "hearsay provided for foundational purposes is not evidence 'against' the defendant." ¶ 22. It is highly doubtful that Carter considered the author of the certification report to be a witness *for* him; thus, the majority has created a new class of "neutral" prosecutorial witnesses who are not subject to Confrontation Clause scrutiny--perhaps because their out-of-court statements are "so trustworthy that adversarial testing can be expected to add little to [their] reliability," *White*, 502 U.S. at 357, 112 S.Ct. at 743. Yet, the majority's theory presupposes that there is no way to effectively cross-examine evidence offered for foundational purposes, an assertion belied by the fact of Carter's appeal. Moreover, all evidence offered by the prosecution at trial--even evidence to establish the competence and credibility of its witnesses--is for the purpose of obtaining a conviction; if not, the evidence is likely irrelevant. The majority provides neither authority nor reasoning for the proposition that evidence of a prosecution witness's (e.g., the

71

¶91     Given these principles, it will often be the case that a person accusing someone of a crime is a "witness[]," as contemplated by the Confrontation Clause, *see King v. Brasier*, *supra* ¶ 74, and that statements made by a person claiming to be the victim of a crime and describing that crime are "testimonial," *see* Friedman, *Basic Principles*, at 1042-43. *See also* Mosteller, *Encouraging and Ensuring*, at 608 n.548 ("If we are to imagine the Framers' reaction to practices that did not exist at the time, we could imagine few practices that would have been more abhorrent to their values than the concept of a

---

Intoxilizer 5000's) competence is not evidence "against" the accused as that term is used in the Sixth Amendment, and *Carter* was not written with this characterization in mind. Rather, the opinion reflects our judgment, based on *State v. Delaney*, 1999 MT 317, 297 Mont. 263, 991 P.2d 461, that "the certification reports are nontestimonial in nature in that they are foundational, rather than substantive or accusatory." *Carter*, ¶ 32. As explained above, the foundational/substantive distinction does not find support in the history and formulations set forth in *Crawford*, which suggests that the remaining theory--that the statements are not accusatory in nature--provides the proper basis for our holding in *Carter*.

But even if we accepted the majority's theory that "hearsay provided for foundational purposes is not evidence 'against' the defendant," ¶ 22, the reason such statements would not be evidence "against" an accused is that they are not of an accusatory nature. Specifically, the statements represented by the certification reports, which were offered to prove the truth of the matter asserted (i.e., that the Intoxilizer 5000 functioned properly), did not accuse Carter--or anyone else, for that matter--of something unlawful. Rather, they related only to the machine's operation. *See Delaney*, ¶ 18 (distinguishing an annual certification form for the Intoxilizer 5000, which was used for foundational purposes in *Delaney*, from a report of the chemical analysis of drugs, which was used substantively in *State v. Clark*, 1998 MT 221, 290 Mont. 479, 964 P.2d 766, on the ground that "[t]he information in the annual certification form was *not accusatory* in the same manner as the chemical analysis in *Clark*") (emphasis added).

Accordingly, the most plausible explanation for why, under *Crawford*, the certification reports at issue in *Carter* were nontestimonial is that the statements represented by those reports--which, as the majority observes, were made in anticipation of prosecutorial use at trial, *see* ¶ 22--were not of an accusatory nature. *See Carter*, ¶ 32. *See also* Mosteller, *Encouraging and Ensuring*, at 575 ("As to all hearsay statements, those made for purposes other than testimony, or more generally prosecutorial court use, or *those that are non-accusatory*, can properly be excluded from a testimonial concept.") (emphasis added). Therefore, the majority's attempt to distinguish "witnesses against" from "accusers" is misguided, and its inexplicable contempt for the accusatorial factor of the "testimonial" inquiry is unsound.

prosecution through the out-of-court accusations of a victim who was not compelled, even if available, to take the stand and make those charges in person to the defendant."). This is particularly true when the declarant is speaking to a person in whom there is little or no expectation of confidentiality, since it would not be reasonable in such circumstance to anticipate that statements accusing someone of a crime and/or describing a crime will not be further transmitted for use at trial as evidence against the accused.

¶92    On the other hand, if such statements were made under circumstances in which the declarant had a reasonable expectation of confidentiality--e.g., during a conversation with a private mental health professional within the confines of the doctor-patient privilege-- then the declarant reasonably could expect that the statements would not be introduced at a later trial. As such, they would be nontestimonial. The same is true of the statement, "If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now," *Dutton v. Evans* (1970), 400 U.S. 74, 77, 91 S.Ct. 210, 214, 27 L.Ed.2d 213 (plurality opinion), made by Evans' coconspirator (Williams) during the concealment phase of their conspiracy. *See Crawford*, 541 U.S. at 57, 124 S.Ct. at 1368 (characterizing the foregoing hearsay statement at issue in *Dutton* as "not testimonial").[30] Though Williams'

---

[30] Evans and Williams were charged with the murders of three police officers in Georgia. Shaw, a prosecution witness at Evans' trial, testified that he and Williams had been fellow prisoners at the time Williams was arraigned. Shaw said that "when Williams was returned to the penitentiary from the arraignment, he had asked Williams: 'How did you make out in court?' and that Williams had responded, 'If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now.' Defense counsel objected to the introduction of this testimony upon the ground that it was hearsay and thus violative of Evans' right of confrontation." The objection was overruled and Williams' hearsay statements were admitted "upon the basis of a Georgia statute that provides: 'After the fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all.' " *See Dutton*, 400 U.S. at 77-78, 91 S.Ct. at 213-14.

statement may have been accusatorial in nature (the jury was "invited to infer that Williams had implicitly identified Evans as the perpetrator of the murder when he blamed Evans for his predicament," *Dutton*, 400 U.S. at 88, 91 S.Ct. at 219), it "contained no express assertion about past fact," *Dutton*, 400 U.S. at 88, 91 S.Ct. at 219, it was made to a "fellow prisoner[]," *Dutton*, 400 U.S. at 77, 91 S.Ct. at 214, and making it was "against [Williams'] penal interest," *Dutton*, 400 U.S. at 89, 91 S.Ct. at 220. As such, it cannot be said that Williams should have anticipated that the statement would be used in a criminal proceeding against Evans.

¶93 Similarly, statements (even those that are accusatorial) made to family members, friends, and other intimates, in whom there is typically an expectation of privacy or confidentiality, will frequently be nontestimonial. As Professor Mosteller points out,

> the vast majority of statements made to private individuals are made for a purpose other than creating evidence . . . . Such statements are typically made to convey information to accomplish other purposes, or for no real purpose other than to share the burden of an emotional event. Moreover, most statements made to private individuals tend to be made without any anticipation by the speaker that the statement will be conveyed beyond the immediate audience, let alone that it will be used at trial.

Mosteller, *Encouraging and Ensuring*, at 573. On the other hand, if it appears from the circumstances that the declarant should have understood that her statements to a family member, friend, acquaintance, etc. would be conveyed beyond that person, then the statements are testimonial.

¶94 As the foregoing discussion and examples illustrate, the nature of the out-of-court statement, the circumstances or formalities under which it was made, and to whom it was made all inform the reasonable anticipation or expectation of the declarant as to whether

her statement will be used for evidentiary purposes. The reasonable anticipation or expectation of the declarant, in turn, determines whether the declarant was functioning as a "witness[] against" the accused and, ultimately, whether her statement was "testimonial."

¶95 Professor Mosteller "suggest[s] one dividing line. When a statement is accusatory and intended to be conveyed beyond those who would be expected to keep it confidential--to government agents, private agencies that perform government functions, and strangers at arms length from the witness--it should be considered testimonial." Mosteller, *Encouraging and Ensuring*, at 544. I find this conception to be a useful guideline; however, I believe the proper focus should be on what the circumstances would lead an objective witness reasonably to believe, *see Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364, not on the declarant's subjective intent, which is frequently difficult, if not impossible, to ascertain in the declarant's absence. *Cf. U.S. v. Cromer* (6th Cir. 2004), 389 F.3d 662, 675 ("The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying *whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime*.") (emphasis added). For this reason, I also do not subscribe to Professor Mosteller's corresponding suggestion (which the majority apparently approves, *see* ¶ 23 & n.3) that when a statement was made to a strictly private party, "the burden can properly be placed on the defendant to show that it was for a testimonial purpose." Mosteller, *Encouraging and Ensuring*, at 544. *See also* Mosteller, *Encouraging and Ensuring*, at 572. Absent

confrontation, a defendant cannot prove whether the declarant's purpose was testimonial or whether she intended the statement to be conveyed beyond those who would be expected to keep it confidential. Rather, the prosecutor, who will always be the proponent of the hearsay statement where a Confrontation Clause issue arises, is the party most likely to have had access to the declarant (either directly or through another agent of the government, such as the investigating officer). Moreover, requiring the State to establish the admissibility of its proffered evidence comports with the fact that the Confrontation Clause is a restriction on the State, not the accused. Thus, the burden of proof is properly placed on the State to establish that the hearsay evidence it seeks to introduce is nontestimonial.

¶96 Turning now to the majority's formulation of "testimonial," the majority desultorily sets forth a number of assertions concerning the purpose of the Confrontation Clause, after which it "[b]ring[s] together these rationales," ¶ 23, into the following definition:

> generally, when a declarant knowingly speaks to a police officer or governmental agent, her statements are presumed testimonial. If, however, the declarant had objective reason to believe that her statement would serve only to avert or mitigate an imminent or immediate danger and the agent who received the statement had no intent to create evidence, the statement is presumed to be nontestimonial. Alternatively, unless the declarant had clear reason to believe that the statement would be used in court as substantive evidence against the defendant, her statements to a non-governmental agent are nontestimonial.

¶ 23. The majority then applies this formulation, as well as several additional factors not set forth in its formulation, to the facts of this case, thereby demonstrating that its approach is unfaithful to the historical foundation of the Confrontation Clause, is contrary

to the common law right of confrontation, and fails to properly safeguard an accused's right to confront the witnesses against him.

¶97    At the outset, it must be acknowledged that the majority's analysis contains significant inconsistencies which make it unclear precisely what standard a court is to apply and what considerations the majority deems determinative in the "testimonial" inquiry.    For instance, whether a statement is testimonial appears to turn on the declarant's knowledge, belief, purpose, motivation, emotional state, and understanding of the elements of the charged offense (subjective factors), *see* ¶¶ 18, 20, 23, 27; nevertheless, the majority insists that the declarant's reasonable expectation (an objective factor) is determinative, *see* ¶¶ 23 n.3, 29 n.7.  We are told that a declarant who is knowingly speaking to a government agent should expect her statements to be used at trial, *see* ¶¶ 18, 23; yet we are also told that a declarant's expectation when speaking to a 911 operator depends on the content of the conversation and the particular circumstances that led to the call's being placed, *see* ¶ 20.  The majority disapproves Professor Mosteller's "proposed 'declarant's intent' standard because of the practical difficulty of divining the intentions of an absent declarant except by reference to what they [sic] have reason to believe," ¶ 23 n.3, but in support of its argument that Debra's statements to Grove were nontestimonial, the majority cites Professor Mosteller's "proposed method for ascertaining whether a statement is testimonial," ¶ 28, the same method the majority disapproved because it turns on the intent of the speaker.  The majority finds the setting in which the statement was made both significant, *see* ¶¶ 18, 21, and insignificant, *see* ¶¶ 17, 23. The list goes on, but the point is that, in light of these ambiguities, no District Court

77

could ever reach an incorrect "testimonial" determination; no matter which way the court came out, it could find support for its result in the majority opinion in this case. Simply put, the majority's approach leaves the interpretation of "testimonial" to the predilections of the particular court attempting to apply it.

¶98 Of course, because the majority concludes that Debra's statements to King and Buennemeyer were "cumulative," ¶¶ 26, 29, that Debra's statements to Grove "[a]rguably . . . [were] also cumulative," ¶ 29 n.6, and that the admission of these statements was, thus, harmless error, *see* ¶ 26, it was unnecessary in this case for the majority to articulate a precise and workable definition of testimonial. Its discussion of the Confrontation Clause, its formulation of testimonial, and its application of that formulation to the facts of this case, therefore, are nothing more than an extensive judicial dictum. Notwithstanding its amorphous and gratuitous analysis, however, it is still possible--and necessary--to address several fundamental shortcomings in the majority's approach.

¶99 First, due either to its dissatisfaction with the formulations of "testimonial" set forth in *Crawford* or to its unfounded belief that *Crawford* contains a "tacit warning" to lower courts against adopting any of those formulations, ¶ 29, the majority embarks on its own independent expedition to define the term, *see* ¶¶ 11-23. While the majority does reference *Crawford* a number of times during this journey, at no time does it mention, let alone identify, *Crawford*'s formulations, except to acknowledge that the Court gave "numerous examples" of testimonial, which the majority terms a "definitional void." *See* ¶ 11.

78

¶100    Ultimately, the majority sets forth a definition of testimonial that bears little resemblance to the formulations set forth by the Supreme Court in *Crawford*.    It conditions the determination of whether an out-of-court statement is testimonial on the official capacity (i.e., government agent versus private party) of the person to whom the declarant was speaking, her knowledge thereof, her belief as to the "substantive" use of her statement, her belief as to the intent of the government agent to whom she was speaking (if she was knowingly speaking to one) to create evidence, and whether those beliefs were clearly or objectively reasonable.[31]   This imaginative definition flows from the majority's mistaken belief that the Confrontation Clause was designed merely to eradicate devious declarants and perfervid police officers from the criminal justice system.

¶101    Specifically, the majority points to "the two concerns engendered by [testimonial] evidence": "possible prosecutorial misconduct and overzealousness" and "the declarant's opportunity to abuse the criminal justice system in order to punish, to exact revenge on,

[31]   Aside from the fact that it includes inquiries into the official capacity and intent of the person to whom the declarant was speaking, the declarant's knowledge thereof, and the declarant's understanding of the substantive use of her statements, the crucial distinction between the majority's formulation and *Crawford*'s third formulation (which, of the three formulations set forth in *Crawford*, is the only one that refers to what a declarant "believe[s]") is the differing approaches to the declarant's belief.  The majority asks what a declarant had "reason to believe" concerning the substantive use of her statement in court and/or concerning the intent of the government agent to whom she was speaking (if she was knowingly speaking to one).  By contrast, the third formulation asks what the circumstances under which the statement was made *would lead* an objective witness reasonably to believe.  The difference, which is subtle but significant, is that the latter approach does not require a determination of what the declarant actually believed; rather, it asks what she *should* have believed.  The majority's approach, on the other hand, asks what the declarant actually believed and whether she had clear or objective reason for that belief.  Determining what the declarant believed, however, is not possible unless she stated that belief when she made her out-of-court statements or she submits to examination by the parties.

or to shift the blame to the defendant." ¶¶ 15, 16. Having identified these concerns as the basis for the right of confrontation, the majority proceeds on the premise that a statement is testimonial only when these concerns are implicated--namely, in "[a]ny situation in which the declarant is knowingly speaking to the police or government agents," since such situation "implicates concerns both with the declarant's motivation and with the possibility of prosecutorial misconduct." ¶ 18. For instance, "the police may deliberately or inadvertently color the substance of their statements to reflect their own prejudices and understandings of the situation, or may selectively record the declarant's statements." ¶ 18. (Curiously, the majority is not concerned that private individuals to whom statements are made might do the same.)

¶102 Notably, the inconsistency with which these two concerns are relevant in the majority's formulation is immediately apparent from the presumption that a statement made knowingly to a government agent is nontestimonial when "the declarant had objective reason to believe that [the] statement would serve only to avert or mitigate an imminent or immediate danger." ¶ 23. This exception to the majority's government agent standard ignores "the declarant's opportunity to abuse the criminal justice system," ¶ 16, since a declarant could have "objective reason to believe" that her statement, *though false*, will serve only to avert or mitigate an imminent or immediate danger. Perhaps the majority had in mind only declarants who reside in Wonderland, where the motive to seek aid precludes the telling of untruths. *Cf. U.S. v. Wilmore* (9th Cir. 2004), 381 F.3d 868, 869 (911 caller lied to 911 operator "in order to get the police to respond quickly to [her] call"). Similarly, there is no reason to assume that the police will not "deliberately or

80

inadvertently color the substance of their statements" or "selectively record the declarant's statements," ¶ 18, simply because the declarant had objective reason to believe that her statements would serve only to avert or mitigate an imminent or immediate danger, or because the agent who received the statements had no intent at the time to create evidence, or because the declarant unknowingly spoke to a government agent.

¶103  But, aside from the fact that the majority's formulation does not consistently reflect the purported concerns with possible prosecutorial misconduct and overzealousness and a declarant's opportunity to abuse the criminal justice system in order to punish, to exact revenge on, or to shift the blame to the defendant, the important point here is that the majority's attempt to conform its formulation of "testimonial" to these two concerns has led it to an incorrect statement of what constitutes a testimonial statement.  As *Crawford* makes clear, "[t]he Sixth Amendment must be interpreted with [a] focus" on the *practices* "that the founding-era rhetoric decried." *Crawford*, 541 U.S. at 50, 124 S.Ct. at 1363.  Those "practices" were not ongoing abuse of the criminal justice system by declarants and excessive zealousness in criminal trials by prosecutors, but rather the customary use of unchallenged evidence against the accused at trial.  The Framers certainly were aware that the use of unchallenged evidence at trial engenders *risks* of misconduct on the part of declarants and government agents; however, their concern was more generalized.  *See* Mosteller, *Encouraging and Ensuring*, at 571-72 (Critics of the civil-law practice "believed that ordinary evidence should be presented before the trier of fact and subjected to testing, *even if the only concern was the error of*

81

*the private accuser or others*, who gave their evidence to the magistrate.") (emphasis added).

¶104   Indeed, the message of *Crawford* is not that the Framers intended with the words "the accused shall enjoy the right . . . to be confronted with the witnesses against him," U.S. Const. amend. VI , to guarantee an accused the right only to ascertain whether his accusers are well-intentioned and whether the police officer(s) and prosecutor(s) who investigated his case are virtuous.  Rather, the core of *Crawford*'s history lesson is that the Framers abhorred "the inquisitorial method of *both* evidence development *and* trial, symbolized by the treason trial of Sir Walter Raleigh."  Mosteller, *Encouraging and Ensuring*, at 514-15 (emphases added).  They "knew that judges, like other government officers, could not always be trusted to safeguard the rights of the people," and they "were loath to leave too much discretion in judicial hands."  *Crawford*, 541 U.S. at 67, 124 S.Ct. at 1373.  Thus, they sought to ensure that the reliability of evidence presented at trial against an accused would "be assessed in a particular manner:  by testing in the crucible of cross-examination."  *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370.  Evidence may be unreliable for a number of reasons, such as those set forth by the majority, *see* ¶¶ 15-16, 18, and those discussed above, *see* ¶¶ 79-81.   However, the right of confrontation is a procedural guarantee.  *See Crawford*, 541 U.S. at 42, 61, 124 S.Ct. at 1359, 1370.  It is expressed in broad terms and reflects the Framers' disdain for a procedural *system* in which a declarant, irrespective of her intentions toward the accused, could bear testimony extrajudicially and in which the government, irrespective of the zeal of its agents, could convict based on *ex parte* evidence against an accused at trial.

82

¶105   It was not Lord Cobham's motivations for writing his accusatory letter(s)--whether or not they were "to abuse the criminal justice system in order to punish, to exact revenge on, or to shift the blame to" Raleigh--with which the Framers were concerned.  Rather, their objection was to the fact that Raleigh was not allowed to cross-examine Cobham and thereby *himself* explore Cobham's motivations in making the accusations.  The irony of the majority's formulation, therefore, is that a judicial officer--not the accused-- determines the declarant's motivations, purposes, knowledge, and/or beliefs when making her out-of-court statement and, to make matters worse, does so in the absence of the declarant and without subjecting her to any examination whatsoever!

¶106   In sum, the possibility of "prosecutorial misconduct and overzealousness" and a "declarant's opportunity to abuse the criminal justice system in order to punish, to exact revenge on, or to shift the blame to the defendant" are two byproducts of the civil-law system which the Confrontation Clause rejects.  It is not sufficient merely to place a band-aid over these two features of that system by making application of the right of confrontation depend on whether the situation in which the out-of-court statement was made presented risks of governmental manipulation and/or maliciousness on the part of the declarant.  Rather, "testimonial" must be defined by reference to the system itself, which allowed a declarant to function as a "witness[] against" the accused extrajudicially. Thus, because the majority's formulation derives from a misinterpretation of the evil at

which the Confrontation Clause was directed, it fails to fully safeguard an accused from that evil.[32]

¶107 Another fundamental shortcoming in the majority's approach is its misguided attempt to emulate *Crawford*'s polar examples of what is and is not "testimonial." *See Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364 (contrasting "a formal statement to government officers" with "a casual remark to an acquaintance"). The majority repeatedly distinguishes formal statements from casual remarks and conversations with law enforcement from conversations over backyard fences, *see* ¶¶ 17, 18, 19, 20, 21, 23, 27, 30; yet, it does not provide a useful method of ascertaining on which side of the line the myriad other statements (i.e., those that do not fall into these examples) lie. *See* Friedman, *Grappling*, at 17 ("The two polar categories, 'a formal statement to government officers' and 'a casual remark to an acquaintance,' plainly do not exhaust all possibilities, and so presenting these two does not indicate where the boundary between testimonial and non-testimonial lies.").

¶108 Granted, we are told that a statement to a known governmental agent is presumed testimonial (unless the declarant had objective reason to believe that her statement would serve only to avert or mitigate an imminent or immediate danger and that the agent to whom she was speaking had no intent to create evidence) and that a statement to a private

---

[32] The majority takes great comfort in the fact that it "has afforded [defendants] *greater* protection from statements made to a government agent, by presuming that such statements are testimonial." ¶ 29. Yet, aside from the fact that *Crawford* does not speak in terms of presumptions, the majority has not explained why such a presumption should not apply equally to statements made to non-governmental agents, who could just as easily color the substance of the statements to reflect their own prejudices and understanding of the situation.

party is presumed nontestimonial (unless the declarant had clear reason to believe that the statement would be used in court as substantive evidence against the defendant). *See* ¶ 23. However, we are not told how these presumptions are overcome, what facts are relevant in this regard, and what standard applies. The majority places the burden on the defendant to show that the State's proffered hearsay evidence, if made to a private individual, "was clearly or exclusively intended to be testimonial." ¶ 23 n.3. Yet, the majority provides no assurances that the accused will be able to interview the declarant prior to trial on her intent, knowledge, or belief at the time she made her statements. Furthermore, the majority's inquiry leaves numerous sub-inquiries unanswered, such as what would give a declarant "clear reason" to believe that her statement would be used in court as "substantive" (as opposed to impeachment or credibility) evidence against the defendant, what would give a declarant "objective reason" to believe that a government agent did not have a specific intent to create evidence, etc. Thus, to the extent the majority's system of presumptions is meant to identify the dividing line between testimonial and nontestimonial statements, it is wholly inadequate.

¶109 Equally unavailing is the majority's observation that "[w]hen speaking to government agents or officials, the circumstances are such that a declarant should reasonably expect that the government will seek to use those statements at trial. Whereas when a declarant speaks with her neighbor across the backyard fence, she has much less of an expectation that the government will make prosecutorial use of those statements." ¶ 18. *See also* ¶ 21 ("We do not assume that a declarant speaking to her neighbor across the backyard fence reasonably expects that the government will seek to use her statements

85

as testimony."). Is this because conversations which take place over backyard fences only consist of " 'casual' remarks"? *See* ¶ 21. Or, is it because neighbors never report crimes or repeat statements of an accusatorial nature?

¶110 Perhaps the majority's point is that the setting in which the statement was made informs the reasonable expectation of the declarant. I do not disagree with this proposition; rather, it is the undue emphasis the majority seems to place on the setting--as well as the undue emphasis it places on the official (versus private) status of the person to whom the declarant was speaking--with which I disagree. The correct focus--one which is entirely absent from the majority's analysis--is on whether the declarant is functioning as a witness, which in turn depends on the nature of her statement *and* whether it was made under circumstances (i.e., where and to whom she made it) that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, *see Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364; in other words, what should the declarant have anticipated regarding the probable prosecutorial use of her statement.

¶111 Lastly, aside from the foregoing definitional problems, the majority's formulation is unworkable. As noted above, the majority claims that its formulation applies an objective standard. *See* ¶¶ 23 n.3, 29 n.7. Yet, the majority's references to what an "objective" or "reasonable" declarant "would expect" and what a declarant "should reasonably expect," *see* ¶¶ 17, 18, 20, 23 n.3, are rendered ambiguous at best by the majority's ultimate conclusion that "testimonial" depends on subjective considerations: the declarant's belief, her knowledge of the official capacity of the person to whom she was speaking and his intent to create evidence, and her understanding of the substantive

use of hearsay statements at trial. *See* ¶ 23. Also contrary to the majority's purported objective inquiry is the fact that its formulation is designed with the declarant's motivations in mind--specifically, her ability "to abuse the criminal justice system in order to punish, to exact revenge on, or to shift the blame to the defendant." ¶ 16 (citing as an example of this concern Cobham's motivation "to save himself"). *See also* ¶¶ 18, 20 (referring to "the declarant's motivation" and "his primary motivation").

¶112 Thus, it is a mystery how a court is to apply the majority's "standard" objectively. Indeed, it appears that the majority's formulation will have courts throughout Montana regularly divining[33] what a given declarant did and did not know about the person to whom she was speaking; what she believed regarding the substantive use of her statement against the defendant and/or the intent of the government agent (to whom she was knowingly speaking) to create evidence; and whether she believed that her statement would serve to avert or mitigate an imminent or immediate danger, and nothing more.[34] *See* ¶ 23. In other words, the determination of whether a statement was "testimonial" will turn on speculative assumptions about an absent witness's beliefs, knowledge, and purposes, notwithstanding the Supreme Court's admonition that "[o]nly

---

[33] The courts' analyses will take place in the absence of the declarants, since a determination of whether an out-of-court statement was "testimonial" is not necessary when the declarant is present in court to be cross-examined.

[34] Under the majority's formulation, the declarant's belief that her statement would serve "to avert or mitigate an imminent or immediate danger" makes the statement, if made to a police officer or government agent to whom she is knowingly speaking and who is not intending to create evidence, nontestimonial, but only if averting or mitigating an imminent or immediate danger is the *only* purpose she had reason to believe her statement would serve. *See* ¶ 23. It is highly doubtful that such a determination could be made accurately in the declarant's absence.

cross-examination could reveal [a declarant's perception of her situation]." *Crawford*, 541 U.S. at 66, 124 S.Ct. at 1373.

¶113 Furthermore, the results of these exercises in clairvoyance will vary from one judge to another, as did reliability determinations under *Roberts*' "unpredictable and inconsistent" framework. *See Crawford*, 541 U.S. at 66, 124 S.Ct. at 1372. As such, the majority's "objective" formulation not only is as unpredictable and difficult to apply as was the *Roberts* test, it also, like the *Roberts* test, will "allow[] a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of" a declarant's belief, knowledge, and purpose in making her out-of-court statement, *Crawford*, 541 U.S. at 62, 124 S.Ct. at 1370, and thus will "fail[] to provide meaningful protection from even core confrontation violations," *Crawford*, 541 U.S. at 63, 124 S.Ct. at 1371.

¶114 By analyzing the issue of whether an out-of-court statement was testimonial without due consideration of the text and historical underpinnings of the Confrontation Clause, the majority has betrayed the protection afforded by the common law right of confrontation. As a result, the majority's formulation of "testimonial" merely substitutes one unworkable test (i.e., *Roberts*) for another (a belief/knowledge/purpose test). In so doing, the majority has misapplied the Confrontation Clause to the facts of this case, as discussed below.

### 3. The Hearsay Statements at Issue are "Testimonial"

¶115 As explained above, a statement is "testimonial" when the declarant made it under circumstances that would lead an objective witness reasonably to believe that the

88

statement would be available for use at a later trial. *See* ¶ 89, *supra*; *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364. In other words, what should the declarant have anticipated regarding the probable prosecutorial use of her statement given the nature of her statement, the circumstances under which it was made, and to whom it was made. (Again, she is deemed to have intended the natural consequences of her actions.) Here, Debra's statements to Grove, King, and Buennemeyer are testimonial.

¶116 Dawn Grove testified that she observed the Mizenkos arrive by car at their home at approximately 4:00 P.M. on October 3, 2003, and that at approximately 5:00 P.M., Debra appeared at her door, with a large dog, "visibly upset" and with a wound on her cheek or jaw. Grove had no recollection of Debra crying. Debra asked Grove to call 911 and another person, Carol Richard. Over objection, Grove testified that "[Debra] said that her husband had been drinking and was trying to hurt her." Grove did not let Debra into her home. Rather, she placed the call to 911 on a cordless phone and handed the phone out to Debra. Grove did not hear Debra's conversation with the dispatcher.

¶117 Debra's statement that "[my] husband [has] been drinking and [is] trying to hurt [me]" (assuming Grove accurately recounted it) is undoubtedly testimonial. First, the nature of the statement was accusatorial, as Debra was claiming to be the victim of a crime, was describing the nature of that crime (domestic abuse), and was identifying the perpetrator of the crime (her husband). Granted, she did not give Grove a *detailed* account of what had taken place in the Mizenko home that afternoon, and her statement was not formal by any means; but it was compelling accusatorial evidence nonetheless. Indeed, the prosecutor found the statement to be *extremely* compelling, as he asked Grove

89

to repeat it at Mizenko's trial, then repeated it himself while Grove was still on the stand ("Q. And you stated that he had been drinking and had hurt her?" "A. Yes."), and then relied on it in his argument to the jury ("[W]hat [Debra] told Dawn Grove, is what [Mizenko] did.").

¶118 Second, Grove testified at trial that "I know [Mizenko] a little bit more than [Debra] but I don't know them very well." Thus, although Debra was speaking to a private party, it was someone with whom she did not have an intimate relationship or an expectation of confidentiality. *Cf.* Mosteller, *Encouraging and Ensuring*, at 544 ("When a statement is accusatory and intended to be conveyed beyond those who would be expected to keep it confidential--to government agents, private agencies that perform government functions, and *strangers at arms length from the witness*--it should be considered testimonial.") (emphasis added). An expectation of confidentiality would have been especially unreasonable here in light of Debra's concurrent request that Grove call 911.

¶119 Third, Debra herself set the prosecutorial machinery in motion by walking over to Grove's house, stating that Mizenko was trying to hurt her, asking Grove to call the authorities, and then telling King (the 911 operator) that she wanted Mizenko arrested. As the following colloquy between King and Debra establishes, Debra undoubtedly understood (and even intended) with all of the statements she made *after leaving her house*, as well as the evidence she left behind there, that she was creating evidence for prosecutorial use against Mizenko.

> King:      What's going on out there?

90

Debra: Um. He hit me, pulled my hair out, and knocked me down. I tried so hard not to call, but um, this is ridiculous. I can't do this anymore.

. . . .

King: So he has hit you and he's pulled out your hair?

Debra: Yes. There's evidence of it in the house. I'm at the neighbor's. I left the hair on the floor and everything else. I want him arrested!

Significantly, Mizenko had been arrested for and convicted of Partner or Family Member Assault at least twice within the preceding twelve months.[35] Thus, Debra *had* to have understood that there was a significant probability her statement to Grove accusing Mizenko of this same crime would be used prosecutorially.[36] Indeed, I seriously doubt that the resulting prosecution came as a surprise.

¶120 Accordingly, given Debra's arm's length relationship with Grove, the incriminating nature of her statement (which is undeniable, given the fact that the prosecutor elicited it from Grove and then repeated it himself at least twice during Mizenko's trial), and the fact that Debra solicited the involvement of law enforcement, she should have realized that she was creating evidence and she should have anticipated-- whether she intended it or not--that her accusatory statements made to Grove and King

---

[35] The affidavit accompanying the Information filed by the County Attorney references convictions on January 23, 2003, and March 24, 2003. The District Court's Judgment states that Mizenko had five previous convictions for Partner or Family Member Assault.

[36] Professor King-Ries (*see* note 1, *supra*) observes that "domestic violence is a pattern of behavior repeated over time. Most victims are assaulted seven times before they involve the police, and they are not able to fully extricate themselves from the violent relationship until the fifth attempt. Domestic violence victims . . . often have repeated contact with law enforcement and the criminal justice system." King-Ries, at 319 (footnotes omitted). And in some cases, the victim will have "firsthand experience and knowledge that her statements to the 911 operator, the police, and doctors could be used in court because she ha[s] seen them used there before." King-Ries, at 319.

for the explicit purpose of having Mizenko arrested once again would be used in a later prosecution of him.

¶121 Nevertheless, the majority holds that Debra's statements to Grove are nontestimonial. *See* ¶ 27. This conclusion rests on several mischaracterizations of the nature of Debra's statements as well as a number of speculations not supported by the record. For instance, the majority, using its sixth sense, states that "Debra, having fled her own home . . . , sought sanctuary from which to take her next step"; that "she sought the immediate solace that [Grove] could provide"; and that she went to Grove's house in order "to share the burden of a traumatic beating." ¶ 27. Yet, the only statements from Debra to Grove in the record before us are "Call 911!" and "[My] husband [has] been drinking and [is] trying to hurt [me]." There is no evidence that Debra asked for sanctuary; rather, the record reflects that she only asked Grove to call 911 and Carol Richard and that, upon concluding her call to 911, Debra returned home, where Deputy Buennemeyer found her upon arriving at the scene. Moreover, the record establishes that Grove barely knew Debra; that they were not friends who shared the burdens of traumatic events with each other; that Grove did not let Debra into her home; that Grove instead handed a cordless phone out to Debra and then walked away (Grove testified that she did not hear Debra's conversation with the 911 operator); and that after the 911 call, Debra did not remain at Grove's house to plan her next step or obtain solace. Thus, Debra's statements to Grove and the circumstances in which they were made cannot fairly be characterized as a confidential conversation in the nature of sharing an emotional burden.

92

¶122 The majority also conjectures that Debra did not call 911 and Carol Richard from the Mizenkos' house because she "did not feel sufficiently secure" there. ¶ 27. Yet, there is nothing in the record to explain why Debra walked to Grove's house to make her call(s). (It is also unclear whether Debra ever called Carol Richard.) What the record does establish is that Debra returned home to wait for Deputy Buennemeyer, notwithstanding "the very real possibility that Mizenko would return and continue the assault," ¶ 27.[37] Thus, an equally plausible theory for why Debra did not call 911 and

---

[37] The following colloquy ensued between King and Debra immediately after Debra stated that "I want him arrested!":

King: Okay. Okay. What I need to have you do is, I need to have you stay right at [Grove's] house. Okay?

Debra: I'm going home right after, and the cops can come and see me there. They know --

King: You're not, you're not to go back there, while he's doing this to you. Wait till my --

Debra: He's gone.

King: Wait till my deputies --

Debra: He's gone.

King: Okay. Which way did he go?

Debra: He went, I don't know. To Great Falls. To Belt. God knows who.

King: Okay.

Debra: But you know --

King: But he's not there now?

Debra: No.

King: Okay. Okay. Alright. Um, if you want to, um, if you're certain that he is not there, then go ahead and go back home, and I'll have my, ah, deputies meet you there so you can give them a statement. Okay?

Debra: Oh God, I appreciate it.

93

Carol Richard from the Mizenkos' house is that she wanted a witness to her accusations and her physical condition.

¶123 The majority's portrayal of the circumstances in which Debra made her statements to Grove, therefore, is not supported by the record. Furthermore, while the majority reasonably infers that these statements provided context for why Debra had "sudden[ly] appear[ed], with dog in tow and a freshly bruised face, on [Grove's] doorstep," ¶ 27, the fact that Debra's statements may have explained her presence at Grove's doorstep does not make them nontestimonial. Rather, the question is whether Debra should have understood there was a significant probability the statements would be used prosecutorially. For the reasons discussed above, she should have.

¶124 Similarly unavailing is the majority's alternative characterization of Debra's statements to Grove as "primarily a cry for help." ¶ 27. It is unclear what the majority means by "a cry for help," particularly in light of the facts that Debra never requested medical assistance from anyone (despite the fact that she had a visible wound on her cheek or jaw) and that Mizenko had left his and Debra's house by the time of Debra's call to 911. But even if Debra's statements were "primarily a cry for help," this does not make them nontestimonial, since a cry for help may at the same time be an accusatorial statement (e.g., "That man just stole my purse!" or "My husband just beat me! Call 911!") that the declarant anticipates or should anticipate will be used prosecutorially. Is the problem that Debra's accusation was not sufficiently explicit relative to her cry for help (yet another undefined standard)? We are left to speculate, though it is worth noting

94

that such a premise (that the statement is testimonial only if the accusatorial aspect of the statement outweighs the aid-seeking aspect of the statement) has no support in *Crawford*.

¶125   Attributing uncommon naiveté to Debra, the majority ultimately decides that she "lacked reason to believe that her statement would be used prosecutorially as substantive evidence against Mizenko." ¶ 27. This conclusion is belied by the facts that Mizenko had been arrested for and convicted of Partner or Family Member Assault at least twice within the preceding twelve months and that Debra felt she "[couldn't] do this anymore," left evidence of the alleged assault in the house, and walked over to Grove's house with an intent she later stated explicitly to King to have Mizenko arrested. The majority argues that "[i]f she had anticipated such use, in all likelihood, she would have divulged greater detail, as she later did when speaking with 911 operator King." ¶ 27. This reasoning presumes, however, that Debra expected Grove not to remain nearby (or at least within earshot) while Debra "divulged greater detail" of the alleged assault to King, which seems unlikely if, as the majority claims, Debra went to Grove's house expecting to obtain "immediate solace" and "share the burden of a traumatic beating," ¶ 27. More importantly, the majority has stated the inquiry backwards: it is not whether Debra's anticipation (i.e., her *intention*, as "anticipation" is used by the majority here) should have led her to make a sufficiently detailed statement, but rather whether her statement (and the circumstances in which it was made) should have led her to anticipate prosecutorial use thereof. As explained above, irrespective of Debra's reasons for not providing Grove with a more extensive description of what had happened at the Mizenko home that afternoon, the degree of detail in Debra's statements was sufficiently accusatorial and

95

compelling under the circumstances (as confirmed by the prosecutor's subsequent reliance on those statements at trial) to make the statements testimonial.

¶126 In addition, the assertion that Debra "had no objective reason to believe or anticipate that her statement would be used in court" since she was "in distress and addressing a non-governmental agent, her neighbor," ¶ 27, is pure folly. A woman who appears on a neighbor's doorstep "visibly upset" with a fresh wound on her cheek or jaw and who asks the neighbor to call 911, explaining that "my husband has been drinking and is trying to hurt me," has *every* reason to anticipate that her statements will be used in court against her husband, particularly when she is clearly contemplative, as was Debra: "I can't do this anymore. . . . I want him arrested!" To suggest, as does the majority, that a person such as Grove would be unaffected by the sight of a battered neighbor standing on her doorstep and take no action (such as alerting law enforcement) in the face of domestic abuse occurring just next door reflects a dim--and unjustified--view of the citizenry of this State.

¶127 The majority cites *Compan v. People* (Colo. 2005), 121 P.3d 876, as support for its position. *See* ¶ 28. In *Compan*, however, the statements of the victim/declarant (Martinez)--*inter alia*, that her husband had hit her and that she was frightened--were made to a *friend* (Vargas) in a context that suggests Martinez reasonably expected Vargas not to repeat them; rather, the statements were made for the purpose of getting to safety and "shar[ing] the burden of an emotional event." Mosteller, *Encouraging and Ensuring*, at 573. As for getting to safety, Martinez stated to Vargas over the telephone that Compan was angry and yelling at her, that she feared Compan would hit her, and that she

wanted to be picked up. Martinez also asked to stay at Vargas's home. *See Compan*, 121 P.3d at 877. As for sharing the burden, when Vargas picked Martinez up, Martinez prefaced her explanation of what Compan had done with " 'Gloria, I just have to tell you what's been happening to me. I can't believe it.' " *Compan*, 121 P.3d at 877. By then, Compan had hit Martinez, *see Compan*, 121 P.3d at 877, and she was clearly terrified of him. She asked Vargas to " 'hurry, hurry. Get out of here. He's standing right there, and he might come after me.' " *Compan*, 121 P.3d at 878. Yet, although she was hurt, Martinez did not ask Vargas to call the police and take her to the hospital until after Martinez had calmed down, about twenty or thirty minutes after they had arrived at Vargas' home. *See Compan*, 121 P.3d at 878.

¶128 By contrast, the record in the case at hand, as discussed above, establishes that Grove and Debra were not friends. Thus, this is not a case in which the declarant made statements for the purpose of sharing the burden of an emotional event with someone she could reasonably expect would keep her statements in confidence. To the contrary, Debra left evidence of the alleged assault in the house and walked over to Grove's "a short time after the assault," according to the majority, *see* ¶ 34, implying that her decision to have Mizenko arrested (because "this is ridiculous. I can't do this anymore.") was made contemporaneously with the assault and before she made her statements. Her intent, she later stated explicitly to King, was to have Mizenko arrested. Getting to safety and/or obtaining medical assistance were never mentioned. Consequently, *Compan* does not support the majority's conclusion that Debra's statements are nontestimonial.

97

¶129 Finally, relying on generalities the majority informs us that "a statement made by the victim of a crime" to a friend, a family member, an acquaintance, or a "loose acquaintance" and "describing the crime, identifying the perpetrator or both" is "nontestimonial unless the declarant had clear reason to believe that [the statement] will be used prosecutorially." ¶ 30. As support for this proposition, the majority provides a multi-page string citation. *See* ¶ 30. Notably, none of these courts applied a "clear reason to believe" standard or referred to the respective declarants as "loose acquaintance[s]," an amorphous term which the majority leaves undefined. Moreover, these cases do not stand for the majority's broad generalization that statements made to "loose acquaintance[s]" are nontestimonial. As explained above, the reasonable anticipation or expectation of the declarant as to whether her statement to a private party will be used for evidentiary purposes depends on the nature of the statement and the circumstances or formalities under which it was made. This conclusion flows in part from Professor Mosteller's discussion of statements made to private parties (*see* ¶ 93, *supra*, quoting Mosteller, *Encouraging and Ensuring*, at 573), which the majority itself favorably cites (*see* ¶¶ 21, 27). As such, the majority's string citation only proves that under the particular circumstances in which the particular statements were made, the courts concluded that the declarants should not have anticipated prosecutorial use thereof. But even if these cases supported the majority's "loose acquaintance" standard, its string citation is still of minimal persuasive value. Although "extant authority," ¶ 30, in medieval Europe supported the view that the world was flat, Europeans' persistent determination in this regard did not make their belief true.

98

¶130 Accordingly, the majority's characterizations of Debra's statements and the circumstances under which they were made are nothing but an unrealistic assessment of what Debra should have reasonably expected (if the majority is applying an objective standard), and an inaccurate assessment of what Debra actually intended and believed (if the majority is applying a subjective standard), given the nature of her statements to Grove and the circumstances under which she made them.[38]

¶131 As to dispatcher King's testimony, she testified to receiving a 911 call from the Grove residence at about 5:30 P.M. and to speaking with a person at that residence.[39] She stated that she could not tell who was actually on the phone. Over objection, King testified that the person with whom she spoke was "[w]inded" and "upset" and that this person "said that [Mizenko] hit her, pushed her down and she had hair -- he had pullen [sic] out her hair," and that "[s]he wanted him arrested." These hearsay statements were testimonial for the same reasons discussed above.

¶132 Lastly, Deputy Buennemeyer testified, over objection, and recounted Debra's statements which were made while taking the deputy around the home and pointing out evidence of the alleged assault. He testified that she told him the tufts of hair found in the house were "her hair, pulled from her head, during an altercation at her residence, at that time and date." As noted above (*see* note 14), these statements fit within the category of

---

[38] As for the majority's observation that Debra's statements, "though evidence, were not created by the judicial process," ¶ 27, there is no such requirement for a statement to be deemed "testimonial." *See* ¶¶ 72-77, 85 n.23.

[39] According to King, all such conversations are tape-recorded as a matter of course, and a copy of a particular recording may be created upon the request of the prosecutor's office, as was done in the case at hand.

"interrogations by law enforcement officers," *Crawford*, 541 U.S. at 53, 124 S.Ct. at 1365. While we can equivocate, as did the Supreme Court, over what constitutes an "interrogation," *see Crawford*, 541 U.S. at 53 n.4, 124 S.Ct. at 1365 n.4, it is clear that Buennemeyer asked Debra questions during his investigation, that she answered those questions, and that he gathered inculpatory evidence on the basis of those questions, all in support of the State's case, not unlike the officer who took statements from Sylvia Crawford. *See Crawford*, 541 U.S. at 39-40, 52-53 & n.4, 124 S.Ct. at 1357, 1364-65 & n.4. Thus, the statements to Buennemeyer are testimonial as well.

¶133 Because all of the statements at issue in the case at hand were testimonial, *Crawford*'s categorical bar applies. The statements were inadmissible at Mizenko's trial unless (1) Debra was "unavailable" and (2) Mizenko had a prior opportunity to cross-examine her. *See Crawford*, 541 U.S. at 53-54, 55-56, 59, 68, 124 S.Ct. at 1365, 1366-67, 1369, 1374. There is no dispute that Mizenko did not have a prior opportunity to cross-examine Debra. Accordingly, I could conclude my analysis under the "testimonial" perspective of *Crawford* at this point by simply observing that the hearsay statements should not have been admitted. However, I am compelled by the manner in which the question of "unavailability" was handled by the District Court to comment on this issue.

### 4. Debra was not "Unavailable"

¶134 Rule 804, M.R.Evid., defines "unavailability" as including situations in which the declarant "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance by process or other reasonable means." Rule 804(a)(5), M.R.Evid. According to the United States Supreme Court, the

100

"unavailability rule" requires "as a predicate for introducing hearsay testimony either a showing of the declarant's unavailability or production at trial of the declarant." *White v. Illinois* (1992), 502 U.S. 346, 354 n.6, 112 S.Ct. 736, 742 n.6, 116 L.Ed.2d 848.

¶135 In the case at hand, the record establishes that the prosecutor failed to meet his burden of establishing Debra's unavailability and that the District Judge erred in not holding the prosecutor to this burden. Specifically, at the end of the State's case, defense counsel moved for a directed verdict of not guilty based on insufficient evidence. *Inter alia*, counsel correctly observed that Debra had not testified, that there was no showing that she was unavailable to testify, that the State's case was based entirely on hearsay, and that his client had been denied his right to cross-examine the State's primary witness. In response to defense counsel's objections, the prosecutor offered the following explanation for Debra's absence:

> Obviously, we would like the victim here to testify, and she is under subpoena. She has not appeared and we have been trying to locate her but apparently she's unwilling to come and testify.

End of story. The trial judge then denied defense counsel's motion.

¶136 Based on Montana case law the court committed reversible error. First, the District Judge did not make any ruling that Debra was unavailable. In *State v. Widenhofer* (1997), 286 Mont. 341, 950 P.2d 1383, we included the failure to rule on unavailability as one of the bases for holding that the District Judge had abused his discretion in denying the defendant's hearsay objection. Specifically, we stated:

> Although the District Court made inquiries as to the availability of Rothschiller, *the court did not make a definitive ruling in that regard* nor did it express a basis for denying defense counsel's objections to Officer

Zarske's hearsay testimony. As a result, Widenhofer was forced to "*only assume that the District Court implicitly ruled that Rothschiller was an unavailable witness under Rule of Evidence 804(a)(5).*" Additionally, the State in its response brief failed to respond to Widenhofer's "unavailable witness" argument and, in its confusion over why the District Court admitted the testimony, ventured into the "adoptive statement" exception to the hearsay rule. *As set forth above, we hold that there was not a sufficient basis for applying either exception to the general rule proscribing hearsay testimony.* Rule 802, M.R.Evid.

*Widenhofer*, 286 Mont. at 353, 950 P.2d at 1390 (emphases added).

¶137 Second, approving the sort of *ad hoc* determination of unavailability that took place here encourages exactly the sort of conduct that the Confrontation Clause, as interpreted by *Crawford,* is designed to prevent--i.e., proof of criminal charges based on otherwise inadmissible hearsay where there has been no prior opportunity for cross-examination, where the State has made only minimal efforts to secure the attendance of the victim/witness (here, a witness who, *before the time of trial*, had recanted and was not going to support the State's case), and where the State is not held to its burden to prove unavailability by demonstrating that it made diligent efforts to secure the witness's attendance.

¶138 In *Widenhofer,* we adopted standards requiring the prosecution to bear the burden under Rule 804, M.R.Evid, "to make a reasonable good faith effort to procure the attendance of a witness." *Widenhofer*, 286 Mont. at 351, 950 P.2d at 1389 (citing *Barber v. Page* (1968), 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (holding that the Confrontation Clause requires the prosecution to meet this burden)). We agreed  that "singularly unenthusiastic" attempts to secure a witness's attendance did not satisfy the government's burden to show that a  witness is unavailable. *See Widenhofer*, 286 Mont.

at 351, 950 P.2d at 1389. Rather, "[t]he Sixth Amendment to the United States Constitution and Art. II, Section 24 of the Montana Constitution . . . requires [sic] a greater exercise of diligence in the attempt to procure personal attendance of a prosecution witness." *Widenhofer*, 286 Mont. at 351, 950 P.2d at 1389 (alteration and ellipsis in original). More specifically, we stated that the proponent of a witness must use "reasonable means" to secure the witness's attendance. *See Widenhofer*, 286 Mont. at 352-53, 950 P.2d at 1390.

¶139 In this case, Debra sent a notarized statement to the prosecutor before trial informing him that Mizenko had not injured her in any way. Apparently believing that "court would [not] even be held after [this] statement had been read" and that, even if court were held, a "jury could [not] find [Mizenko] guilty after seeing [her] true statement," Debra ignored her subpoena and did not show up at trial. Yet, despite the fact that he had a written notice from Debra *before trial* that she was recanting, the county attorney's only "means," "diligence," and "good faith effort" in procuring Debra's attendance at trial consisted of the following:

> Obviously, we would like the victim here to testify, and she is under subpoena. She has not appeared and we have been trying to locate her but apparently she's unwilling to come and testify.

If this lame excuse and showing meet the rigorous standards and burden we imposed on the State in *Widenhofer*, then, in reality, we have no standard and the State has no burden. To be intellectually honest, we should just overrule *Widenhofer*. In this case the prosecutor failed to describe how long Debra had been under subpoena; what, if anything, the State had done or was doing to locate her (especially since she had notified the

103

prosecutor that she was recanting); how long these efforts (if any there were) had been ongoing; and what, if anything, the State had done to ensure her appearance at trial or to secure her testimony in a proceeding that would allow Mizenko's counsel to cross-examine her. *See* § 46-11-601, MCA. It can hardly be argued that Debra, the victim of the alleged assault, was not a material witness, particularly in light of the fact that the State's case depended entirely on her hearsay testimony.

¶140 Of course, none of these questions is answered on the record because the District Court utterly failed in its obligation to hold the State to its burden to prove Debra's unavailability and to make a definitive ruling in that regard. Granted, the court's minute entry on the morning of trial indicates that the court held Debra in contempt and ordered the sheriff to find her and deliver her to court. But this only begs the question why no reasonable efforts were made to secure the attendance of the prosecution's primary witness *until the morning of trial*. How convenient it was for the prosecution that, because of Debra's "apparent unwillingness" to testify, it did not have to contend with her recanted testimony, it was able to introduce her unchallenged hearsay statements in the cloak of sworn testimony, and it was able, therefore, to nullify Mizenko's fundamental constitutional right to confront his accuser face to face.[40] The District Court's after-the-

___

[40] As noted above (*see* note 5), Debra's notarized statement to the prosecutor (in which she stated that Mizenko had not injured her in any way) contradicted her hearsay statements to Grove, King, and Buennemeyer. Similarly, in her Victim's Impact Statement and letter attached thereto, she reiterated that she "was not injured [as a result of this incident]"; that "[t]he rugburn on [her] chin was a result of playing w/the dog"; that her recorded statement was an "inebriated recording"; that "because of [her] inebriated and false statement, [her] husband has lost his job"; and that she "was not the victim, [Mizenko] is the victim of this whole case and still is." Thus, if Debra had been subjected to direct and cross examination at trial, the prosecutor would have had to contend with Debra's recantation. As things turned out, however, the prosecutor was able to confidently state

fact sanction did absolutely nothing to protect Mizenko's fundamental constitutional rights of confrontation and cross-examination.

¶141   This brings me to the second focus of *Crawford*.

### 5. *Crawford* Rejected Multi-Factored Reliability and Trustworthiness Balancing

¶142   The *Crawford* Court did not directly rule on the vitality of the hearsay exception at issue in the case at bar--the excited utterance exception, Rule 803(2), M.R.Evid.  Briefly, this hearsay exception provides that an "excited utterance" is not excluded by the hearsay rule, even though the declarant is available as a witness.  The Rule defines an excited

---

during his closing argument that "what [Debra] told Dawn Grove, is what [Mizenko] did."  The jury never had to decide whether Debra's statements to the contrary were more reliable than her statements to Grove, King, and Buennemeyer; the District Court, in overruling Mizenko's hearsay objections, did that for them.

The majority dismisses the force of Debra's Victim's Impact Statement and attached letter, pointing out that they were "not submitted until after trial, and [have] *no* evidentiary value as to the propriety of admitting Debra's various statements, nor as to Mizenko's guilt."  ¶ 29.  (Notably, the majority makes no mention of the one document that *was* submitted before trial and had tremendous evidentiary value both as to Mizenko's guilt and as to the propriety of admitting Debra's various statements, but which was not presented to the jury:  Debra's notarized letter recanting her earlier statements.)  The point of quoting from the Victim's Impact Statement and attached letter, however, is to highlight the fact that Debra had recanted the statements she had made to Grove, King, and Buennemeyer and had provided a new version of events that completely contradicted those earlier statements, something the prosecutor would have been forced to contend with had Mizenko not been denied his right to confront the witnesses against him.

The majority also points out that the hearsay statements contained in the Victim's Impact Statement suffer from lack of oath, inability to cross-examine, and inability to assess credibility, as well as Debra's "ample opportunity" to reflect and fabricate her statements.  *See* ¶ 29.  Of course, the same is true of her hearsay statements to Grove, King, and Buennemeyer, which is exactly why *none* of Debra's statements should have been admitted at trial absent confrontation.  Moreover, if the majority truly believed that statements made after a declarant has had "ample opportunity" to reflect and fabricate should not be admitted, then it would not affirm the admission of Debra's statements to Grove, King, and Buennemeyer in this case.  Ironically, the majority condemns Debra's "premeditated, conscientious attempt to provide testimony" of an *exculpatory* nature via the Victim's Impact Statement, but not her "premeditated, conscientious attempt to provide testimony" of an *inculpatory* nature via Grove, King, and Buennemeyer.  *See* ¶ 29.

utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Rule 803(2), M.R.Evid.

¶143  We have allowed excited utterance testimony because "[t]he *guarantee of trustworthiness* is provided by the spontaneity of the statement, caused by the excitement '. . . which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.' " *State v. Hamby*, 1999 MT 319, ¶ 26, 297 Mont. 274, ¶ 26, 992 P.2d 1266, ¶ 26 (ellipsis in original) (emphasis added).  *See also Idaho v. Wright* (1990), 497 U.S. 805, 820, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638 ("The basis for the 'excited utterance' exception, for example, is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous.").  In other words, excited utterances are the "Oh my God, that truck just hit that child!" type of statement. The State's counsel conceded at oral argument that the excited utterance exception is premised on guarantees of trustworthiness.

¶144  *Crawford*, by contrast, dealt with the hearsay exception involving statements against interest.  *See Crawford*, 541 U.S. at 40, 124 S.Ct. at 1358.  This exception allows the admission of a hearsay statement if the declarant is unavailable as a witness and the statement was, at the time of its making, against the declarant's interest.  *See* Wash. Rule

106

Evid. 804(b)(3). A statement against interest includes one which "tend[s] to subject the declarant to civil or criminal liability." Wash. Rule Evid. 804(b)(3). [41]

¶145 Like the excited utterance exception, the statement against interest exception is rooted in guarantees of trustworthiness. *See State v. Whelchel* (Wash. 1990), 801 P.2d 948, 952 ("[H]earsay statements against penal interest are admissible if . . . corroborating circumstances clearly indicate the statement's *trustworthiness*." "The inquiry into trustworthiness ensures that the proffered evidence offers some reliability in terms of the declarant's perception, memory, and credibility--a function traditionally performed by cross examination.") (emphasis added). *See also* Fed. R. Evid. 804(b)(3), advisory committee's notes ("The rule defines those statements which are considered to be against interest and thus of *sufficient trustworthiness* to be admissible even though hearsay.") (emphasis added). [42] The fact that these two hearsay exceptions are both grounded in "guarantees of trustworthiness" is important because of how the *Crawford* Court analyzed this particular basis for admitting hearsay evidence.

¶146 As discussed above, the Supreme Court drew two inferences about the meaning of the Sixth Amendment from the common law tradition and development of the right of confrontation. First, the Court determined that the principle evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and

---

[41] In the pertinent part quoted, this language is identical to Rule 804(b)(3), M.R.Evid., and Fed. R. Evid. 804(b)(3).

[42] The same is true of this exception under Montana law. *See* Rule 804(b)(3), M.R.Evid.; *Heisler v. Boule* (1987), 226 Mont. 332, 337, 735 P.2d 516, 519; *In re Marriage of Sarsfield* (1983), 206 Mont. 397, 408, 671 P.2d 595, 601.

particularly its use of *ex parte* examinations as evidence against the accused. Second, the Court concluded that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the accused had had a prior opportunity to cross-examine him.

¶147 The Court then proceeded to discuss its case law, which "has been largely consistent with these two principles." *Crawford*, 541 U.S. at 57, 124 S.Ct. at 1367. One exception, the Court noted, was *White v. Illinois* (1992), 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848:

> One case arguably in tension with the rule requiring a prior opportunity for cross-examination when the proffered statement is testimonial is *White v. Illinois*, 502 U.S. 346 (1992), which involved, *inter alia*, statements of a child victim to an investigating police officer admitted as spontaneous declarations. It is questionable whether testimonial statements would ever have been admissible on that ground in 1791; to the extent the hearsay exception for spontaneous declarations existed at all, it required that the statements be made "immediat[ely] upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage." In any case, the only question presented in *White* was whether the Confrontation Clause imposed an unavailability requirement on the types of hearsay at issue. The holding did not address the question whether certain of the statements, because they were testimonial, had to be excluded *even if* the witness was unavailable. We "[took] as a given . . . that the testimony properly falls within the relevant hearsay exceptions."

*Crawford*, 541 U.S. at 58 n.8, 124 S.Ct. at 1368 n.8 (alterations in original) (citations omitted). Thus, the Court concluded, "[o]ur cases have . . . remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59, 124 S.Ct. at 1369.

¶148 However, while the results of the Court's decisions had generally been faithful to the original meaning of the Confrontation Clause, the same could not be said of the Court's rationales. *See Crawford*, 541 U.S. at 60, 124 S.Ct. at 1369. The Court noted that *Roberts* conditions the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." *See Crawford*, 541 U.S. at 60, 124 S.Ct. at 1369. Because this approach departed from the historical principles discussed above, the Court criticized the test in two respects. First, the test is too broad, as it applies "the same mode of analysis whether or not the hearsay consists of *ex parte* testimony." *Crawford*, 541 U.S. at 60, 124 S.Ct. at 1369. At the same time, the test is too narrow, in that it "admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability." *See Crawford*, 541 U.S. at 60, 124 S.Ct. at 1369. This "malleable standard," the Court explained, "often fails to protect against paradigmatic confrontation violations." *See Crawford*, 541 U.S. at 60, 124 S.Ct. at 1369.

¶149 Observing that "none of the [historical] authorities discussed above acknowledges any general reliability exception to the common-law [right of confrontation]," the Court expressed doubt that "the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' " *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370. The Court explained that

> [a]dmitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-

examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

The *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one. In this respect, it is very different from exceptions to the Confrontation Clause that make no claim to be a surrogate means of assessing reliability[--for example, the rule of forfeiture by wrongdoing].

*Crawford,* 541 U.S. at 61-62, 124 S.Ct. at 1370 (citations omitted).

¶150 It is noteworthy that the Court did not simply dismiss *Roberts* at this point as an aberration. Rather, the Court continued to lambast the *Roberts* test, focusing on its demonstrated inability to protect the right of confrontation. "The legacy of *Roberts* in other courts vindicates the Framers' wisdom in rejecting a general reliability exception [to the right of confrontation]." *Crawford*, 541 U.S. at 62, 124 S.Ct. at 1371. "Reliability is an amorphous, if not entirely subjective concept"; as a result, "[t]he [*Roberts*] framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations." *Crawford*, 541 U.S. at 63, 124 S.Ct. at 1371.

¶151 The Court then cited numerous examples of hearsay statements being admitted pursuant to *Roberts*. *Crawford*, 541 U.S. at 63-65, 124 S.Ct. at 1371-72. Of particular interest to the case at hand, the Colorado Supreme Court in one case[43] found a statement more reliable because it was given "immediately after" the events at issue, while that

---

[43] *People v. Farrell* (Colo. 2001), 34 P.3d 401, 407.

same court in another case[44] found a statement more reliable because two years had elapsed. *See Crawford*, 541 U.S. at 63, 124 S.Ct. at 1371. As these cases illustrate, the admission of hearsay statements pursuant to multi-factored reliability balancing tests is completely unpredictable--e.g., the passage of time makes a statement more reliable in one case and less reliable in another.

¶152 At this point it is necessary to digress from *Crawford.* As noted above, *Crawford* did not deal with the hearsay exception at issue here--the excited utterance exception; however, *White* did deal with this exception. Among other offenses, White was charged with and convicted of sexually assaulting a 4-year-old girl. The trial court ruled that testimony recounting the child's statements describing the crime, that was given by her babysitter, her mother, an investigating officer, an emergency room nurse, and a doctor, was admissible under the state-law hearsay exception for spontaneous declarations (and, with respect to the nurse and the doctor, also under the exception for statements made in the course of securing medical treatment). The child never testified, and the trial court made no finding as to her unavailability. White objected to the aforementioned testimony on hearsay grounds. *See White*, 502 U.S. at 349-51, 112 S.Ct. at 739-40.

¶153 The case worked its way to the United States Supreme Court on the issue of whether the Confrontation Clause requires that, before a trial court admits testimony

---

[44] *Stevens v. People* (Colo. 2001), 29 P.3d 305, 316.

under the "spontaneous declaration"[45] and "medical examination"[46] exceptions to the hearsay rule, the prosecution must either produce the declarant at trial or the trial court must find that the declarant is unavailable. *See White*, 501 U.S. at 348-49, 112 S.Ct. at 739. In affirming the admissibility of the hearsay evidence at issue, the Court relied on *Roberts* and *United States v. Inadi* (1986), 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390.[47]

¶154 Of particular relevance to the present discussion, the Court reiterated the evidentiary rationale for permitting hearsay testimony regarding spontaneous declarations and statements made in the course of receiving medical care, as follows: "such out-of-court declarations are made in contexts that provide *substantial guarantees of their trustworthiness*." *White*, 502 U.S. at 355, 112 S.Ct. at 742 (emphasis added). In this regard, the Court observed that these two hearsay exceptions were "firmly rooted"-- meaning they "carry sufficient indicia of reliability to satisfy the reliability requirement posed by the Confrontation Clause"--because they were long-standing exceptions, were recognized in the Federal Rules of Evidence, and were widely accepted among the States.

---

[45] The language of the spontaneous declaration exception at issue in *White* is identical to that of our excited utterance exception. *See* Rule 803(2), M.R.Evid.; *White*, 502 U.S. at 350 n.1, 112 S.Ct. at 740 n.1.

[46] The language of the medical examination exception at issue in *White* is very similar to that of our statements for purposes of medical diagnosis or treatment exception. *See* Rule 803(4), M.R.Evid.; *White*, 502 U.S. at 351 n.2, 112 S.Ct. at 740 n.2.

[47] As noted above (*see* note 9), the scope of *Roberts* was clarified in *Inadi*: "So understood, *Roberts* stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding." *White*, 502 U.S. at 354, 112 S.Ct. at 741 (citing *Inadi*, 475 U.S. at 394, 106 S.Ct. at 1125).

*See White*, 502 U.S. at 355 n.8, 112 S.Ct. at 742 n.8. Given that "a statement that qualifies for admission under a 'firmly rooted' hearsay exception is so trustworthy that adversarial testing can be expected to add little to its reliability," the Court ultimately declined to "exclud[e] from trial, under the aegis of the Confrontation Clause, evidence embraced within such exceptions to the hearsay rule as those for spontaneous declarations and statements made for medical treatment." *White*, 502 U.S. at 357, 112 S.Ct. at 743.

¶155 Returning now to *Crawford*, the Supreme Court soundly and specifically rejected each of the foregoing rationales on which the *White* Court relied in upholding testimony offered under the spontaneous declaration (excited utterance) and medical examination exceptions--i.e., that these two exceptions carry sufficient indicia of reliability in that they are "firmly rooted" and, therefore, that statements admitted pursuant to these exceptions are "so trustworthy that adversarial testing can be expected to add little to [their] reliability." It follows, therefore, that hearsay evidence grounded in the excited utterance exception is inadmissible (for the purpose of establishing the truth of the matter asserted) after *Crawford* for the simple reason that the Court rejected the underpinnings of that exception--guarantees of trustworthiness.

¶156 Restated, in *White* the Court observed that the admissibility of spontaneous declarations is grounded in the reliability of such statements and, in particular, their "substantial guarantees of trustworthiness." *See White*, 502 U.S. at 355 & n.8, 112 S.Ct. at 742 & n.8. Yet, as explained in *Crawford*, the Framers rejected a general reliability exception to the right of confrontation. *See Crawford*, 541 U.S. at 62, 124 S.Ct. at 1371. Thus, any argument that excited utterances should be admitted on the ground that they

113

bear "particularized guarantees of trustworthiness" or fall within a "firmly rooted hearsay exception" (the two ways in which an out-of-court statement may be deemed to have "adequate indicia of reliability" under *Roberts*, *see Crawford*, 541 U.S. at 42, 124 S.Ct. at 1359) was completely discredited in *Crawford*'s flat out rejection of this sort of approach and its overruling of the *Roberts* decision.

¶157   The majority agrees with this conclusion where *testimonial* statements are at issue, *see* ¶ 31 ("*Crawford* does disallow the use of hearsay exceptions based on indicia of reliability as the basis to admit hearsay statements . . . in the context of testimonial statements."); but, with respect to *nontestimonial* statements, the majority claims that this dissent "paints with too broad a brush" because "*Crawford* does not expressly or impliedly supersede the rules of evidence as they relate to nontestimonial evidence," ¶ 31. The majority reads *Crawford* too narrowly.

¶158   First, *prior* to setting forth the concept of a "testimonial" approach to the right of confrontation, the Court expressly severed Confrontation Clause analysis from the law of evidence, which had been the approach under *Roberts*. *See Crawford*, 541 U.S. at 50-51, 124 S.Ct. at 1364 ("[W]e once again reject the view . . . that [the Confrontation Clause's] application to out-of-court statements introduced at trial depends upon 'the law of Evidence for the time being.' Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices.") (citations omitted).  Thus, if we accept that the right of confrontation applies to both testimonial and nontestimonial statements--which the majority, in a moment of lucidity, does, *see* ¶¶ 32-34 (subjecting Debra's statements to

114

Grove to federal Confrontation Clause scrutiny after concluding that those statements are nontestimonial)--then the majority is incorrect in its assertion that *Crawford* "does not . . . supersede the rules of evidence as they relate to nontestimonial evidence."

¶159 Second, as support for the proposition that "*Crawford* does not expressly or impliedly supersede the rules of evidence as they relate to nontestimonial evidence," ¶ 31, the majority quotes the following statement from *Crawford*: "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law--as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether," *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374. *See* ¶ 31. It is not clear from this language whether the Court is in fact affording the States such flexibility and suggesting two possible approaches--*Roberts*, or exempting nontestimonial statements from Confrontation Clause scrutiny altogether--or whether such flexibility is the inevitable result of the *Crawford* holding to be made explicit in a subsequent opinion.

¶160 The majority concludes that the language carries even more weight--specifically, that it *requires* courts to continue analyzing nontestimonial hearsay "pursuant to the *Roberts* reliability standard" until the Supreme Court "expressly overrule[s] *Roberts*." ¶ 31. *See also* ¶ 32. Contrary to the majority's interpretation, however, a careful reading of the sentence reveals only that *Roberts* "afford[s] the States flexibility in their development of hearsay law." This is not an admonition that "nontestimonial hearsay [be] analyzed pursuant to the *Roberts* reliability standard." ¶ 31. Rather, the most that can be gleaned from the Court's language is that it was *not deciding* what approach is

115

mandated by the Confrontation Clause with respect to nontestimonial statements. More informative in this regard is the Court's suggestion elsewhere in the *Crawford* opinion that *Roberts* actually does *not* apply to such hearsay. Specifically, the Court stated that its analysis (in *Crawford*) "casts doubt" on the first holding of *White*, which was that the Confrontation Clause (and, thus, the *Roberts* framework itself which, at the time of *White*, was the accepted method of reviewing Confrontation Clause challenges) applies to *all* hearsay, whether testimonial or nontestimonial. *See Crawford*, 541 U.S. at 61, 124 S.Ct. at 1369-70; *White*, 502 U.S. at 352-53, 112 S.Ct. at 740-41. In other words, it appears that the federal right of confrontation may not reach nontestimonial statements.

¶161 Until the Supreme Court makes such a limitation explicit, however, it is appropriate to continue applying the Clause to nontestimonial statements. As noted above, the majority does so, *see* ¶¶ 32-34; however, it errs in defaulting--or, perhaps more accurately, regressing--to the *Roberts* framework, *see* ¶¶ 31-33. The purported basis for its decision to do so is the following quote from *Agostini v. Felton* (1997), 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391: "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions," 521 U.S. at 237, 117 S.Ct. at 2017 (alteration in original) (internal quotation marks omitted). *See* ¶ 31. Applying this directive, however, first requires a determination of whether *Roberts* "has direct application in" or "directly controls" this case. It seems, therefore, that the majority has

assumed the very conclusion it seeks to prove with the foregoing citation--i.e., that *Roberts* applies to nontestimonial statements.

¶162  Furthermore, *Roberts* does not "appear[] to rest on reasons rejected in some other line of decisions"; rather, *Roberts itself* was rejected, and in the *same* line of Confrontation Clause decisions.  Thus, the majority's assertion that *Roberts* applies to Debra's purportedly nontestimonial statements only begs the question why *Roberts* is an adequate safeguard of the right of confrontation where nontestimonial statements are at issue, but not where testimonial statements are at issue.  The *Roberts* test does not somehow become less "unpredictable," "subjective," and "amorphous," *Crawford*, 541 U.S. at 63, 124 S.Ct. at 1371, and its standards do not somehow become less "[v]ague" and "manipulable," *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1373, simply because the statements at issue are nontestimonial.  As such, it defies logic to affirm that nontestimonial statements are subject to federal Confrontation Clause analysis but then to apply to such statements the very framework the Supreme Court rejected in *Crawford* as an inadequate safeguard of that right.  To be intellectually honest in its analysis, the majority should simply concede that, in its view, nontestimonial hearsay statements are exempted from federal Confrontation Clause analysis altogether--an alternative arguably authorized by *Crawford*, as explained above; *see also Flores v. State* (Tex.App. Amarillo 2005), 170 S.W.3d 722, 725 & n.1, and cases cited therein--and that Debra's statements were properly admitted because, in the majority's view, they met the requirements of a recognized hearsay exception.

¶163   I do not mean to suggest that I am advocating such a result.  To the contrary, rather than exempting nontestimonial statements from Confrontation Clause analysis or applying the *Roberts* framework to such statements, I believe the proper approach is to assess the hearsay exception at issue--in this case, the excited utterance exception--in the context of, and with due respect for, *Crawford*'s discussion of the failings of *Roberts*.  In other words, if the basis for our not subjecting nontestimonial hearsay statements to cross-examination at trial is that we feel satisfied that the statements are sufficiently reliable and trustworthy under a *Roberts*-type of multi-factored balancing--which is, in fact, the current state of affairs--then the time has come to reexamine our comfort level with this unpredictable approach, the failings of which *Crawford* (and the cases to which the Court cites in Parts V.B. and V.C. of its opinion) makes amply apparent.  *See Crawford*, 541 U.S. at 63-67, 124 S.Ct. at 1371-73.  As the Court explained, the Confrontation Clause "reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about *how reliability can best be determined*." *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370 (emphasis added).  As the legacy of *Roberts* demonstrates, leaving reliability determinations to judges who perform open-ended balancing tests rather than to fact-finders who observe a witness's demeanor, body language, etc., under the rigors of cross-examination renders the right of confrontation bereft of any substance.

¶164   This approach is not contrary to *Crawford*.  It is true that the statements at issue in that case were not nontestimonial, *see Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370 ("Sylvia Crawford's statement is testimonial under any definition"), but that does not

118

mean that the rationales and reasoning of the *Crawford* opinion cannot be applied beyond the specific facts of that case. Moreover, the Court itself took the same approach with respect to the hearsay exceptions for business records and for statements in furtherance of a conspiracy, which it noted "covered statements that *by their nature* were not testimonial." *Crawford*, 541 U.S. at 56, 124 S.Ct. at 1367 (emphasis added). In other words, the specific requirements of these particular hearsay exceptions meant that most statements within them would not meet the definition of testimonial. *See* Mosteller, *Encouraging and Ensuring*, at 547.

¶165 Similarly, I maintain that if the rationales and requirements for admitting testimony (in a criminal trial to establish the truth of the matter asserted) pursuant to a particular hearsay exception are the same as those for which *Crawford* expressed unequivocal contempt when it comes to protecting an accused's right to confront the witnesses against him--i.e., that the out-of-court statements were "made in contexts that provide substantial guarantees of their trustworthiness," *White*, 502 U.S. at 355, 112 S.Ct. at 742, and that "adversarial testing can be expected to add little to [the statements'] reliability," *White*, 502 U.S. at 357, 112 S.Ct. at 743--then the exception cannot stand.

¶166 In sum, the Confrontation Clause's "ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370. *Roberts*' multi-factored balancing approach substitutes an "amorphous" and "subjective" reliability test for this "constitutionally prescribed method of assessing reliability,"

119

*Crawford*, 541 U.S. at 62, 63, 124 S.Ct. at 1370, 1371; it incorporates a "malleable standard" which "often fails to protect against paradigmatic confrontation violations," *Crawford*, 541 U.S. at 60, 124 S.Ct. at 1369; it establishes a general reliability exception not recognized in the common-law right of confrontation; and, in so doing, it departs from the historical principles on which the Confrontation Clause is grounded.

¶167   For these reasons, *Roberts*' multi-factored balancing approach must be rejected as a safeguard of an accused's right of confrontation; and statements admitted pursuant to the excited utterance hearsay exception--because they depend for their admission on the same notions of reliability that underlie the *Roberts* framework--must be barred at trial, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine her.  The facts of the case at bar prove the legitimacy of the concerns articulated by the *Crawford* Court.  It is to that aspect of this case that I now turn.

¶168   At the outset, it is important to note that the evidence that Mizenko had assaulted Debra was disputed; in other words, this is not a case where the evidence of the assault was uncontradicted.  Furthermore, the State relied almost entirely (particularly regarding the identity of the perpetrator of Debra's injuries) on Grove's, King's, and Buennemeyer's testimony, which repeated Debra's hearsay statements accusing Mizenko of the assault.  Indeed, the prosecutor summed up the case as follows:  "So given all the evidence, I told you it's a simple case.  It is.  If you believe *what [Debra] told people that night*, you need to find him guilty.  Thank you."  (Emphasis added.)  In addition, Deputy Buennemeyer conceded that other than what he had heard from Debra and from the dispatcher (hearsay within hearsay), he could not tell whether the hair which was entered

120

in evidence came from Debra brushing her hair (as testified to by Mizenko) or from being pulled out.

¶169 Thus, the hearsay statements supported the State's theory of the crime, and that was the only reason they were offered--as evidence of Mizenko's commission of the facts proving he assaulted Debra. That theory was disputed not only by Mizenko (who claimed that there was no physical assault, only a verbal argument) but also by Debra, who had changed her story and had so informed the prosecutor in writing prior to the commencement of the trial. *See* note 5, *supra*.[48]

¶170 This is a perfect example of why "the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas* (1965), 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923. It is why "[c]ross-examination is the hallmark of our system of justice"--"it produces truth" through "[s]uch things as the demeanor of a witness, his or her body language, and a witness's hesitancy in giving testimony, [which] often communicate as much to the fact-finder as the spoken words." *State v. Clark*, 1998 MT 221, ¶ 23, 290 Mont. 479, ¶ 23, 964 P.2d 766, ¶ 23. It is why in Montana the accused has the fundamental constitutional right to confront his accuser "face to face." Art. II, Sec. 24, Mont. Const. It is why the constitutionally prescribed method of assessing the reliability of hearsay evidence is not a multi-factored, open-ended balancing test, but

---

[48] According to the record, the jury asked during deliberations to see the letter Debra had written to the prosecutor stating that Mizenko had not injured her in any way. The jury also asked why the letter was not entered in evidence. Without objection by counsel, the trial court denied the jury's request and stated that it could not answer the second question.

rather confrontation and cross-examination. *See Crawford*, 541 U.S. at 61-62, 124 S.Ct. at 1370.

¶171 Nevertheless, the District Court admitted Debra's statements through Grove, King, and Buennemeyer under the excited utterance exception. In affirming this ruling, the majority relies in part on *State v. Cameron*, 2005 MT 32, 326 Mont. 51, 106 P.3d 1189 (*see* ¶ 33); but *Cameron* actually demonstrates why admitting hearsay statements on the basis of their "reliability" and "trustworthiness" was soundly rejected in *Crawford*.

¶172 In *Cameron*, the trial record was silent as to why the prosecutor offered the victim's statement and as to why the court admitted it. *Cameron*, ¶ 31. On appeal, the State came up with the theory that the victim's statement had been an excited utterance. We[49] agreed and affirmed the District Court for reaching the right result, though for an unspecified reason. *See Cameron*, ¶¶ 31-35, 37.

¶173 Historically, the excited utterance exception admitted statements made "*immediat[ely]* upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage." *Crawford*, 541 U.S. at 58 n.8, 124 S.Ct. at 1368 n.8 (alterations in original) (emphasis added) (internal quotation marks omitted). *See also State v. Hamby*, 1999 MT 319, ¶ 26, 297 Mont. 274, ¶ 26, 992 P.2d 1266, ¶ 26 ("[T]he excited utterance exception relies on the *spontaneity* of the statement caused by the excitement of the event.") (emphasis added); *State v. Caryl* (1975), 168 Mont. 414, 431, 543 P.2d 389, 398 ("Declarations made while the mind of the speaker is laboring

---

[49] I did not sit on this case.

under the excitement aroused by the accident, *before there was time to reflect and fabricate, . . . .*") (emphasis added); 6 Wigmore, Evidence § 1749, at 199 (Chadbourn rev. 1976) ("The utterance, it is commonly said, must be 'spontaneous,' 'natural,' 'impulsive,' 'instinctive,' 'generated by an excited feeling which extends without let or breakdown from the moment of the event they illustrate.' ").

¶174   For instance, in *In re S.M.*, 2001 MT 11, 304 Mont. 102, 19 P.3d 213, we affirmed the admission of a five-year-old declarant's hearsay statement (that she was frightened upon seeing her abuser) because the statement "related to a startling event--suddenly being confronted by [her abuser]," *S.M.*, ¶ 24; and she made it "*upon* seeing" her abuser, *S.M.*, ¶ 24 (emphasis added), "*while* she was perceiving [the] startling event and *while* she was under the stress of the excitement caused by that event," *S.M.*, ¶ 22 (emphases added), and "*before [she] had time to reflect*," *S.M.*, ¶ 24 (emphasis added).  (We also found the statement to be admissible under the present sense impression and the then-existing mental, emotional, or physical condition exceptions.  *See S.M.*, ¶¶ 23-24.)  By contrast, the *Cameron* Court determined that a statement made *an hour or two* after an alleged assault qualified as an excited utterance.  This conclusion was justified by "[f]urther circumstances," which the Court deemed "relevant to resolution of this issue"--in particular, the declarant "wept from the moment she left [the defendant's trailer] until well after she uttered the hearsay statement," and, as she arrived home, the declarant "showed no sign of diminished excitement."  *Cameron*, ¶ 34.

¶175   While these "[f]urther circumstances" may indeed suggest that the declarant was "still laboring under the stress of excitement caused by the attack," *Cameron*, ¶ 34, they

123

cannot be allowed to eclipse the crucial factor respecting the trustworthiness of excited utterances: time to reflect and fabricate. After the alleged attack, the declarant "had to travel roughly eight miles on foot" for "an hour or two." *Cameron*, ¶ 33. To assert that her capacity to reflect on the attack was stilled during this entire walk/run is disingenuous. Undoubtedly, she was upset during this period, but this fact does not establish that her statements were in fact free of conscious fabrication.

¶176 The Court also cited with approval various excited utterance cases from other jurisdictions that allowed statements made "up to three and a half hours," "two to three hours," "hours," and "one to several hours" after the respective incidents. *See Cameron*, ¶ 36. Yet, this only further illustrates the Court's either/or approach to excited utterances: an excited utterance is trustworthy if the statement was made *either* while the mind of the speaker is laboring under the excitement aroused by the accident *or* before there was time to reflect and fabricate. Contrary to *Cameron*, however, these two requirements are conjunctive, not disjunctive. *See Hamby*, ¶ 26; *Caryl*, 168 Mont. at 431, 543 P.2d at 398. As a result, *Cameron* cuts the excited utterance exception loose from its moorings.[50]

---

[50] Notably, the Supreme Court in *Crawford* suggested that the excited utterance exception has been distorted beyond recognition, due in particular to the relaxation of the spontaneity requirement. Referring to the "spontaneous declarations" admitted by the trial court in *White*--the declarant's statement to her babysitter within a minute or two of the startling event, to her mother 30 minutes after the startling event, to the investigating officer roughly 45 minutes after the startling event, and to an emergency room nurse and a doctor approximately four hours after the startling event, *see White*, 502 U.S. 349-50, 112 S.Ct. at 739--the Court stated that "to the extent the hearsay exception for spontaneous declarations existed at all [in 1791], it required that the statements be made 'immediat[ely] upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage.' " *Crawford*, 541 U.S. at 58 n.8, 124 S.Ct. at 1368 n.8 (second and third alterations in original).

¶177 The fact is that there is nothing "immediate" or "spontaneous" about the statements made in *Cameron* and in the cases on which it relies, and the same is true of the case at bar. As described above, Grove testified that she observed the Mizenkos arrive by car at their home at approximately 4:00 P.M. and that at approximately 5:00 P.M., Debra appeared at her door, with a large dog, "visibly upset" and with a wound on her cheek or jaw. Grove had no recollection of Debra crying. Grove testified that "[Debra] asked me to call 911, and Carol Richard, she said that her husband had been drinking and was trying to hurt her." The majority finds it sufficient that these statements to Grove were made "a short time" after the startling event, ¶ 34; however, the record establishes that the alleged assault occurred *up to 60 minutes* prior to Debra's statements to Grove, and there is no evidence that Debra's capacity for reflection was stilled during this entire time. 911 operator King, for her part, testified that the person with whom she spoke "said that [Mizenko] hit her, pushed her down and . . . had pullen [sic] out her hair," and that "[s]he wanted him arrested." This "excited utterance" testimony was relayed to King at about 5:30 P.M. And Buennemeyer recounted Debra's "excited utterances" that had occurred even later still and included her taking the deputy around the home and "excited[ly]" pointing out evidence of the alleged assault. By this time, however, Debra clearly had had plenty of time to "devise or contrive" her statements. I do not mean to suggest that she--or the declarant in *Cameron*, for that matter--in fact did so. Indeed, whether or not Debra contrived her statements is something that should have been probed *by Mizenko* while Debra was under oath and subject to cross-examination. It

125

is not for the District Judge or for this Court to make the determination that Debra's statements were not contrived, which is the point of this discussion.

¶178 Thus, Debra's statements were not "excited utterances," at least not within the meaning historically--and logically--ascribed to that term. Nevertheless, the majority claims otherwise, explaining that "a lapse of time is not determinative of whether [the stress of excitement caused by a startling event] has subsided." ¶ 33. This explanation misses the point; the question is not whether, at the time she made the statements to Grove, sufficient time had elapsed such that Debra no longer labored under the stress of excitement caused by the startling event (the alleged assault), but rather whether Debra's capacity for reflection was stilled during the entire period between the startling event and the making of the statements, such that the statements were "made under the immediate and uncontrolled domination of the senses [by the stress of nervous excitement], and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection." 6 Wigmore, Evidence § 1747, at 195 (Chadbourn rev. 1976). While Debra and the victim in *Cameron* may have been upset, there is no evidence that they did not engage in reflective thought prior to making the statements at issue; clearly, they each had ample time to do so. *Cameron* was wrongly decided.

¶179 Be that as it may, the point to be made is this: different courts--and even different judges on the same court (as the foregoing discussions of *Cameron* and the case at hand illustrate)--often reach different reliability determinations on the same facts. This is the inevitable result of admitting hearsay testimony pursuant to an unpredictable reliability test. "Reliability is an amorphous, if not entirely subjective, concept. There are countless

126

factors bearing on whether a statement is reliable." *Crawford*, 541 U.S. at 63, 124 S.Ct. at 1371. The right of confrontation cannot be left to the vagaries of such a system.

¶180 All of Debra's statements were admitted under a hearsay exception, the underpinnings of which--reliability and trustworthiness balancing--the Supreme Court condemned in *Crawford*. Mizenko was denied his fundamental right to a fair trial because the State was allowed to build its case on hearsay evidence that was not tested "in the crucible of cross-examination" and by "the adversary process," but rather was based on "a mere judicial determination of reliability." *Crawford*, 541 U.S. at 61, 62, 124 S.Ct. at 1370. Because the District Court dispensed with confrontation on the premise that the excited utterance testimony was obviously reliable, the court effectively dispensed with the trial because Mizenko was obviously guilty. *See Crawford*, 541 U.S. at 62, 124 S.Ct. at 1371 ("Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty.").

¶181 Indeed, in summarily denying Mizenko's motion to dismiss, the District Court actually did find the defendant guilty. Specifically, the judge stated:

> *The Court would find that there is proof beyond a reasonable doubt that there was an injury that she suffered and that the Defendant did it.* Obviously, when a victim does not appear, you are unable to confront her, but you certainly questioned those people who had contact with her, and whether you planted that out in a juror's mind. So the Court finds there is a basis for the matter to proceed. We will deny the motion and we will send the case to the jury. [Emphasis added.]

Mizenko had not even put on his case, yet the court had already found him guilty on the basis of "reliable" and "trustworthy" excited utterances that had not been subjected to any adversarial testing whatsoever. And, to add insult to injury, the judge's observation that

127

Mizenko "certainly questioned those people who had contact with [Debra]" is about as reassuring as telling Raleigh that he was "perfectly free to confront those who read Cobham's confession in court." *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364. "This is not what the Sixth Amendment prescribes." *Crawford*, 541 U.S. at 62, 124 S.Ct. at 1371. Nor does Article II, Section 24, of the Montana Constitution.

### III. Conclusion

¶182 Except for the photograph of the slight bruise on Debra's chin, the entirety of the State's case was based on out-of-court statements which were testimonial. Conveniently, Debra's contrary statements contained in her notarized letter to the prosecutor were kept from the jury (despite the jurors' request to include those statements in their deliberations). Because Mizenko did not at any time have an opportunity to cross-examine Debra as to her statements to Grove, King, and Buennemeyer, and because Debra was not "unavailable" for trial, the statements should not have been admitted.

¶183 Furthermore, Debra's statements were admitted pursuant to a hearsay exception under which the trustworthiness of her statements was assessed by a judge performing a multi-factored, open-ended balancing test (à la the *Roberts* framework). The Supreme Court, however, condemned this malleable approach, grounded in amorphous notions of "reliability," in *Crawford*. Thus, testimony proffered by the prosecution pursuant to hearsay exceptions that owe their existence to that same malleable standard--such as the excited utterance exception--must be rejected, unless the declarant is unavailable in the legal sense and there was a prior opportunity for cross-examination by the defendant. For this reason as well, Debra's out-of-court statements should not have been admitted.

128

¶184 Instead, Mizenko was denied his right to confront his accuser face to face and to cross-examine the State's primary witness because the State did nothing to ensure her presence at trial. Mizenko was convicted on hearsay testimony that was untested in the crucible of cross-examination and by the adversary process. He was convicted on evidence, the reliability of which was based on a judicial determination and which the Confrontation Clause of the Sixth Amendment and Article II, Section 24, were meant to exclude.

¶185 Seeking to justify the District Court's denial of Mizenko's right of confrontation in a trial which took place pre-*Crawford*,[51] the majority signals its approval of similar violations in post-*Crawford* trials. Yet, it is entirely plausible that if Mizenko's trial had taken place post-*Crawford*, the prosecutor would have made greater efforts to procure the attendance of Debra at trial or to provide Mizenko with an opportunity to cross-examine her hearsay statements during a pre-trial proceeding, such as a deposition or a preliminary hearing. For this reason, we should not decide *Crawford* challenges with a backward-looking perspective, seeking to uphold convictions based on inadmissible testimonial statements because the prosecutors and District Judges in those cases followed a set of practices designed to meet a different standard. *See* Mosteller, *Encouraging and Ensuring*, at 517.[52] By doing so, the majority countenances the continued use of such

---

[51] *Crawford* was decided March 8, 2004. Mizenko's trial was held February 3, 2004.

[52] "The current period of transition between systems is particularly fraught with the danger that confrontation will be unnecessarily limited because of a backward-looking concern for *Crawford*'s impact on the cases that have already been tried but are on direct review and where 'retroactivity' rules clearly make the opinion applicable. These cases put pressure on the lower appellate courts to narrow the definition of testimonial, to expand exceptions to preserve

statements and unconstitutional procedures in post-*Crawford* trials. We have previously held that new rules of constitutional criminal procedure apply to all cases which are on direct appeal at the time the new rule is announced. *See State v. Carter*, 2005 MT 87, ¶ 18, 326 Mont. 427, ¶ 18, 114 P.3d 1001, ¶ 18. To be faithful to this principle, we must decide this case unimpeded by the fact that the prosecutor and the District Judge were not aware of *Crawford*'s mandates at the time of Mizenko's trial. Based upon the foregoing analysis, I would reverse Mizenko's conviction and remand this case to the District Court for retrial with instructions that the hearsay statements at issue here be excluded, unless Debra is "unavailable" for trial and Mizenko is given a prior opportunity to cross-examine her.

¶186 Justice Warner's concurrence, though well-intentioned, is fundamentally flawed for four reasons. First, my colleague makes much of the interests of crime victims, stating that the dissent "fails to give sufficient consideration" to those interests. Yet, he cites no constitutional provision guaranteeing a victim the right not to testify against the accused. Indeed, the constitutional provisions at issue here--and in criminal cases generally--are restraints on the power of the State in its prosecutions of crimes. As such, they are safeguards afforded *persons accused of crimes*. While it is a hard and often bitter reality, the Constitution does not confer upon victims of crimes any explicit rights;

---

convictions, or both. This is true even though, had the more exacting requirements been known earlier, confrontation could often have been provided and the evidence introduced. Also, a host of prosecutorial actions could have been taken either to admit alternative evidence or to avoid creating or admitting evidence that violates the Confrontation Clause." Mosteller, *Encouraging and Ensuring*, at 517 (footnote omitted).

at the very least, it cannot be said that the Constitution guarantees victims the right to "victimless" prosecutions based on hearsay testimony (*see* note 1, *supra*). To be sure, crime victims justifiably deserve the support and protection of the government, and the Legislature accordingly has provided them with a number of statutory rights. *See*, *e.g.*, Title 46, Chapter 24, Montana Code Annotated (Treatment of Victims and Witnesses); Title 46, Chapter 6, Part 6, Montana Code Annotated (Domestic Violence Provisions); § 46-18-236, MCA (funding of services to crime victims). However, these statutory rights may not supersede the constitutional protections guaranteed to persons prosecuted for criminal offenses.

¶187  Second, the concurrence states that "an accused must not be allowed to hide behind the Constitution by intimidating witnesses." Obviously, if the accused has, in fact, intimidated a witness, that conduct in and of itself constitutes a crime. *See* § 45-7-206, MCA. The Constitution and the Confrontation Clause do not prevent the accused from being charged with and prosecuted for such criminal conduct. Moreover, in such circumstances, the rule of forfeiture by wrongdoing would extinguish any confrontation claim he might raise. *See Crawford*, 541 U.S. at 62, 124 S.Ct. at 1370 (One exception to the Confrontation Clause, "the rule of forfeiture by wrongdoing (which we accept)[,] extinguishes confrontation claims on essentially equitable grounds."). More to the point, however, the accused *is* allowed to "hide behind" the Constitution--or, more properly, he *is* allowed to exercise his constitutional rights. That is precisely why such rights were enshrined in the Constitution. In point of fact, the accused *is* guaranteed the right to "hide behind" the Fourth Amendment to the Federal Constitution and Article II, Sections 10

131

and 11, of the Montana Constitution if he is the subject of an unreasonable search and seizure; he *is* guaranteed the right to "hide behind" the Fifth Amendment and Article II, Section 25, if he is compelled to incriminate himself; he *is* guaranteed the right to "hide behind" the Sixth Amendment and Article II, Section 24, if he is deprived of his right to the effective assistance of counsel; and he, most certainly, *is* guaranteed the right to "hide behind" the Sixth Amendment and Article II, Section 24, if he is denied his right to confront his accusers. These protections are not subject to exception simply because we believe the defendant is a bad guy or because we feel compassion for the victim.

¶188 Third, the concurrence rallies behind law enforcement and prosecutors. Again, the reality is that law enforcement and prosecutors are in the business of obtaining convictions through the criminal justice system. That is properly their job, and I take no issue with that, contrary to the concurrence's implication. However, our job is to uphold the law and the Constitution. And there is the rub. To the extent that this Court, or any other court, punches loopholes of convenience in the constitutional rights of persons accused of crimes, we must expect that those loopholes will be utilized by professionals in the competitive enterprise of ferreting out and prosecuting crime. To believe otherwise is pure naiveté. As demonstrated above, law enforcement and prosecutors already are conducting "victimless" prosecutions and are modifying their evidence-gathering techniques to avoid the impact of *Crawford*. *See* notes 1 & 2, *supra*. That is why this case is before us. It is simply a fact of life: "If the courts allow it, they will come."

¶189 And that brings me to my fourth and final point. There runs through the concurrence the theme that "the ends justify the means." Domestic abuse is a very bad

132

thing, so it is acceptable to maintain prosecutions "if witnesses, for whatever reason, do not appear at trial," as the concurring Justice puts it. While currently popular among many elected officials, this mindset is precisely what our federal and state constitutions were written to prohibit. It is remarkably easy to justify ignoring a person's constitutional rights when there is a perceived "greater good" to be served. Facile arguments can always be advanced to obviate applying the law and upholding the Constitution in challenging, disgusting, and sometimes heartbreaking circumstances. This approach, however, rings hollow. If we are to be a State and nation truly committed to the rule of law, then our constitutions must continue to serve as a shield against this philosophy of expedience.

¶190 No doubt, victim advocates, law enforcement, prosecutors, and others will consider the majority opinion a great victory in the battle against domestic abuse and assault. Unfortunately, however, when this Court diminishes the fundamental constitutional rights of any given defendant, it concomitantly diminishes those same rights for every other person in this State. I am deeply sympathetic with the problem of domestic abuse and those who suffer from it; yet, denying to those accused of these crimes one of the most fundamental and cherished of our constitutional rights--the right to confront and cross-examine one's accuser face to face--is not the answer, particularly since the right of confrontation and the prosecutorial use of a victim's out-of-court statements are not incompatible. *See* Mosteller, *Encouraging and Ensuring*, at 520 (As to declarants "such as domestic violence victims who frequently become unavailable or uncooperative at trial, the [confrontation] right and admissibility may both be met by

greater efforts to afford confrontation at early adversarial hearings, such as preliminary examinations and depositions."); Mosteller, *Encouraging and Ensuring*, at 610 ("In domestic violence cases, instead of the prosecution attempting to secure more victim testimony, another approach is likely to be more effective. This approach creates opportunities for testimony by the victim at the outset of the prosecution, when she may be a more willing witness, with a right of cross-examination by the defendant."). By continuing to riddle the right of confrontation with broad, yet "reliable," hearsay exceptions, such that the right in effect applies only when the declarant actually shows up for trial, we reduce the protection to a "hollow formalism," *United States v. Owens* (1988), 484 U.S. 554, 572, 108 S.Ct. 838, 849, 98 L.Ed.2d 951 (Brennan, J., dissenting).

¶191 The majority dismisses this dissent as "jousting with windmills." ¶ 29. While that may be, it is interesting to note that these same concerns are presently before the United States Supreme Court, which has granted petitions for a writ of certiorari in *State v. Davis* (Wash. 2005), 111 P.3d 844 (in which a majority of the Washington Supreme Court concluded that there was no evidence the declarant had been subjectively motivated by a desire to bear witness in contemplation of legal proceedings when she called 911), *cert. granted*, 74 U.S.L.W. 3265, 74 U.S.L.W. 3272 (U.S. Oct. 31, 2005) (No. 05-5224); and *Hammon v. State* (Ind. 2005), 829 N.E.2d 444 (in which the Indiana Supreme Court concluded that whether a statement from a declarant to a police officer is testimonial will hinge upon the intent of the declarant in making the statement and the purpose for which the police officer elicited the statement), *cert. granted*, 74 U.S.L.W. 3265, 74 U.S.L.W.

3272 (U.S. Oct. 31, 2005) (No. 05-5705).[53]  Hopefully, the Montana Appellate Defender and the criminal defense bar will seek review of this case before that Court as well.  In the mean time, where defense of the fundamental right of confrontation is concerned, call me Don Quixote.

¶192   I dissent.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter joins in the dissent of Justice James C. Nelson.

/S/ PATRICIA O. COTTER

Justice Patricia O. Cotter dissents.

¶193   I join in the foregoing dissent.  I write to add that I *did* participate as a member of the majority in *Cameron*.  See, ¶¶ 171-179.  Having now received the benefit of Justice Nelson's exhaustive analysis on the subject of *Crawford* and the excited utterance exception to the hearsay rule, I agree with his conclusion that *Cameron* was wrongly decided.

---

[53]   The questions presented in *Davis* and *Hammon*, respectively, are "[w]hether an alleged victim's statements to a 911 operator naming her assailant - admitted as 'excited utterances' under a jurisdiction's hearsay law - constitute 'testimonial' statements subject to the Confrontation Clause restrictions enunciated in *Crawford v. Washington*, 541 U.S. 36 (2004)," and "[w]hether an oral accusation made to an investigating officer at the scene of an alleged crime is a testimonial statement within the meaning of *Crawford v. Washington*, 541 U.S. 36 (2004)." (Obtained from the Supreme Court's online docket, at http://www.supremecourtus.gov/docket/docket.html.)

/S/ PATRICIA O. COTTER